# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| TONY SHEN, derivatively on behalf of NANTHEALTH, INC.,<br><br>    Plaintiff,<br><br>    vs.<br><br>PATRICK SOON-SHIONG, PAUL HOLT, MICHAEL S. SITRICK, KIRK K. CALHOUN, MARK BURNETT, EDWARD MILLER, and MICHAEL BLASZYK,<br><br>    Defendants,<br><br>    and<br><br>NANTHEALTH, INC.,<br><br>    Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Tony Shen ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant NantHealth, Inc. ("NantHealth" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Patrick Soon-Shiong, Paul Holt, Michael S. Sitrick, Kirk K. Calhoun, Mark Burnett, Edward Miller, and Michael Blaszyk (collectively, the "Individual Defendants" and together with NantHealth, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of NantHealth, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys,

which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NantHealth, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by NantHealth's directors and officers from June 1, 2016 through the present (the "Relevant Period").

2.      NantHealth provides genome analysis and gene sequencing software, including a service called "GPS Cancer Solution."[1]

3.      Between November 2014 and January 2015, the University of Utah (or, the "University") and certain entities owned by Defendant Patrick Soon-Shiong ("Soon-Shiong") entered into a series of agreements pursuant to which three non-profit entities owned by Defendant Soon-Shiong donated $12 million to the University, and the University awarded the Company a $10 million contract to perform research services for the University.

4.      Before receiving the donation from the Company, and hidden from the investing public, the University of Utah entered into a memorandum of understanding in September 2014 with the entities Defendant Soon-Shiong controlled (the "MOU"), which essentially guaranteed that the University of Utah would choose the Company to perform the research services.

---

[1] GPS, in this instance, stands for Genomic Proteomic Spectrometry.

5.      After the execution of the MOU, and also in September 2014, the University of Utah and three non-profit entities controlled by Defendant Soon-Shiong executed an agreement under which the controlled entities donated $12 million to the University of Utah (the "Donation Agreement"). The Donation Agreement did not reference the MOU and was executed by Defendant Soon-Shiong as CEO of the non-profits.

6.      In January 2015, the University of Utah and the Company entered into an agreement for NantHealth to provide research services to the University in connection with a project dubbed the "Heritage 1K Project" (the "Heritage Service Agreement," and together with the MOU and the Donation Agreement, the "Soon-Shiong/University Agreements").

7.      Following the execution of the Soon-Shiong/University Agreements, the Company went public via an initial public offering that offered NantHealth common stock for $14 a share (the "IPO"). NantHealth ultimately raised approximately $91 million through the IPO.

8.      In connection with the IPO, the Company filed a prospectus and registration statement with the SEC (the "Offering Materials"). The Offering Materials contained false and misleading statements regarding the Company's business operations and prospects, including its "GPS Cancer Solution" service ("GPS Cancer") and the Company's relationship with the University of Utah.

9.      The Offering Materials misleadingly stated that the University of Utah was not obligated to retain the Company and pay it for research services, creating the illusion that the University of Utah independently chose the Company as the most qualified to perform the research.

10.      The Individual Defendants caused the Company to make, and several of the Individual Defendants themselves personally made, false and misleading statements during the

Relevant period that perpetuated the false and misleading statements made in the Offering Materials and misrepresented the commercial demand for GPS Cancer.

11.     The truth regarding the Company's relationship with the University of Utah and demand for GPS Cancer slowly emerged during the Relevant Period, beginning on November 7, 2016. In response to many of the partial disclosures, the price of the Company's securities decreased, closing at $2.98 per share on May 1, 2017, a 78.7%, or $11.02, decrease from the IPO price.

12.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

13.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to NantHealth, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had failed to maintain internal controls; and (6) as a result of the foregoing, statements about the Company's

business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

14.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

15.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

16.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer ("CEO"), the Company's Chief Financial Officer ("CFO"), all of the current members of the Company's Board of Directors (the "Board"), and one former member of its Board to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of all of them in the Securities Class Action, and of their not being

disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act of 1933 ("Securities Act") and the Exchange Act.

20.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.    Venue is proper in this District because NantHealth is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23.    Plaintiff is a current shareholder of NantHealth. Plaintiff has continuously held NantHealth common stock at all relevant times.

**Nominal Defendant NantHealth**

24.     NantHealth is a Delaware corporation with its principal executive offices at 9920 Jefferson Boulevard, Culver City, California, 90232. NantHealth's shares trade on the NASDAQ under the ticker symbol "NH."

**Defendant Soon-Shiong**

25.     Defendant Soon-Shiong has served as the Company's CEO and as Chairman of the Board since the founding of the Company in 2010. According to the Company's Schedule 14A filed with the SEC on April 24, 2017 (the "2017 Proxy Statement), as of April 17, 2017, Defendant Soon-Shiong beneficially owned 70,937,304 shares of the Company's common stock, representing 57.9% of all outstanding shares as of that date.[2] Given that the price per share of the Company's common stock at the close of trading on April 17, 2017 was $3.64, Soon-Shiong owned over $258.2 million worth of NantHealth stock.

26.     In addition to his work with the Company, Defendant Soon-Shiong is, and was at all relevant times, the CEO of the following non-profits: (1) the Chan Soon-Shiong NantHealth Foundation; (2) the Chan Soon-Shiong Family Foundation; and (3) the Chan Soon-Shiong Institute of Molecular Medicine. He is also the CEO and founder of NantOmics, a for profit entity.

---

[2] Includes (i) 67,214,114 shares of NantHealth common stock held by NantWorks, LLC; (ii) 2,899,297 shares of NantHealth common stock issuable held by NantOmics, LLC; and (iii) 823,893 shares of NantHealth common stock issuable upon conversion of those certain senior convertible promissory notes held by Cambridge Equities, LP. NantWorks, LLC is the largest member of NantOmics, LLC, holding approximately 84% of the outstanding equity and approximately 99% of the outstanding voting equity. NantHealth Chairman and Chief Executive Officer, Defendant Soon-Shiong, is the controlling member of NantWorks, LLC with voting and dispositive power over the shares of NantHealth common stock that are owned by NantWorks, LLC. The address of NantWorks, LLC is 9920 Jefferson Boulevard, Culver City, California 90232. NantHealth Chairman and Chief Executive Officer, Defendant Soon-Shiong, indirectly owns all of the equity interests in NantWorks, LLC. MP 13 Ventures, LLC, or MP 13 Ventures, is the general partner of Cambridge Equities and may be deemed to have beneficial ownership of the shares held by Cambridge Equities. Defendant Soon-Shiong, NantHealth Chairman and Chief Executive Officer and a member of NantHealth board of directors, is the sole member of MP 13 Ventures, and has voting and dispositive power over the shares held by Cambridge Equities. The address for Cambridge Equities is 9920 Jefferson Boulevard, Culver City, California 90232.

27.     The Company's 2017 Proxy Statement stated the following about Defendant Soon-Shiong:

*Patrick Soon-Shiong, M.D., FRCS (C), FACS*[3] has served as our Chief Executive Officer and as Chairman of our board of directors since the formation of our company in July 2010. In 2011, he founded NantWorks, an ecosystem of companies to create a transformative global health information and next generation pharmaceutical development network for the secure sharing of genetic and medical information, where he currently serves as Chief Executive Officer and Chairman of the board of directors. NantWorks is an affiliate and significant stockholder of NantHealth and Dr. Patrick Soon-Shiong indirectly controls all of the equity interests of NantWorks. Dr. Patrick Soon-Shiong, a physician, surgeon and scientist, has pioneered novel therapies for both diabetes and cancer, published over 100 scientific papers, and has over 95 issued patents on groundbreaking advancements spanning myriad fields. Dr. Patrick Soon-Shiong performed the world's first encapsulated human islet transplant, the first engineered islet cell transplant and the first pig to man islet cell transplant in diabetic patients. He invented and developed Abraxane, the nation's first FDA-approved protein nanoparticle albumin-bound delivery technology for the treatment of cancer. Abraxane was approved by the FDA for metastatic breast cancer in 2005, lung cancer in 2012, and pancreatic cancer in 2013. Abraxane is now approved in many countries across the globe with sales of approximately $1.0 billion. From 1997 to 2010, Dr. Patrick Soon-Shiong served as founder, Chairman and Chief Executive Officer of two global pharmaceutical companies, American Pharmaceutical Partners (sold to Fresenius SE for aggregate consideration of up to $5.6 billion in 2008) and Abraxis BioScience (sold to Celgene Corporation for aggregate consideration of up to $3.6 billion in 2010). Dr. Patrick Soon-Shiong serves as Chairman and Chief Executive Officer of NantKwest, Inc. (NASDAQ:NK), a publicly-traded pioneering clinical-stage immunotherapy company and an affiliate of NantHealth. Although we expect Dr. Patrick Soon-Shiong will devote on average at least 20 hours per week to our company, he will primarily focus on NantKwest, where he is Chairman and Chief Executive Officer, and will also devote time to other companies operating under NantWorks. Dr. Patrick Soon-Shiong also serves as Chairman of the Chan Soon-Shiong Family Foundation and Chairman and Chief Executive Officer of the Chan Soon-Shiong Institute of Molecular Medicine, a non-profit medical research organization. He currently co-chairs the CEO Council for Health and Innovation at the Bipartisan Policy Center and is a member of the Global Advisory Board of Bank of America. He is an Adjunct Professor of Surgery at the University of California, Los Angeles, or UCLA, a visiting Professor at the Imperial College of London, the Executive Director of the UCLA Wireless Health Institute, a board member of the California Telehealth Network, and global director for Cancer Services and Bioinformatics at Providence Health. The Friends of the National Library of Medicine has honored him with their Distinguished Medical Science Award. Dr. Patrick Soon-Shiong holds a degree in medicine from the

---

[3] Emphasis in original unless otherwise noted throughout.

University of the Witwatersrand and a M.Sc. in science from the University of British Columbia. Dr. Patrick Soon-Shiong is a board certified surgeon and a fellow of the American College of Surgeons and of the Royal College of Physicians and Surgeons of Canada.

We believe that Dr. Patrick Soon-Shiong is qualified to serve as a member of our board of directors due to his depth of expertise as chairman and chief executive officer of multiple multi-billion dollar companies in the life sciences industry, his broad experience in research and development of pioneering technologies and his educational background.

**Defendant Holt**

28.     Defendant Paul Holt ("Holt") has served as the Company's CFO since April 2015. According to the 2017 Proxy Statement, as of April 17, 2017, Defendant Holt beneficially owned 59,682 shares of the Company's common stock.[4] Given that the price per share of the Company's common stock at the close of trading on April 17, 2017 was $3.64, Defendant Holt owned approximately $217,242 worth of NantHealth stock.

29.     For the fiscal year ended December 31, 2016, Defendant Holt received $915,012 in compensation from the Company. This included $360,433 in salary, a $98,056 bonus, $445,136 in stock awards, and $11,387 in non-equity incentive plan compensation.

30.     The Company's 2017 Proxy Statement stated the following about Defendant Holt:

***Paul Holt*** was appointed Chief Financial Officer in April 2015. Prior to joining NantHealth, Mr. Holt served as Chief Financial Officer of Quality Systems, Inc. (NASDAQ: QSII), a healthcare information technology and services company, from 2000 to April 2015. He was Controller of Quality Systems from January 2000 to May 2000. Mr. Holt was the Controller of Sierra Alloys Co., Inc., a titanium metal manufacturing company, from August 1999 to December 1999. From 1995 to 1999, he was Controller of Refrigeration Supplies Distributor, the largest independently owned wholesale distributor and manufacturer of refrigeration supplies and heating controls in the western United States. From 1990 to 1995, Mr. Holt was a Certified Public Accountant at McGladrey & Pullen, LLP. Mr. Holt holds an MBA from the University of Southern California and a BA in Economics (*cum laude*) from the University of California, Irvine.

---

[4] Consists of 41,500 shares of common stock and 18,182 shares issuable upon the vesting of phantom units that vest within 60 days of April 17, 2017.

**Defendant Blaszyk**

31.     Defendant Michael Blaszyk ("Blaszyk") has served as a Company director since

May 2016 and is the Chair of the Audit Committee.

32.     For the fiscal year ended December 31, 2016, Defendant Blaszyk received $35,000

in compensation from the Company in fees paid or earned in cash.

33.     The Company's 2017 Proxy Statement stated the following about Defendant

Blaszyk:

> **Michael Blaszyk** has served as a member of our board of directors since May 2016.
> Since 2016, Mr. Blaszyk has served as the managing partner of Saguaro Ridge
> LLC, an advisory services and investments company. From 2000 to 2016, Mr.
> Blaszyk served as the senior executive vice president, chief financial officer and
> chief corporate officer for Dignity Health (formerly known as Catholic Healthcare
> West), a not-for-profit public benefit corporation. Prior to joining Dignity Health,
> Mr. Blaszyk was the senior vice president and chief financial officer for University
> Hospitals Health System in Cleveland, Ohio, a healthcare system, from October
> 1997 to December 2000. Mr. Blaszyk also previously served as the managing
> partner of the Northeast region Health Care Provider Consulting Practice for
> Merger LLC (formerly known as William M. Mercer), a global consulting firm,
> and the executive vice president at Boston Medical Center, a non-profit academic
> medical center. Mr. Blaszyk serves as a director of NantKwest, Inc. (NASDAQ:
> NK), a clinical-stage immunotherapy company, and a director and member of the
> audit committee of Sound Physicians, Inc., a Fresenius company. He received his
> bachelor's degree in life sciences from Wayne State University and his master's
> degree in health services administration from the University of Colorado. We
> believe that Mr. Blaszyk is qualified to serve as a member of our board of directors
> because of his extensive experience and knowledge in the healthcare industry and
> his significant financial and accounting background.
>
> We believe that Mr. Blaszyk is qualified to serve as a member of our board of
> directors because of his extensive experience and knowledge in the healthcare
> industry and his significant financial and accounting background.

**Defendant Burnett**

34.     Defendant Gary F. Burnett ("Burnett") has served as a Company director since May

2016. According to the 2017 Proxy Statement, as of April 17, 2017, Defendant Burnett beneficially

owned 125,000 shares of the Company's common stock.[5] Given that the price per share of the

Company's common stock at the close of trading on April 17, 2017 was $3.64, Burnett owned

approximately $455,000 worth of NantHealth stock.

35.    For the fiscal year ended December 31, 2016, Defendant Burnett received over $2.1

million in compensation from the Company. This included $29,167 in fees earned or paid in cash,

and $2,079,758 in stock awards.

36.    The Company's 2017 Proxy Statement stated the following about Defendant

Burnett:

> **Mark Burnett** has served as a member of our board of directors since May 2016.
> Mr. Burnett has been the President of the MGM Television and Digital Group since
> January 2016, and is an eight-time Emmy Award winner. Mr. Burnett has produced
> more than 3,200 hours of television programming, which regularly airs in more
> than 70 countries worldwide. The group Mr. Burnett leads currently has numerous
> TV shows airing or in production, including "The Voice" (NBC); "Survivor"
> (CBS); "Shark Tank" (ABC); "Fargo" (FX); "Vikings" (HISTORY); "Beyond the
> Tank" (ABC); "Celebrity Apprentice" (NBC); "Teen Wolf" (MTV); "500
> Questions" (ABC); "The People's Choice Awards" (CBS); "Lucha Underground"
> (El Rey Network); and "America's Greatest Makers" (INTEL/Turner Awards
> (CBS)). Mr. Burnett is one of very few producers to have had a renewed series of
> each of the four major networks and to have multiple series win their time slots on
> five nights of television in the same week. Prior to joining MGM, Mr. Burnett was
> a director and Chief Executive Officer of One Three Media from April 2011 until
> September 2014, and was a director and Chief Executive Officer of UAMG, LLC
> from September 2014 until January 2016. Mr. Burnett has also served as a director
> of Lightworkers Media OTT, LLC and its predecessor entities since December
> 2012. Mr. Burnett is also a director of our affiliate, NantBioScience, Inc.
>
> We believe that Mr. Burnett is qualified to serve as a member of our board of
> directors because of his expertise in the areas of marketing and communications.

**Defendant Calhoun**

37.    Defendant Kirk K. Calhoun ("Calhoun") has served as a Company director since

May 2016 and sits on the Audit Committee. According to the 2017 Proxy Statement, as of April

---

[5] Consists of shares issuable upon the exercise of options that are exercisable within 60 days of April 17, 2017.

17, 2017, Defendant Calhoun beneficially owned 13,090 shares of the Company's common stock.

Given that the price per share of the Company's common stock at the close of trading on April 17, 2017 was $3.64, Calhoun owned over $410,370 worth of NantHealth stock.

38.     For the fiscal year ended December 31, 2016, Defendant Calhoun received $29,167 in compensation from the Company in fees paid or earned in cash.

39.     The Company's 2017 Proxy Statement stated the following about Defendant Calhoun:

> **_Kirk K. Calhoun_** has served as a member of our board of directors since May 2016. Mr. Calhoun joined Ernst & Young LLP, a public accounting firm, in 1965 and served as a partner of the firm from 1975 until his retirement in 2002. Mr. Calhoun is a Certified Public Accountant (non-practicing) with a background in auditing and accounting. He has previously served on the boards and audit committees of six public companies in the pharmaceutical and medical diagnostic industries up until the dates of their respective sales, including Abraxis Bioscience, Inc., Myogen, Inc., Aspreva Pharmaceuticals Company, Replidyne, Inc., Adams Respiratory Therapeutics, Inc. and Response Genetics, Inc. Mr. Calhoun currently serves on the boards of Ryerson Holding Corporation (NYSE: RYI), a metals processor and distributor, and Great Basin Corporation (OTCQB: GBSN), a molecular diagnostic testing company using chip-based technologies, plus three private companies, including NeuroSigma, Inc., a developer of products treating major neurological and neuropsychiatric disorders, and PLx Pharma, Inc. (NASDAQ: PLXP), a late stage startup specialty pharmaceutical company focused on commercializing aspirin products. Mr. Calhoun received a BS in accounting from the University of Southern California.
>
> We believe that Mr. Calhoun is qualified to serve as a member of our board of directors because of his extensive experience and knowledge in the healthcare industry and his significant financial and accounting background.

**Defendant Miller**

40.     Defendant Edward Miller ("Miller") served as a Company director from May 2016 until the Company's June 13, 2017 annual meeting of stockholders, where he was not nominated for re-election.

41.     For the fiscal year ended December 31, 2016, Defendant Miller received $29,167 in compensation from the Company in fees earned or paid in cash.

42.     The Company's 2017 Proxy Statement stated the following about Defendant Miller:

> **Edward Miller, M.D.** has served on our board of directors since May 2016. Dr. Miller has served as a director of Noxilizer, Inc. since 2000 and as a director of PNC Mutual Funds since 1997. From 2009 to 2015, Dr. Miller served as a director of CareFusion Corporation. From 1997 to 2012, Dr. Miller was the Chief Executive Officer and dean of The Johns Hopkins University School of Medicine. Prior to that, Dr. Miller served as vice president for medicine of The Johns Hopkins University, as a professor and Chairman of the Department of Anesthesiology at Columbia Presbyterian Medical Center, and as a professor at the University of Virginia. Dr. Miller received his A.B. from Ohio Wesleyan University and his M.D. from the University of Rochester School of Medicine and Dentistry, and was a research fellow in physiology at Harvard Medical School. Dr. Miller is a member of the Institute of Medicine of the National Academy of Sciences, has served as president of the Association of University Anesthesiologists, and is a fellow of the Royal College of Physicians and the Royal College of Anaesthetists. Dr. Miller has authored or co-authored numerous scientific papers, abstracts and book chapters.

**Defendant Sitrick**

43.     Defendant Michael S. Sitrick ("Sitrick") has served as a Company director since May 2016 and sits on the Audit Committee.

44.     For the fiscal year ended December 31, 2016, Defendant Sitrick received $32,083 in compensation from the Company in fees paid or earned in cash.

45.     The Company's 2017 Proxy Statement stated the following about Defendant Sitrick:

> **Michael S. Sitrick** has served on our board of directors since May 2016. Since October 2016, Mr. Sitrick served as Chair and Chief Executive Officer of Sitrick Group, LLC, a subsidiary of Resources Connection, Inc (NASDAQ: RECN). From November 2009 to October 2016, Mr. Sitrick has served as the Chairman and Chief Executive Officer of Sitrick Brincko LLC, a subsidiary of Resources Connection, Inc (NASDAQ: RECN), and also currently serves as Chair and Chief Executive Officer of Sitrick And Company, which he founded in 1989. Sitrick And Company, which was sold to Resources Connection, Inc. in 2009., is a public relations,

strategic communications and crisis management company providing advice and counseling to some of the country's largest corporations, non-profits and governmental agencies, in many areas including investor relations, corporate governance, mergers and acquisitions, litigation support, corporate positioning and repositioning, reputation management, the development and implementation of strategies to deal with short sellers, executive transitions and government investigations. Prior to that, from 1981 to 1989 he was an executive and senior vice president – communications for Wickes Companies, Inc., head of communications and government affairs for National Can Corporation from 1974 to 1981 and group supervisor at Selz, Seabolt and Associates before that. Prior to that, Mr. Sitrick was assistant director of public information in the Richard J. Daley administration in Chicago and worked as a reporter. Mr. Sitrick is a published author, frequent lecturer, a former board member at two public companies (both of which were sold) and a current and former board member of several charitable organizations. Mr. Sitrick serves as a director of JAKKS Pacific, Inc. (NASDAQ: JAKK). He holds a BS in business administration with a major in journalism from the University of Maryland, College Park.

We believe that Mr. Sitrick is qualified to serve as a member of our board of directors because of his extensive experience and knowledge serving on and advising other public company boards.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

46.     By reason of their positions as officers, directors, and/or fiduciaries of NantHealth, and because of their ability to control the business and corporate affairs of NantHealth, the Individual Defendants owed NantHealth and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage NantHealth in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of NantHealth and its shareholders so as to benefit all shareholders equally.

47.     Each director and officer of the Company owes to NantHealth and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

48.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of NantHealth, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

49.     To discharge their duties, the officers and directors of NantHealth were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of NantHealth, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders, that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised NantHealth's Board at all relevant times.

51.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

52.     To discharge their duties, the officers and directors of NantHealth were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of NantHealth were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to NantHealth's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how NantHealth conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of NantHealth and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that NantHealth's operations would comply with all applicable laws and NantHealth's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53.     Each of the Individual Defendants further owed to NantHealth and the shareholders the duty of loyalty requiring that each favor NantHealth's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

54.     At all times relevant hereto, the Individual Defendants were the agents of each other and of NantHealth and were at all times acting within the course and scope of such agency.

55.     Because of their advisory, executive, managerial, and directorial positions with NantHealth, each of the Individual Defendants had access to adverse, non-public information about the Company.

56.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by NantHealth.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of NantHealth was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of NantHealth and was at all times acting within the course and scope of such agency.

## NANTHEALTH'S CODE OF ETHICS

62.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), the Code "applies to all directors, officers and employees of NantHealth, Inc. and its subsidiaries . . ."

63.     As to "Compliance with law," the Code of Ethics provides that "[y]ou are responsible for complying with all laws, rules, regulations and regulatory orders applicable to the conduct of our business."

64.     The Code of Ethics provides, as to "Public communications and filings," that:

Depending upon your position with the Company, you may be called upon to provide information to help assure that the Company's public reports and communications are complete, fair, accurate and understandable. You are expected to use all reasonable efforts to provide complete, accurate, objective, relevant, timely and understandable answers to inquiries related to the Company's public disclosures.

***Individuals involved in the preparation of public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications***.

> If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of the Chief Financial Officer or designated legal counsel.

(Emphasis added.)

65.     The Code of Ethics addresses its reporting obligations in a section titled "Financial Reporting." In a subsection titled "Compliance with rules, controls and procedures," the Code of Ethics provides that:

> It is important that all transactions are properly recorded, classified and summarized in our financial statements, books and records in accordance with our policies, controls and procedures, as well as all generally accepted accounting principles, standards, laws, rules and regulations for accounting and financial reporting.

66.     In a separate subsection, the Code of Ethics provides, as to "Accuracy of records and reports," that:

> It is important that those who rely on records and reports—managers and other decision makers, creditors, customers and auditors—have complete, accurate and timely information. False, misleading or incomplete information undermines the Company's ability to make good decisions about resources, employees and programs and may, in some cases, result in violations of law. ***Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must be diligent in assuring that those records and reports are complete, accurate and timely***. Anyone representing or certifying as to the accuracy of such records and reports should make an inquiry or review adequate to establish a good faith belief in their accuracy.

(Emphasis added.)

67.     In another subsection, the Code of Ethics provides, as to "Intentional misconduct," that:

> You may not intentionally misrepresent the Company's financial performance or otherwise intentionally compromise the integrity of the Company's reports, records, policies and procedures. For example, you may not:
>
> - report information or enter information in the Company's books, records or reports that fraudulently or intentionally hides, misrepresents or disguises the true nature of any financial or non-financial transaction or result;

* * *

- intentionally misclassify transactions as to accounts, business units or accounting periods; or

- knowingly assist others in any of the above

68.     In another subsection titled "Dealing with auditors," the Code of Ethics provides that:

Our auditors have a duty to review our records in a fair and accurate manner. You are expected to cooperate with independent and internal auditors in good faith and in accordance with law. In addition, you must not fraudulently induce or influence, coerce, manipulate or mislead our independent or internal auditors regarding financial records, processes, controls or procedures or other matters relevant to their engagement.

69.     In subsection titled "Obligation to investigate and report potential violations," the Code of Ethics provides that:

You should make appropriate inquiries in the event you may see, for example:

- financial results that seem inconsistent with underlying business performance;

- inaccurate financial records, including travel and expense reports, time sheets or invoices;

- the circumventing of mandated review and approval procedures;

- transactions that appear inconsistent with good business economics;

- the absence or weakness of processes or controls; or

- persons within the Company seeking to improperly influence the work of our financial or accounting personnel, or our external or internal auditors.

70.     In section titled "Reporting violations," the Code of Ethics provides that "you should promptly report violations or suspected violations of this Code to the Chief Financial Officer."

71.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Sections 14(a) of the Exchange Act. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

72.     About Advanced Health, LLC was founded as a Delaware limited liability company in 2010. About Advanced Health LLC later changed its name to NantHealth LLC. NantHealth LLC became NantHealth, Inc. following the Company's IPO on June 1, 2016.

73.     NantOmics, another entity owned by Defendant Soon-Shiong, provides testing capabilities that provide medical profiles of the cancers of individual patients. NantOmics has several accredited and licensed laboratories located around the United States.

74.     NantHealth and NantOmics entered into a reseller agreement in May of 2016, under which NantHealth received the exclusive rights to access and sell GPS Cancer. GPS Cancer is central to the Company's business model, as demonstrated by the Company's Offering Materials, which highlight GPS Cancer throughout.

75.     For example, the Prospectus, in a section titled "Key Factors Affecting our Performance," lists "Commercialize and Expand the Adoption of Our GPS Cancer Solution" as the first key factor, stating, in relevant part:

 Our performance depends on our ability to drive adoption of GPS Cancer and

22

reimbursement at levels that are profitable . . . GPS Cancer is the only comprehensive and commercially available clinical cancer platform incorporating and integrating whole genome (comparing both a patient's normal and tumor tissue), RNA, proteomic and molecular pathways information into a clinical report that analyzes this data and identifies actionable targets and potential treatment decisions. We believe the potential market for GPS Cancer is significant. We are increasing recognition of GPS Cancer by engaging and educating oncologists, cancer patients, patient advocacy groups and other key oncology stakeholders and pursuing reimbursement.

76.     The importance of GPS Cancer to the success of NantHealth is further evidenced by the Company's press releases and periodic filings with the SEC, as well as analyst reports regarding NantHealth.

77.     NantHealth has stated that GPS Cancer is designed to diagnose cancer "at the molecular level by measuring the whole genome and proteome of a patient and thereby potentially predicting the patient's response and resistance to particular therapies." This information about the phenotype and expression of a particular patients' cancer reportedly provides information that can impact treatment decisions by giving doctors insight into what drugs and therapies are most likely to address the patient's cancer.

### Defendant Soon-Shiong, Entities Controlled by Him, and the University of Utah

78.     Between November 2014 and January of 2015, the University of Utah entered into a series of agreements with entities controlled by Defendant Soon-Shiong. The effect of these agreements was that certain non-profits controlled by Defendant Soon-Shiong would pay the University of Utah $12 million, and, in return, the University of Utah would pay NantHealth $10 million for research services.

79.     The MOU was entered into between the University of Utah and Defendant Soon-Shiong in September 2014.

80.     At that time, the University of Utah and Defendant Soon-Shiong were in discussions for certain non-profit entities associated with Soon-Shiong to provide the University with a $12 million "donation" that would enable the University of Utah to purchase $10 million worth of research services from third parties in connection with a project referred to as the "Heritage 1K Project."

81.     Under the MOU, NantHealth would have the right to perform all the research services for the Heritage 1K Project. The MOU stated that "Donor-affiliated Scientists shall have the right to analyze the sequence data for any or all of the Heritage 1K project," and that genetic analysis would be carried out "by a bioinformatics team associated with the Donor."

82.     After the execution of the MOU, and also in September 2014, the University of Utah and three non-profit entities controlled by Defendant Soon-Shiong[6] executed the Donation Agreement, under which the controlled entities donated $12 million to the University of Utah. The Donation Agreement did not reference the MOU and was executed by Defendant Soon-Shiong as CEO of the non-profits.

83.     Under the Donation Agreement, the donation was to be used for "whole genome, exome, RNA sequencing and analysis of approximately 1,000 individuals distributed among Utah families affected by a variety of rare and common diseases and other phenotypes relevant to health such as chronic lymphocytic leukemia, prostate cancer, diabetes mellitus, amyotrophic lateral sclerosis (Lou Gehrig's disease), healthy aging/longevity, and other diseases."

84.     The Donation Agreement established that $10 million of the donation could be allocated to third-party services for analyzing the patient data. The criteria to qualify to perform the work as a third-party was highly specific. The Donation Agreement stated, in relevant part:

---

[6] Specifically, the entities who contributed to the donation were the Chan Soon-Shiong Family Foundation, the Chan Soon-Shiong NantHealth Foundation, and the Chan Soon-Shiong Institute of Molecular Medicine.

> In performing the research, ***University may contract with non- University entities (an "Omics Facility") for the performance of the Omics Analyses*** or other work in connection with the Project. Any such Omics Facility will comply with the highest quality, research-grade sequencing available at time of the Gift, and University will make all efforts to ensure that the ***highest standards*** are met, including germline WGS (60 x coverage) on all samples, cancer and somatic WGS (60 x coverage) and WES for all cancer-related samples, and whole exome sequencing or RNA-Seq (three replicates) for selected samples as technically necessary or desired . . . For Project samples, University will expect the Omics Facility or Facilities to perform the following functions: WGS, WES, RNA-seq (total and poly-a), and HIPAA-secured transport of sequence data to analysis machines for quality control, variant calling and variant annotation (e.g., determining if a given variant induces an amino acid change), and that these will be presented in a complete report including annotated VCF files to Heritage 1K Scientists at the University within a total of seven to ten (7-10) business days from the time of receipt of sample (it being understood and agreed that the 7- 10 business day time frame is in the course of performing Omics Analysis on 1,000 samples over a period of 12 months).

(Emphasis added.)

85.     As the University later acknowledged, the only facilities capable of meeting the specification in the Donation Agreement within the University of Utah's timeline were those owned by NantHealth.

86.     In January 2015, the University of Utah and NantHealth LLC entered into the Heritage Service Agreement for NantHealth LLC to provide research services to the University in connection with the Heritage 1K Project.

87.     The Heritage Service Agreement provided that NantHealth LLC would provide the $10 million in research services that had been contemplated in the MOU and Donation Agreement.

88.     The Heritage Service Agreement did not reference the MOU, instead stating that the "University requires the services of a genomics sequencing facility to perform certain genomics sequencing and analyses using samples provided by the University."

89.    The scope of work described by the Heritage Service Agreement is substantially similar to that outlined in the Donation Agreement. The Heritage Service Agreement states, in relevant part:

> Facility agrees to perform comprehensive whole genome sequencing ("WGS"), whole exome sequencing (WES), RNA-Seq, and analyses (the "Omics Analyses" or "Services"), as requested from time to time by the University . . . the parties anticipate that the University will require Omics Analyses on approximately 1,000 individuals, and on some number of matched somatic samples, to be determined on an Initiative-by-Initiative basis in collaboration with the scientific staff of Facility . . . Turn-around-time for delivery of the [complete report] shall be approximately seven to ten (7-10) business days from Facility's receipt of sample, assuming a volume of not more than 100 samples per month.

90.    The Heritage Service Agreement states that NantHealth LLC "has the facilities, equipment and qualified personnel necessary to perform the services required by the University."

91.    The University of Utah has paid millions to NantHealth for performing research services pursuant to the Heritage Service Agreement. These services do not include GPS Cancer tests.

### IPO

92.    Following the execution of the MOU, Donation Agreement, and Heritage Services Agreement, the Company filed a registration statement and preliminary prospectus on Form S-1 with the SEC on May 6, 2016. The Form S-1 was signed by all of the Individual Defendants.

93.    On June 1, 2016, the Company filed its final prospectus with the SEC in connection with the IPO.

94.    In connection with the IPO, 6,500,000 shares of NantHealth stock were offered at a price of $14.00 per share, and the underwriters were granted an option to purchase an additional 975,000 shares. According to the Offering Materials, there would be 120,732,690 shares of NantHealth stock outstanding following the IPO.

95.     NantHealth ultimately sold 6,900,000 shares in the IPO, raising net proceeds of approximately $83.2 million.

### Notes Issuance

96.     On or around December 15, 2016, NantHealth entered into agreements to issue $100 million in senior unsecured notes, set to mature on December 13, 2021 (the "Notes"). Of the Notes, $90 million were sold to unaffiliated entities.

### **False and Misleading Statements**

### *The Offering Materials*

97.     The Offering Materials only made the following statements regarding the Soon-Shiong/University Agreements:

> We expect to launch our commercial sequencing and molecular analysis solution, or GPS Cancer, in the second quarter of 2016. In January 2015, we entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases. The agreement provides that the university pay us $10.0 million in exchange for our providing sequencing services through our reseller agreement with NantOmics. In 2015, we provided $6.2 million of services, which has been recorded as a deemed capital contribution instead of revenue. At the university's request, ***certain non-profit organizations provided partial funding for the sequencing and related bioinformatics costs associated with the project.*** Our Chairman and Chief Executive Officer serves as a member of the board of directors of, and may have significant influence or control over, these organizations. ***The university was not contractually or otherwise required to use our molecular profiling solution or any of our other products or services as part of the charitable gift.*** In 2016, we expect to complete another $3.8 million in services, which will also be recorded as deemed capital contributions.

* * *

> In January 2015, the Company entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases. The agreement provides that the university pay the Company $10[ million] in exchange for the Company providing sequencing services through its Reseller Agreement with NantOmics. The Company provided $6,190[,000] of services in 2015 at a cost of approximately $3,714[,000]. At the request of the university, ***certain public and private charitable 501(c)(3) non-profit organizations provided partial funding for the sequencing***

*and related bioinformatics costs associated with the project*. The Company's Chairman and CEO serves as the CEO and a member of the board of directors of each of the organizations and by virtue of these positions he may have influence or control over these organizations. The university was not contractually or otherwise required to use the Company's molecular profiling solutions or any of the Company's other products or services as part of the charitable gift. The $6,190[,000] of services performed has been recorded as a deemed capital contribution within Series A members' equity and the costs have been expensed as incurred as other services cost of revenue. The remaining $3,810[,000] in sequencing services will be recorded as a deemed capital contribution within Series A members' equity as services are performed, and any future related costs will be expensed at the same time as the recognition of the capital contribution.

(Emphasis added.)

98.     In regard to GPS Cancer, the Offering Materials stated, in relevant part:

**Key Factors Affecting Our Performance**

We believe that our performance and future success are dependent upon a number of factors, including our ability to (i) commercialize and grow acceptance and adoption of our GPS Cancer solutions, (ii) continue to expand sales of CLINICS, NantOS and NantOS apps to both new and existing clients, (iii) acquire and integrate technologies and businesses that would enhance our offering, (iv) innovate and enhance our Systems Infrastructure and platforms, including in particular, integrating our capabilities in support of growth of GPS Cancer, and (v) successfully invest in our infrastructure. While each of these areas presents significant opportunities for us, they also pose significant risks and challenges that we must address. See the section titled "Risk Factors" for more information.

*Commercialize and Expand the Adoption of Our GPS Cancer Solution*

Our performance depends on our ability to drive adoption of GPS Cancer and reimbursement at levels that are profitable. We also receive revenue from our sale of NantOmics' whole genome sequencing and proteomic analysis based on certain amounts billed for the NantOmics services, as specified in our Reseller Agreement. GPS Cancer is the only comprehensive and commercially available clinical cancer platform incorporating and integrating whole genome (comparing both a patient's normal and tumor tissue), RNA, proteomic and molecular pathways information into a clinical report that analyzes this data and identifies actionable targets and potential clinical treatment decisions. We believe the potential market for GPS Cancer is significant. We are increasing recognition of GPS Cancer by engaging and educating oncologists, cancer patients, patient advocacy groups and other key oncology stakeholders and pursuing reimbursement. In January 2016, a large health plan announced that it would provide insurance coverage for GPS Cancer, representing the nation's first such insurance coverage for a comprehensive whole genome and proteome molecular diagnostic program in the United States.

99.   The Offering Materials also discussed the Company's "Market Opportunity" and

"Competitive Strengths," stating, in relevant part:

**Our Market Opportunity**

We have a unique opportunity to become the leading next-generation, evidence-based, personalized healthcare company by applying novel diagnostics tailored to the specific molecular profiles of patient tissues, integrated clinically to track patient outcomes. We believe the increasing focus on value-based reimbursement models and evidence-based, personalized medicine will drive validation and adoption of CLINICS, positioning us at the forefront of multiple significant growing market opportunities. Recent statistics show that 41% of Americans will be diagnosed with cancer at some point in their lives, resulting in a potential $173 billion of medical costs by 2020. Further, cancer patients receiving chemotherapy average $111,000 in annual medical and pharmacy costs. We estimate the potential global market opportunity for CLINICS, including GPS Cancer, to be in excess of $50 billion annually, as our platforms and solutions enable more effective treatment decisions for critical illnesses.

We believe the potential addressable market for CLINICS will continue to grow in relation to the market-share gains of value-based models. Additionally, we see the precision medicine market growing substantially as comprehensive diagnostics and evidence-based medicine become increasingly important across multiple disease areas and likely assuming greater share of the combined biopharmaceutical and diagnostics markets. We expect several factors to drive adoption of our universal diagnostics solution GPS Cancer, which enables an increased understanding of molecular pathways and their targets, such as

- improved pharmacoeconomics, including the use of more cost-effective drugs approved for other indications (such as asthma and diabetes) in cancer treatment regimens;
- a clearer understanding of critical drug resistance information;
- increased adoption of bundled payments as providers and payors recognize the efficiency of optimized therapies; and
- increased awareness and published clinical results demonstrating the benefits of evidence-based molecular medicine.

**Our Competitive Strengths**

We have invested significant capital and healthcare and biotechnology expertise over nearly a decade to develop, acquire and integrate the necessary components to establish a comprehensive, adaptive learning system designed to address many of the challenges faced by stakeholders across the continuum of care.

We believe our unique capabilities will facilitate the shift from a siloed domain approach to a more patient-centered and patient-empowered approach, and from retrospective claims data mining to real-time, proactive biometric and phenotypic analysis. We believe molecular profile data will significantly enhance outcomes and allow a shift from cohort statistics driven pathways to individualized treatment pathways and accelerate the benefit of value-based models. We also believe the unique multidimensional approach of combining biometric and phenotypic data with targeted molecular pathway information will lead to network effects unavailable to parties looking at each segment individually.

We believe we are differentiated by CLINICS, which creates a novel, comprehensive ecosystem with powerful network effects. In our view, clients who adopt our platforms receive more coordinated, targeted patient therapy and care, which leads to improved outcomes at lower cost. Each data point contributes to the broader dataset, enhancing the continuous learning system and driving value to the user and overall adoption of the system. We believe our success will be based on the following key strengths and advantages:

\* \* \*

- *A clinical comprehensive molecular analysis solution*. We have exclusive rights to NantOmics' proprietary clinical comprehensive molecular analysis solution, GPS Cancer, for the clinical market that examines the entire genome, both in tumor and normal tissue samples, in addition to RNA and protein expression in the tumor sample, including quantitative proteomics measured by mass spectrometry. The test provides quantitative analysis of targeted proteins at the attomolar level, while also comparing 6 billion DNA base pairs (tumor and normal) and sequencing 200,000 RNA transcripts and provides analysis for over 15,000 nodes within approximately 1,500 protein pathways. Using this solution, we create a full genomic and quantitative proteomic profile designed to identify alterations in cellular signaling behavior that are driving disease progression. Unique adaptive machine learning algorithms match the alterations to a library of known signaling pathways and drug and drug targets, irrespective of indication, to predict the effectiveness of personalized therapies and points of resistance. We are able to deliver to providers and payors integrated and comprehensive test results aimed to arrive at improved care decisions for patients. We deliver a concise, actionable GPS Cancer report that matches these alterations with approved on-label and investigative targeted therapies and clinical trials, and GPS Cancer is the only comprehensive and commercially available clinical cancer platform incorporating and integrating whole genome (comparing both a patient's normal and tumor tissue), RNA, proteomic and molecular pathways information into such a report. We have signed agreements or agreements in principle with several customers for GPS Cancer.

30

100.   The statements made in the Offering Materials referenced above were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, prospects, and legal compliance, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) that the Company had failed to maintain internal controls; and (6) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### July 25, 2016 Press Release

101.   On July 25, 2016, the Company issued a press release announcing a partnership with the University of Utah to analyze certain genomic profiles. The press release states, in relevant part:

> NantHealth . . . has partnered with the University of Utah in analyzing the entire genomic profiles of at least 1,000 individuals who have a history of rare and life-threatening diseases and conditions in their respective families. The landmark project will focus on researching the genetic causes of 25 conditions, including, breast, colon, ovarian, and prostate cancers, amyotrophic lateral sclerosis (ALS), chronic lymphocytic leukemia, autism, preterm birth, epilepsy, and other hereditary

conditions. Genomic sequencing will be conducted with unique, comprehensive molecular tests offered by NantHealth.

NantHealth's genomic sequencing platform integrates whole genome (DNA) sequencing, and RNA sequencing. By carrying out this extensive testing, including analysis of germline and somatic samples, University of Utah and NantOmics researchers will be able to explore the underlying genetic causes of certain conditions and diseases at the cellular level.

102.    The press release quoted Defendant Soon-Shiong, who stated: "Understanding the molecular profile and underlying genetic basis of various conditions and diseases, including cancer, will be accelerated through our partnership with the University of Utah and its Utah Genome Project."

103.    The press release continued, stating "[t]he Heritage 1K Project will expand and focus Utah Genome Project research discovery efforts to help patients prevent, diagnose, and successfully treat diseases that have afflicted their families."

104.    Finally, the press release quoted CEO of University of Utah Health Care Dr. Vivian S. Lee as stating:

By partnering with NantHealth and leveraging the power of genome sequencing, our researchers are now transforming our understanding of common diseases and how they should be treated . . . We are pleased to be working with Dr. Soon- Shiong to further expand genetic discovery research under our Utah Genome Project.

105.    The statements in the July 25, 2016 press release were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs

associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had failed to maintain internal controls; and (6) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### August 9, 2016 Press Release and Conference Call

106.    On August 9, 2016 the Company issued a press release regarding its financial results for the quarter ended June 30, 2016. Defendant Holt signed the Form 8-K filed with the SEC on the same day, to which the press release was attached as an exhibit. The press release stated, in relevant part:

> CULVER CITY, Calif.--(BUSINESS WIRE)--Aug. 9, 2016-- NantHealth, Inc. (NASDAQ-GS: NH), a next-generation, evidence-based, personalized healthcare company, today reported financial results for its 2016 second quarter ended June 30, 2016. The company completed its initial public offering (IPO) in early June 2016, raising net proceeds of approximately $83.2 million.
>
> For the 2016 second quarter, total net revenues increased 167% to $31.5 million from $11.8 million in last year's second quarter. Gross profit grew 69% to $9.3 million, from $5.5 million, for the 2015 second quarter. Selling, general and administrative (SG&A) expenses were $47.2 million, including stock compensation expense related to the company's IPO, compared with $17.8 million for the prior year second quarter. Research and development (R&D) expenses, including stock compensation expense related to the company's IPO, increased to $24.3 million from $5.0 million in the comparable quarter of last year.
>
> With the inclusion of stock based compensation expense related to the IPO, equal to $0.42 per share, net loss was $54.1 million, or $0.52 per share, compared with $17.2 million, or $0.21 per share, for the 2015 second quarter. Financial results for the 2016 second quarter included approximately $43.7 million in stock based compensation, equal to $0.42 per share, related to the vesting of equity tied to the company's Initial public offering. On a non-GAAP basis, for the 2016 second quarter, adjusted net loss was $16.5 million, or $0.15 per share, compared with adjusted net loss of $14.3 million, or $0.15 per share, in the prior year second quarter.

"We achieved stellar topline results across all of our revenue lines, reflecting how strongly customers have responded to NantHealth's innovative offerings," said Patrick Soon-Shiong, M.D., chief executive officer and chairman of NantHealth. "Our strong second-quarter financial performance included revenues recognized from several large implementations and service contracts for our technology offerings, which were completed and delivered earlier than anticipated. As a result, we recognized certain revenues in our second quarter that we previously projected to be recorded in the second half of 2016.

"Looking ahead, we are focused on adding customers and executing on our opportunities across the spectrum of our offerings. In addition, the acquisitions we completed in the last year are paying dividends and our GPS Cancer product continues to gain traction and acceptance among insurers. Combined, these efforts and initiatives will drive our growth in the near term and beyond."

107.    The press release additionally noted highlights for GPS Cancer, stating, in relevant part:

**GPS Cancer – Highlights**

- **Number of covered cancer lives:** at June 30, the number of patients with cancer covered by a payer for GPS testing was approximately 180,000. Subsequent to the quarter through August 9, the company added approximately 20,000 covered cancer lives, bringing the total number of cancer patients covered by GPS Cancer to approximately 200,000.

- **Number of GPS Cancer payers:** at June 30, the number of payers covering GPS Cancer was three. Subsequent to the end of the quarter through August 9, the company added three new payers, bringing the total number of payers covering GPS Cancer to six, resulting in 200,000 covered cancer lives.

- **Number of international GPS Cancer payers:** During the second quarter, the company added an international reseller.

108.    Also on August 9, 2016 the Company held a conference call with analysts and investors. During the call, NantHealth's President and Chief Growth Officer Robert Watson ("Watson") stated that the Company's "second quarter included a small number of completed GPS Cancer tests" due to the "short window for ordering." He further explained that "GPS Cancer orders continue to ramp up into the third quarter."

109.   During the call, Defendant Soon-Shiong touted the Company's growth, stating, "Yesterday, frankly, I think we broke the record because we are actually processing 350 whole-genome simultaneously on our massive parallel computing gear."

110.   The statements in the August 9, 2016 press release and conference call were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) that GPS Cancer orders were not "ramping up," as asserted in the August 9, 2016 conference call; (6) the Company had exaggerated the use of, and demand for, GPS Cancer; (7) the Company had failed to maintain internal controls; and (8) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *2Q 2016 10-Q*

111.   The Company filed its financial results for the quarter ended June 30, 2016 on Form 10-Q with the SEC on August 15, 2016 (the "2Q 2016 10-Q"). Defendant Holt signed the 2Q 2016 10-Q.

112.    The 2Q 2016 10-Q commented on an agreement the Company entered into "to provide certain research related sequencing services to a university," stating, in relevant part:

> In January 2015, the Company entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases ("the university"). The agreement provides that the university pay the Company $10[ million] in exchange for the Company providing sequencing services through the Original Reseller Agreement.
>
> At the request of the university, ***certain public and private charitable 501(c)(3) non-profit organizations provided partial funding for the sequencing and related bioinformatics costs associated with the project***. The Company's Chairman and CEO serves as the CEO and a member of the board of directors of each of the organizations and by virtue of these positions he may have influence or control over these organizations. ***The university was not contractually or otherwise required to use the Company's molecular profiling solutions or any of the Company's other products or services as part of the charitable gift***.

(Emphasis added.)

113.    Attached to the 2Q 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Soon-Shiong and Holt attesting to the accuracy of the 2Q 2016 10-Q.

114.    The statements in the 2Q 2016 10-Q were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the

Company had exaggerated the use of, and demand for, GPS Cancer; (6) the Company had failed to maintain internal controls; and (7) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### November 7, 2016 Press Release and Conference Call

115.    After markets closed on November 7, 2016, the Company issued a press release attached to a Form 8-K filed with the SEC (the "November 2016 Press Release"). The November 2016 Press Release reported that 524 GPS Cancer tests had been ordered in the quarter ended September 30, 2016, which the press release characterized as "Rapid Adoption of GPS Cancer." Defendant Holt signed the Form 8-K.

116.    The press release stated, in relevant part:

CULVER CITY, Calif.--(BUSINESS WIRE)--Nov. 7, 2016-- NantHealth, Inc. (NASDAQ-GS: NH), a next-generation, evidence-based, personalized healthcare company, today reported financial results for its third quarter ended September 30, 2016.

For the 2016 third quarter, total net revenue increased 76% to $25.4 million from $14.4 million in last year's third quarter. Gross profit more than tripled to $8.1 million, from $2.3 million, for the 2015 third quarter. Selling, general and administrative (SG&A) expenses were $24.7 million compared with $18.1 million for the prior year third quarter. Research and development (R&D) expenses increased to $13.9 million from $7.0 million in the comparable quarter of last year.

Net loss for the 2016 third quarter was $36.9 million, or $0.30 per share, compared with $23.0 million, or $0.24 per share, for the 2015 third quarter. Financial results for the 2016 third quarter included approximately $5.5 million of intangible amortization and $5.2 million in non-cash, stock-based compensation expense, equal to $0.10 per share. On a non-GAAP basis, for the 2016 third quarter, adjusted net loss was $22.4 million, or $0.18 per share, compared with $18.2 million, or $0.17 per share, in the prior year third quarter.

"The significant increase of total net revenue was primarily driven by a 252% increase in SaaS revenue," said Patrick Soon-Shiong, M.D., chief executive officer and chairman of NantHealth. "We continue to make great strides in healthcare interoperability and connectivity. With regard to our GPS Cancer Test, education

in the oncology community is progressing rapidly. As the oncologists begin to understand that this test better informs them and their patients as to the biology of the cancer and which drugs may or may not be effective based on the genomics and proteomics signature, adoption is progressing as evidenced by the over 100% increase in number of oncologists ordering the test. We are gratified to experience this response since we believe the test is as important to guide the physician as to which drugs not to administer as well as which agents may show sensitivity. The opportunity to have this information on hand before treatment begins is having an impact on physicians' acceptance of the value that this test can bring to cancer care. The challenge and opportunity remains, [sic] our need to continue this educational process both with provider and payer. We have ramped up our efforts to educate oncologists in target markets, secured new payer coverage and streamlined IT implementations."

117.    The press release also provided quarterly highlights for GPS Cancer, stating, in relevant part:

**GPS Cancer – Highlights**

- **Number of covered cancer lives:** at September 30, 2016 the number of patients with cancer covered by a payer for GPS testing was approximately 200,000. Subsequent to the end of the quarter, the company reported a coverage agreement with Horizon BCBS for a pilot study.

- **Number of GPS Cancer payers:** at September 30, 2016 the number of payers covering GPS Cancer was seven, representing 200,000 covered cancer lives. Discussions are in progress with 17 payers, increasing from 13 in Q2. GPS Cancer Coverage[.]

- **Number of international GPS Cancer payers:** Subsequent to the end of the third quarter, the company added an additional international reseller bringing the total of international resellers to two.

- **Number of GPS Cancer Tests:** 524 ordered in Q3.

118.    On the same day, the Company held a conference call with analysts and investors, during which it was reported that 180 of the 524 GPS Cancer tests had been ordered by the University of Utah.

119.    During the call, Defendant Soon-Shiong stated:

In the GPS Cancer profile segments of our business, you will see that we have now had rapid adoption of GPS Cancer with more than 100% increase in the number of

oncologists ordering the test from the second quarter to the third quarter. We have 524 GPS Cancer orders in the quarter and we've delivered completed reports on 334 of these to date as we're going through the processing.

* * *

Let me turn my attention to GPS cancer. We've clearly made significant progress during this quarter and have learned a lot with regard to a launch of this novel breakthrough product. Of the 524 of GPS Cancer orders in the quarter, 344 were commercial and 180 were ordered under a research agreement with University of Utah, which we announced earlier this year. We completed more than, as I said, 334 GPS Cancer reports.

120.    Defendant Soon-Shiong also cited purchases from a clinic in Florida as proof of market demand for GPS Cancer and the utility of the results provided by GPS Cancer. He did not disclose, however, that the doctor who ran the clinic, Steve Mamus, was also a paid consultant for NantHealth.

121.    Watson noted that GPS Cancer orders were increasing, stating, in relevant part:

GPS orders accelerated in the quarter. The number of reports delivered in the quarter was 334. However, revenue recognition was adversely impacted by three issues. First, the 180 profiles that were completed under the research agreement with the University of Utah were not recognized as revenue because it was considered a research project that was started in advance of the IPO.

122.    Contrary to these statements, the Heritage Service Agreement did not involve any GPS Cancer profiles, and no GPS Cancer profiles had been conducted under the Heritage Services Agreement.

123.    The statements in the November 7, 2016 press release and conference call were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by

Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had exaggerated the use of and demand for GPS Cancer; (6) 180 GPS Cancer tests allegedly provided to the University of Utah were not, in fact, GPS Cancer tests; (7) at least one doctor who was ordering GPS Cancer tests was a paid consultant of NantHealth; (8) the Company had failed to maintain internal controls; and (9) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *Q3 2016 10-Q*

124.    On November 10, 2016, the Company filed its financial results for the quarter ended September 30, 2016 on Form 10-Q with the SEC, which was signed by Defendants Soon-Shiong and Holt (the "Q3 2016 10-Q").

125.    The Q3 2016 10-Q made substantially similar statements regarding NantHealth's relationship with the University of Utah as contained in the Q2 2016 10-Q. Specifically, the Q3 2016 10-Q stated as follows:

> In January 2015, the Company entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases. The agreement provides that the university pay the Company $10,000 in exchange for the Company providing sequencing services.
>
> At the request of the university*, certain public and private charitable 501(c)(3) non-profit organizations provided partial funding for the sequencing and related bioinformatics costs associated with the project*. The Company's Chairman and CEO serves as the CEO and a member of the board of directors of each of the non-profit organizations and by virtue of these positions he may have influence or control over these organizations. ***The university was not contractually or***

> *otherwise required to use the Company's molecular profiling solutions or any of the Company's other products or services as part of the charitable gift, however, the university did not have a requirement to order or pay for the services unless it first received private donor funding for the project.* As a result, the Company does not classify the fees related to this project as revenue but instead classifies the amounts as deemed capital contributions from the Company's Chairman and CEO.

(Emphasis added.)

126.    Attached to the Q3 2016 10-Q were SOX certifications signed by Defendants Soon-Shiong and Holt attesting to its accuracy.

127.    The statements in the Q3 2016 10-Q were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had failed to maintain internal controls; and (6) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### March 7, 2017 Conference Call

128.    The Company held a conference call with analysts and investors on March 7, 2017. During that call, a Company representative stated with regard to GPS Cancer orders in the quarter

ended September 30, 2016: "So let's talk about GPS [Cancer] by the numbers. These are Q3 numbers. End of Q3, there's about 170 ordering physicians. There were 524 tests in the quarter."

129.    The statements in the March 7, 2017 conference call were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had overstated the number of GPS Cancer orders received in the quarter ended September 30, 2016, thereby exaggerating the demand for GPS Cancer in the marketplace; (6) the Company had failed to maintain internal controls; and (7) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *2016 10-K*

130.    On March 31, 2017, the Company filed its financial results for the quarter and year ended December 31, 2016 on Form 10-K with the SEC (the "2016 10-K), which was signed by each of the Individual Defendants.

131.    Regarding the Company's relationship with the University of Utah, the 2016 10-K stated:

### GPS in Rare Diseases and Chronic Illnesses

Although we are deploying GPS initially for cancer, we believe this solution has potential application in identifying molecular profiles and germline mutations in rare diseases and chronic illnesses. Our molecular profile solutions are being used by a large academic research institution to examine the genomic familial drivers of cardiac disease and to perform additional research in ALS, obesity, suicide and diabetes, among other diseases.

For example, in July 2016, NantHealth announced a partnership with the University of Utah to analyze the entire genomic profiles of at least 1,000 individuals who have a history of rare and life-threatening diseases and conditions in their respective families. The landmark project is focusing on researching the genetic causes of 25 conditions, including, breast, colon, ovarian, and prostate cancers, amyotrophic lateral sclerosis (ALS), chronic lymphocytic leukemia, autism, preterm birth, epilepsy, and other hereditary conditions.

132.    Attached to the 2016 10-K were SOX certifications signed by Defendants Soon-Shiong and Holt attesting to its accuracy.

133.    The statements in the 2016 10-K were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had not performed any GPS Cancer tests for the University of Utah, and there was not as much demand for GPS Cancer as represented; (6) the Company had failed to maintain internal controls; and (7) as a result of the foregoing, statements about the Company's business, operations

and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### 2017 Proxy Statement

134.    The Company filed its 2017 Proxy Statement on April 24, 2017. Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statements are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

135.    The 2017 Proxy Statement stated, with regard to the Board's adoption of the Code of Ethics, that:

> Our board of directors has adopted a written code of business conduct and ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and agents and representatives, including consultants. A copy of the code of business conduct is available on our website, www.nanthealth.com, under the investors tab. If we make any substantive amendments to, or grant any waivers from, the code of business conduct and ethics for any officer or director, we will disclose the nature of such amendment or waiver on our website.

136.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Soon-Shiong/University Agreements.

137.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were misrepresented as a result of false and misleading

statements related to the Soon-Shiong/University Agreements and work performed pursuant thereto.

138.    The 2017 Proxy Statement also failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had not performed any GPS Cancer tests for the University of Utah, and there was not as much demand for GPS Cancer as represented; (6) the Company had failed to maintain internal controls; and (7) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

139.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

140.    Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

141.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

**The Truth Gradually Emerges**

142.    During the Relevant Period, the truth regarding NantHealth, its relationship with the University of Utah, and sales of GPS Cancer slowly emerged through a series of partial disclosures contained in media and analyst reports and SEC filings made by the Company. In response to many of these disclosures, the price per share of NantHealth stock dropped to more accurately reflect the true value of the Company.

*November 2016 Disclosures*

143.    The November 2016 Press Release revealed that NantHealth had received only 524 orders for GPS Cancer tests in the quarter ended September 20, 2016, 180 of which were not recorded as revenue as a result of having been performed under the Heritage Service Agreement. During a conference call held November 7, 2016, the Company revealed that it had only performed 334 commercial GPS Cancer tests, which did represent the "ramp up" of GPS Cancer that the Company's prior public statements had suggested.  In fact, the Company had not performed any GPS Cancer tests for the University of Utah, as would subsequently be revealed.

144.    Analyst reports issued following the November 2016 Press Release opined that the GPS Cancer orders and completed tests did not represent the "ramp up" that had been expected, and that NantHealth revenue had missed analysts' expectations.

145.    On this news, the price per share of NantHealth common stock dropped $1.08, or nearly 9.7%, from the previous day's closing price to close at $10.09 per share on November 8, 2016.

*March 2017 Disclosures*

146.    Early on Monday, March 6, 2017, *STAT* published an article titled "How the world's richest doctor gave away millions – then steered the cash back to his company." The article

reported that of the $12 million donation made to the University of Utah, by non-profits controlled

by Defendant Soon-Shiong "$10 million . . . would be sent right back to one of his companies.

And the contract for his gift was worded in a way that left the University of Utah with no other

choice."

147.    The March 6, 2017 *STAT* article opined that the deal with the University of Utah:

> made it possible for [NantHealth] to inflate, by more than 50 percent, the number
> of test orders it reported to investors late last year while updating them on interest
> in . . . GPS Cancer. [Defendant] Soon-Shiong's team counted genetic sequencing
> ordered by the University of Utah in those order numbers — ***even though the work
> for the university did not have anything to do with diagnosing or recommending
> treatments for cancer patients***.

(Emphasis added.)

148.    With regard to the legality of the Soon-Shiong/University Agreements, the *STAT*

article noted that:

> Four tax experts who reviewed the contracts at STAT's request all agreed that the
> Utah deal was suspicious. Two said it appeared to violate federal tax rules
> governing certain charitable donations, amounting to indirect self-dealing by
> [Defendant] Soon-Shiong and his foundations.
>
> "They're laundering the funds through the University of Utah," said Marc Owens,
> a tax lawyer with Loeb & Loeb . . . who said the contracts appeared to violate
> federal rules.

149.    Marc Owens, a tax lawyer, was further quoted as stating, "I think that this

transaction was deliberately structured to attempt to disguise self-dealing."

150.    The article also reported that a University of Utah spokesman and the geneticist

leading the Heritage 1K Project had stated that the services procured from the Company were not

related to GPS Cancer, and were instead straightforward genetic testing. The leading geneticist on

the Heritage 1K Project "said she could not understand why NantHealth would count the work as

orders for GPS Cancer."

151.     On this news, the price per share of NantHealth common stock dropped $1.67, or 23% its closing price on the previous trading day, to close at $5.50 per share on March 7, 2017. An analyst report from Cantor Fitzgerald attributed the decline in price to the *STAT* article.

152.     After markets closed on March 7, 2017, *The Los Angeles Times* published an article discussing the March 6, 2017 *STAT* article and the allegations therein.[7] While *The Los Angeles Times* article quoted Defendant Soon-Shiong as describing the allegations in the *STAT* article as "maliciously false," he did not deny that the University of Utah had not ordered any GPS Cancer tests, instead defending the inclusion of those tests in the GPS Cancer orders on the basis "that the gene sequencing work for the university was done on the same machines that perform the cancer test."

153.     *The Los Angeles Times* article reported that "[t]he university said it had tried to look for another provider to perform the genomic sequencing but chose NantHealth because it was the only company that met the contract's detailed requirements."

154.     On this news, the price per share of NantHealth common stock dropped $0.30, or 6% from its closing price on the previous trading day, to close at $4.64 per share on March 8, 2017.

155.     On March 6, 2016, the price of NantHealth's Notes declined from $85.86 to $81.80, a drop of $4.06 or 4.7%. By March 10, 2017, the price of the Notes had further declined to $75.51, a 12% drop over the week of March 6, 2017.

*April 2017 Disclosures*

156.     *Politico* published an investigative report on April 9, 2017, titled "How Washington's favorite cancer fighter helps himself." The *Politico* report revealed a pattern of self-

---

[7] Defendant Soon-Shiong is the second largest shareholder and vice chairman of Tronc Inc., which owns *The Los Angeles Times*, as of February 28, 2017, according to Tronc, Inc.'s most recent Schedule 14A filed with the SEC on March 9, 2017.

dealing by Defendant Soon-Shiong disguised as philanthropic activity. According to the report, "[a] POLITICO investigation found that the majority of [the Chan Soon-Shiong NantHealth foundation's] expenditures flow to businesses and not-for-profits controlled by [Defendant] Soon-Shiong himself, and the majority of its grants have gone to entities that have business deals with his for-profit firms."

157.    On Monday, April 10, 2017, following this news, the price per share of NantHealth common stock closed at $4.45 per share, a decline of $0.75, or 14% from its closing price on the previous trading day. The price of NantHealth common stock continued to decline on April 11, 2017, losing 4.7% of their value, or $0.21 per share, closing at $4.24 per share on April 11, 2017.

158.    The value of the Company's Notes also declined over the same period, losing $4.50, or 5.7% of their value between April 10 and April 11, 2017 to a price of $73.96 on April 11, 2017.

159.    On April 13, 2017, *L.A. Weekly* published an article titled "Patrick Soon-Shiong Is No Longer the Richest Person in L.A., -- and That's Not the Worst of It." The article detailed the above-described allegations against the Company and Defendant Soon-Shiong. The *L.A. Weekly* article reported that "[a] spokesman for [Defendant] Soon-Shiong [told] *L.A. Weekly*: 'The Politico article has numerous inaccuracies and misleading statements.' When asked for an example, the spokesman said, 'We're not gonna go point by point on this.'"

160.    On this news, the price per share of NantHealth common stock dropped $0.20, or nearly 5%, from its closing price on the previous trading day, to close at $3.86 per share on April 13, 2017.

161.    The following day, Good Friday, *STAT* published an article titled "'It will help us with our product': Emails show how a billionaire's philanthropy boosted his business." The article averred that *STAT* had obtained "more than a dozen" NantHealth documents, including "emails

and documents [that] make clear that executives at NantHealth and officials at the university viewed the deal through a transactional lens, intended, at least in part, to boost [Defendant] Soon-Shiong's commercial interests."

162.     Specifically, with regard to the MOU, the article stated that "[a] university memorandum from September 2014, days before the donation was made official, stipulates that the genetic analysis to be paid for by [Defendant] Soon-Shiong's gift would be done by [Defendant] Soon-Shiong's team."

163.     On this news, the price per share of NantHealth common stock dropped $0.22, or nearly 5%, on April 17, 2017 (the first trading day following the Good Friday *STAT* article) from its closing price on the previous trading day, to close at $3.64 per share on April 17, 2017. The price of NantHealth common stock continued to decline on April 18, 2017, losing 4.4% of its value, or $0.16 per share, closing at $3.48 per share on April 18, 2017.

164.     The value of the Company's Notes also declined over the same period, losing $5.13, or 7% of their value between April 17 and April 18, 2017 to a price of $70.04 on April 18, 2017.

165.     Before markets opened on April 24, 2017, *Bloomberg* published an article that revealed that the success of GPS Cancer was limited and suggested that the Company's financial metrics were not telling the full story.

166.     Regarding payment for GPS Cancer tests, the *Bloomberg* article stated, in relevant part:

> "They seem to distribute an extraordinary number of tests that aren't paid for," said Paul Knight, an analyst at Janney Montgomery Scott who covers the diagnostic industry. Giving away tests to doctors to get the word out and generate demand is common among genomics startups but NantHealth's numbers are "unusual" and show that the test is "a long way from being commercially viable."

167.    With regard to the Company's financial reporting, the *Bloomberg* article stated: "NantHealth reported $100.4 million in 2016 revenue but didn't break out how much came from the diagnostic tests. The company also sells various software services to payers and hospitals."

168.    Regarding NantHealth's customer base, *Bloomberg* reported that the while the Company had reported that it had signed eight employers and insurers to use the tests, those entities "aren't rushing to place orders." Further, of those eight entities, *Bloomberg* reported that two were "double counted"—employers and insurers who had signed a single contract were counted as two separate entities.

169.    On this news, the price per share of NantHealth common stock dropped $0.10, or 3%, from its closing price on the previous trading day, to close at $3.20 per share on April 24, 2017.

170.    The *Deseret News* published an article on April 27, 2017 that quoted a spokesperson from the University of Utah who "confirmed that NantHealth was the only organization that met the 'specific requirements' stipulated in" the Donation Agreement.

171.    On April 28, 2017, *The Cancer Letter* reported that the University of Utah had concluded "NantHealth was the only facility capable of meeting the state of the art standards and specification required under the gift agreement." It further reported that the University of Utah had stated "[n]o future collaborations with NantHealth are planned."

172.    *The Cancer Letter* article quoted Hakon Hakonarson[8] as stating, with regard to the Donation Agreement and Heritage Service Agreement:

> It is noteworthy that the sequencing metrics [Defendant Soon-Shiong's] company (NantHealth) is providing are conveniently exactly the same as the stipulations for the required metrics from the facility chosen for the project; so while there is no direct stipulation [in the Donation Agreement] that NantHealth be the sole provider,

---

[8] Hakonarson is director of the Center for Applied Genomics at the Children's Hospital of Pennsylvania and an associate professor of pediatrics at the University of Pennsylvania School of Medicine.

**the stipulation makes it essentially impossible for the University of Utah to do this through a different partner**.

(Emphasis added.)

173.   *The Cancer Letter* article also quoted Paul Wolpe[9] as stating:

A grant given to a university for a research project should not use its funds to subcontract with a private company which has a key owner or official affiliated with the fund. ***It is clearly a conflict of interest*** . . . If the grant requires the use of that company, it is an even more egregious conflict of interest. It is simply inappropriate to have a funder also be a key owner or otherwise significantly affiliated with a private company paid by those funds. It is, in fact, a kind of "money laundering"—using a university as a conduit to funnel foundation money through a university to a company affiliated with the foundation, formally or through a common owner or a key investor or executive . . . For a company to profit from such a foundation should never be permitted.

(Emphasis added.)

174.   On this news, the price per share of NantHealth common stock dropped $0.21, or 6.3%, from its closing price on the previous trading day, to close at $3.11 per share on April 28, 2017.

175.   On Friday, April 28, 2017, after trading hours, *The Salt Lake Tribune* published an article titled "U. Health Care CEO Vivian Lee resigns after cancer institute controversy." The article reported that the CEO of University of Utah Health Care System had resigned. It further noted that Jon Huntsman Sr., benefactor of the Huntsman Cancer Institute at the University of Utah, believed that the resignation was "related to her dealings with [Defendant] Soon-Shiong."

176.   On this news, the price per share of NantHealth common stock dropped $0.13, or 4%, from its closing price on the previous trading day, to close at $2.98 per share on May 1, 2017.

177.   In the summer of 2017, the Company sold its patient/provider communications platform to Allscripts and cut its staff by 300 to save costs.

---

[9] Paul Wolpe is the director of the Emory Center for Ethics and the Asa Griggs Candler Professor of Bioethics.

178.     In November 2017, the Office of the Legislative Auditor General of the state of Utah issued a report concluding that the University of Utah improperly bypassed procurement rules in awarding NantHealth the contract for the Heritage 1K Project.

## DAMAGES TO NANTHEALTH

179.     As a direct and proximate result of the Individual Defendants' conduct, NantHealth will lose and expend many millions of dollars.

180.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, CFO, all of the members of its Board, and one former member of its Board, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

181.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

182.     As a direct and proximate result of the Individual Defendants' conduct, NantHealth has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

183.     Plaintiff brings this action derivatively and for the benefit of NantHealth to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of NantHealth, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

184.    NantHealth is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

185.    Plaintiff is, and has been at all relevant times, a shareholder of NantHealth. Plaintiff will adequately and fairly represent the interests of NantHealth in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

186.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

187.    A pre-suit demand on the Board of NantHealth is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants Soon-Shiong, Sitrick, Calhoun, Burnett, and Blaszyk (the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

188.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.   Indeed, the United States District Court for the Central District of California denied the 12(b)6 motion to dismiss as to the Securities Act claim made in the Securities Class Action against each of the Directors.

189.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

190.    Additional reasons that demand on Defendant Soon-Shiong is futile follow. Defendant Soon-Shiong currently serves as the Company's CEO, and is thus, as the Company admits, a non-independent director. Defendant Soon-Shiong was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings and press releases referenced herein, almost all of which he personally made statements in or signed. His large Company stock holding, worth over $258.2 million before the fraud was fully exposed, reveals his interest in keeping the Company's stock price as high as possible. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Soon-Shiong also breached the duty of loyalty by engaging in self-interested transactions with the University of Utah, a breach which is non-indemnifiable, and as a result, faces a substantial likelihood of liability. Moreover, Defendant Soon-Shiong is a defendant in the Securities Class Action. For these reasons, too, Defendant Soon-Shiong breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

191.    Additional reasons that demand on Defendant Burnett is futile follow. Defendant

Burnett has served as a Company director since May 2016. He received lavish compensation,

including over $2.1 million in 2016, and thus he is not an independent director. Defendant Burnett

is ultimately responsible for the false and misleading statements made in the Registration

Statement and 2016 10-K, both of which he signed. His large Company stock holding, worth

approximately $455,000 before the fraud was exposed, reveals his interest in keeping the

Company's stock price as high as possible. As a trusted Company director, he conducted little, if

any, oversight of the Company's engagement in the scheme to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and

engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

Moreover, Defendant Burnett is a defendant in the Securities Class Action. Defendant Burnett is

also beholden to Defendant Soon-Shiong, who himself faces a substantial likelihood of liability in

this action, as discussed above. As disclosed in the 2017 Proxy Statement:

> An entity controlled by Dr. Patrick Soon-Shiong has agreed to indemnify Mr.
> Burnett for any losses or liabilities incurred by Mr. Burnett in connection with his
> service on our board of directors, but only to the extent such losses or liabilities are
> not covered by our directors' and officers' insurance policies or our indemnification
> agreement with Mr. Burnett and only to the extent a court of competent jurisdiction
> has determined pursuant to a final order not subject to further appeal or stay that
> Mr. Burnett has breached his duty of loyalty to our company by reason of his service
> as a board member on other entities controlled by Dr. Patrick Soon-Shiong. The
> indemnification obligation will not apply to fraud, illegal acts or intentional
> misconduct of Mr. Burnett to the extent determined by a final order of a court of
> competent jurisdiction not subject to further appeal or a stay. Mr. Burnett has an
> understanding with Dr. Patrick Soon-Shiong that Mr. Burnett will be appointed as
> a director of, and receive equity in, other entities controlled by Dr. Patrick Soon-
> Shiong as mutually determined between them. Mr. Burnett currently serves as a
> director of NantBioScience, Inc.

As established in the 2017 Proxy Statement, Defendant Burnett is indemnified by Defendant

Soon-Shiong for breaches of the duty of loyalty, even though indemnification for breaching the

duty of loyalty is prohibited by law. Such an indemnification provision demonstrates the Defendant Burnett is beholden to Defendant Soon-Shiong and is unable to evaluate a demand with independence. Defendant Burnett is also a director of another entity controlled by Defendant Soon-Shiong, NantBioScience, Inc. Thus, for these reasons, Defendant Burnett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

192.    Additional reasons that demand on Defendant Blaszyk is futile follow. Defendant Blaszyk has served as a Company director since May 2016 and is the Chair of the Audit Committee. Defendant Blaszyk is ultimately responsible for the false and misleading statements made in the Registration Statement and 2016 10-K, both which he signed. As a director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Blaszyk is a defendant in the Securities Class Action. Defendant Blaszyk is also a director of NantKwest, Inc., another entity controlled by Defendant Soon-Shiong. In a securities class action against NantKwest and certain of its officers and directors, captioned *Sudunagunta v. NantKwest, Inc., et al.*, Case No. CV 16-1947-MWF (JEMx), the United States District Court for the Central District of California held that plaintiffs stated a claim under the heightened pleading standards of the Private Securities Litigation Reform Act for securities fraud against Defendant Blaszyk. The district court held, in pertinent part: "the Consolidated Third Amended Complaint pleads a detailed theory that Soon-Shiong and his associates [including Defendant Blaszyk] hid the true extent of his executive compensation and dealings with his own, related companies, in an attempt to make NantKwest more appealing to

investors during the IPO." Thus, Defendant Blaszyk has a history of knowingly violating the federal securities laws by deceiving investors in order to make more money for Defendant Soon-Shiong and Defendant Soon-Shiong's companies.  For this reason, Defendant Blaszyk would not consider a pre-suit demand to take action against Defendant Soon-Shiong and is clearly beholden to Defendant Soon-Shiong. Thus, for these reasons, Defendant Blaszyk breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

193.    Additional reasons that demand on Defendant Sitrick is futile follow. Defendant Sitrick has served as a Company director since May 2016 and is a member of the Audit Committee. Defendant Sitrick is ultimately responsible for the false and misleading statements made in the Registration Statement and 2016 10-K, both of which he signed. As a director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Sitrick is a defendant in the Securities Class Action. Further, Defendant Sitrick, whose primary occupation is through his public relations firm, appears to have other business arrangements with Defendant Soon-Shiong that affect his ability to evaluate demand with independence. Indeed, an October 2, 2017 report from *Healthcare IT News* describes Defendant Sitrick as a "spokesman for [Defendant] Soon-Shiong," and quotes Defendant Sitrick as describing a shareholder suit against Altor Acquisition, Defendant Soon-Shiong, and others as having "no merit." Thus, for these reasons, Defendant Sitrick breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

194.    Additional reasons that demand on Defendant Calhoun is futile follow. Defendant Calhoun has served as a Company director since May 2016 and is a member of the Audit Committee. Defendant Calhoun is ultimately responsible for the false and misleading statements made in the Registration Statement and 2016 10-K, both of which he signed. As a director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Calhoun is a defendant in the Securities Class Action. Thus, for these reasons, Defendant Calhoun breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

195.    Additional reasons that demand on the Board is futile follow.

196.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

197.    Defendant Soon-Shiong controls and dominates the board by virtue of his 57.9% ownership of the Company's outstanding stock. The Company admitted to Defendant Soon-Shiong's control in the 2017 Proxy Statement, which states, in relevant part: "Patrick Soon-Shiong, M.D., our Chairman and Chief Executive Officer, and entities affiliated with him control a significant majority of our common stock. As a result, we are a 'controlled company' within the meaning of the NASDAQ corporate governance standards." As Defendant Soon-Shiong faces a

substantial likelihood of liability in the both the instant action and the Securities Class Action, the remainder of the Board is unable to evaluate a demand with independence as a result of Defendant Soon-Shiong's control over the Company, and therefore, demand is excused.

198.    All of the Directors breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's operations, prospects and relationship with the University of Utah, despite having knowledge of the falsity of those statements. Directors may not be indemnified for breaching the duty of candor. As a result, all of the Directors face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

199.    In violation of the Code of Ethics, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Ethics, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

200.    NantHealth has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for NantHealth any part of the damages NantHealth suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

201.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

202.    The acts complained of herein constitute violations of fiduciary duties owed by NantHealth's officers and directors, and these acts are incapable of ratification.

203.    The Directors may also be protected against personal liability for their breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of NantHealth. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of NantHealth, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

204.     If there is no directors' and officers' liability insurance, then the Directors will not cause NantHealth to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

205.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants for Violations of
Section 14(a) of the Exchange Act**

206.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

208.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

209.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

210.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had not performed any GPS Cancer tests for the University of Utah, and there was not as much demand for GPS Cancer as represented; (6) the Company had failed to maintain internal controls; and (7) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

211.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were misrepresented as a result of false and misleading

statements related to the Soon-Shiong/University Agreements and work performed pursuant thereto.

212.    The 2017 Proxy Statement also made reference to the Company's Code of Ethics. The Code required the Company and Individual Defendants to abide by relevant laws and statutes, and not engage in off-label marketing. By issuing the false and misleading statements alleged herein, the Individual Defendants violated the Code of Ethics. The 2017 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code Conduct were being violated.

213.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including but not limited to, election of directors and ratification of the appointment of an independent auditor.

214.    Indeed, had Company shareholders known the extent of Defendant Soon-Shiong's related-party transactions and fraudulent conduct, they would have thought twice about voting for him as a director.

215.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

216.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

217.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of NantHealth's business and affairs.

218.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

219.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of NantHealth.

220.     In breach of their fiduciary duties owed to NantHealth, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had not performed any GPS Cancer tests for the University of Utah, and there was not

as much demand for GPS Cancer as represented; (6) the Company had failed to maintain internal controls; and (7) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

221.     The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

222.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

223.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of NantHealth's securities.

224.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls,

even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of NantHealth's securities.

225.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

226.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, NantHealth has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

227.     Plaintiff on behalf of NantHealth has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

228.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, NantHealth.

230.     The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from NantHealth that was tied to the performance or artificially inflated valuation of NantHealth, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

231.     Plaintiff, as a shareholder and a representative of NantHealth, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

232.    Plaintiff on behalf of NantHealth has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of NantHealth, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to NantHealth;

(c)    Determining and awarding to NantHealth the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing NantHealth and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect NantHealth and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of NantHealth to nominate at least three candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding NantHealth restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

Dated: April 13, 2018

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-542
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff*