**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE NANTHEALTH, INC. STOCKHOLDER DERIVATIVE LITIGATION | Case No. 18-cv-551-LPS<br><br>**DEMAND FOR JURY TRIAL**<br><br>**FILED UNDER SEAL** |

**<u>VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT</u>**

## TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................................................1

JURISDICTION AND VENUE .............................................................................................8

PARTIES .................................................................................................................................8

SOON-SHIONG'S FIDUCIARY DUTIES.........................................................................16

SOON-SHIONG'S MISCONDUCT ....................................................................................18

THE FEDERAL SECURITIES CLASS ACTION...............................................................68

THE CHANCERY COURT ACTION ..................................................................................69

DAMAGES TO NANTHEALTH .........................................................................................71

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ..................................................72

COUNT I ...............................................................................................................................83

COUNT II ..............................................................................................................................84

COUNT III.............................................................................................................................86

PRAYER FOR RELIEF ........................................................................................................87

Plaintiffs Tony Shen ("Shen") and Louis Manuel ("Manuel") (collectively, "Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant NantHealth, Inc. ("NantHealth" or the "Company"), file this Verified Amended Stockholder Derivative Complaint against Individual Defendant Patrick Soon-Shiong ("Soon-Shiong") for breach of his fiduciary duties as a director and officer of NantHealth, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and contribution pursuant to sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against Soon-Shiong, Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things a review of: documents produced by NantHealth in response to a demand to inspect certain of NantHealth's books and records pursuant to 8 *Del. C.* § 220 ("220 Demand"); NantHealth's public filings, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NantHealth; legal filings, news reports, securities analysts' reports and advisories about the Company; and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Defendant Soon-Shiong, a director and officer of NantHealth, from June 1, 2016 through the present.

2.     NantHealth is a healthcare technology company that offers a portfolio of genome analysis and gene sequencing software. The Company's main product is its "GPS Cancer Solution"

1

platform ("GPS Cancer"),[1] a proprietary process for diagnosing cancer patients at the molecular level and predicting a patient's response and resistance to particular treatments.

3.     Beginning in September 2014 and January 2015, the University of Utah (or, the "University") and certain entities owned by Soon-Shiong entered into a series of agreements pursuant to which three non-profit entities controlled by Defendant Soon-Shiong donated $12 million to the University.

4.     Unbeknownst to the investing public, before the University of Utah received the donation from the Company, the University entered into a memorandum of understanding in September 2014 with the non-profit entities Defendant Soon-Shiong controlled (the "MOU"), which essentially guaranteed that in exchange for the donation, the University of Utah would award a $10 million contract to the Company to perform genetic research services for the University.

5.     Shortly after the execution of the MOU, the University of Utah and the three non-profit entities controlled by Defendant Soon-Shiong executed an agreement pursuant to which the controlled entities donated $12 million to the University of Utah (the "Donation Agreement"). The Donation Agreement did not reference the MOU that was executed by Defendant Soon-Shiong as CEO of the non-profits.

6.     In January 2015, the University of Utah and the Company entered into an agreement for NantHealth to provide comprehensive whole genome sequencing and other research services to the University in connection with a project dubbed the "Heritage 1K Project" (the "Heritage Service Agreement," and together with the MOU and the Donation Agreement, the "Soon-Shiong/University Agreements").

---

[1]     GPS, in this instance, stands for Genomic Proteomic Spectrometry.

7.      Following execution of the Soon-Shiong/University Agreements, the Company went public via an initial public offering that offered NantHealth common stock for $14.00 per share (the "IPO").

8.      On May 6, 2016,  in connection with the IPO, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement"), which was signed by Defendant Soon-Shiong. The Registration Statement was declared effective on June 1, 2016, and the Company's stock began trading publicly on the NASDAQ the next day, on June 2, 2016. Subsequently, on June 3, 2016, the Company filed with the SEC a Prospectus on Form 424B4 (the "Prospectus") in connection with the IPO. The Prospectus, the Registration Statement, and all amendments thereto are collectively referred to herein as the "Offering Materials." NantHealth ultimately raised approximately $91 million through the IPO.

9.      The Offering Materials contained false and misleading statements regarding the Company's business operations and prospects, including its GPS Cancer product and the Company's relationship with the University of Utah. Specifically, the Offering Materials misleadingly stated that the University of Utah was not obligated to retain the Company and pay it for research services, creating the illusion that the University of Utah independently chose the Company as the most qualified entity to perform the research.  Plaintiffs did not own NantHealth stock prior to the IPO and do not assert claims for wrongdoing prior to the IPO.

10.      Following the IPO, Defendant Soon-Shiong also personally made and caused the Company to make a number of false and misleading statements that perpetuated the false and misleading statements made in the Offering Materials. Among other things, he concealed the nature of the Soon-Shiong/University Agreements by falsely asserting that: (i) the Soon-Shiong-controlled nonprofit organizations provided only "partial funding" for the University deal; and (ii)

3

that the University was not "contractually or otherwise required to use ... [NantHealth's] products or services as part of the charitable gift."  Additionally, he caused the Company to issue quarterly reports throughout the rest of 2016 that touted strong demand for GPS Cancer.  At the time these public statements were made, Soon-Shiong knew that the disclosures were false, and he knew that the Soon-Shiong/University Agreements were linked, and together were a significant related party transaction, which he misrepresented in the Company's proxy statements.

11.    The truth regarding the Company's relationship with the University of Utah and demand for GPS Cancer slowly emerged due a series of news articles issued by third-parties beginning in November 2016.  On March 6, 2017, a publication called *STAT* published an article revealing the undisclosed Soon-Shiong/University Agreements and that they enabled Defendant Soon-Shiong to artificially increase demand for GPS Cancer by more than 50%.  Specifically, the article accurately reported that Defendant Soon-Shiong had donated $12 million to the University through his non-profit organizations, and, in return, the University agreed to earmark $10 million of the "donated" funds to engage NantHealth for genomic sequencing research. Further, the article highlighted that the Soon-Shiong/University Agreements effectively required the University to select NantHealth for its services.

12.    Subsequent media articles revealed more details about the tit for tat agreements and further developments, including: (1) on April 9, 2017, *Politico* reported on Defendant Soon-Shiong's use of his non-profits to build business for his for-profit companies; (2) on April 14, 2017, *STAT* reported that the MOU had been drafted before the gift was even official and, after analyzing internal documents, concluded that the deal was "intended, at least in part, to boost Soon-Shiong's commercial interests;" (3) on April 24, 2017, *Bloomberg* claimed that "NantHealth is giving away the vast majority of the commercially ordered tests" and reported that two out of

4

the eight payers NantHealth "says it has signed up . . . are double counted;" (4) on April 28, 2017, the University told *The Cancer Letter* that "[n]o future collaborations with NantHealth are planned;" and (5) on April 28, 2017, the CEO of the University's Health Care System resigned, reportedly due "to her dealings with" Defendant Soon-Shiong.

13.     Meanwhile, the Company's misleading disclosures continued.  For example, each and every Form 10-Q filed from the IPO to May 2018 repeated the false assertions that: (i) the Soon-Shiong-controlled nonprofit organizations provided only "partial funding" for the University deal; and (ii) that the University was not "contractually or otherwise required to use ... [NantHealth's] products or services as part of the charitable gift."  Critical to this charade was that the Company's 2017 and 2018 proxy statements concealed the details of the arrangement with the University.  Both proxy statements omitted the University transactions from their discussions of significant related party transactions, even though they identified numerous other related party transactions and described them in detail, and the Company's independent auditor ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████  Moreover, where the Soon-Shiong/University Agreements were referenced in the Forms 10-Q and Proxy Statements, critical information about them identified to the Board by the independent auditor was omitted.

14.     The foregoing events, which are alleged in detail herein, subjected the Company to significant harm, including two securities class actions,[2] which, after denial of a motion to dismiss NantHealth agreed to settle on October 23, 2019 for $16.5 million, as well as another shareholder

---

[2]     *Deora v. NantHealth, Inc., et al.*, Docket No. 2:17-cv-01825-TJH-MRW (C.D. Cal.), filed March 7, 2017 (the "Federal Securities Class Action") and *Bucks County Employees Retirement Fund v. NantHealth, Inc., et al.*, Docket No. BC662330 (Super. Ct. Los Angeles County), filed May 22, 2017.

derivative action in the Delaware Court of Chancery,[3] which is currently in discovery after motions to dismiss were denied in January 2020.

15.     In the Federal Securities Class Action, on March 27, 2018, U.S. District Judge Terry J. Hatter denied NantHealth's and Soon-Shiong's motion to dismiss. Judge Hatter held that a securities fraud claim was stated in connection with the following categories of statements and omissions that are also alleged herein: (i) regarding whether Defendant Soon-Shiong's non-profits provided partial funding for NantHealth's research services at the University; (ii) concerning the University's contractual obligation to select NantHealth; and (iii) regarding the amount of GPS Cancer tests ordered in the third quarter of 2016. *Deora v. NantHealth, Inc*., No. CV1701825TJHMRWX, 2018 WL 4743494, at *3 (C.D. Cal. Mar. 27, 2018) ("Federal Securities Class Action Order")

16.     With respect to Defendant Soon-Shiong, Judge Hatter held that the allegations, which are repeated herein, plausibly allege Defendant Soon-Shiong was "intimately involved with the nonprofits, the MOU, the Agreements, and was the catalyst of the relationship between NantHealth and the University" and therefore that a "strong inference" existed that Soon-Shiong "intentionally, knowingly, or with deliberate recklessness, misrepresented, or omitted material facts, regarding the relationship between the University and NantHealth, and NantHealth's total orders of GPS Cancer." *Id.* at **5-6.

17.     On September 10, 2020, Judge Hatter issued an order finally approving the settlement of the Securities Class Action.  Federal Securities Class Action at ECF No. 137.

---

[3]     *In re Nanthealth, Inc. Stockholder Litigation*, Lead C.A. No. 2018-0302-AGB (Del. Ch.), filed April 23, 2018 (the "Chancery Court Action").

18.     In the Chancery Court Action, on January 14, 2020, Chancellor Bouchard denied defendants' motions to dismiss pursuant to Court of Chancery Rules 23.1 and 12(b)(6). *In re Nanthealth, Inc. Stockholder Litig.*, No. CV 2018-0302-AGB, 2020 WL 211065 (Del. Ch. Jan. 14, 2020).  Chancellor Bouchard held that defendants Burnett and Sitrick, who were two of the four directors on NantHealth's Board at commencement of the Chancery Court Action, as well as this action, were not independent of Soon-Shiong and that a claim for breach of fiduciary duties was stated against Soon-Shiong. *Id.*, at \*\*7-8.

19.     The factual allegations that resulted in denial of the motions to dismiss in the Securities Class Action and the Chancery Court Action are also alleged herein.

20.     Plaintiffs did not make a demand on NantHealth's Board prior to commencing this action.  For the same reasons that demand was excused in the Chancery Court Action, demand is excused here as to the breach of fiduciary duty claim against Soon-Shiong.  Demand is excused as to the claims for violations of Section 14(a) of the Exchange Act against Soon-Shiong for the same reason: half of the Board at commencement of this action was not independent of him.  Finally, demand is excused as to the contribution claim pursuant to sections 10(b) and 21D of the Exchange Act for the same reason again, the Board at commencement of this action was not independent of Soon-Shiong.  While Plaintiffs believe demand futility as to the contribution claim should be assessed against the original Board because it arises from the same facts alleged in the original complaint, if demand futility as to the contribution claim were evaluated against the current Board the outcome would be the same: at least half of the directors on the Board other than Soon-Shiong are not independent of him.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act of 1933 ("Securities Act") and the Exchange Act.

22.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(l) because complete diversity exists between plaintiffs and each defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.  This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

23.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

24.     Venue is proper in this District because NantHealth is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendant has received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff Shen

25.     Plaintiff Shen is a current shareholder of NantHealth. Plaintiff Shen has continuously held NantHealth since April 2017.  Shen is a resident of Massachusetts.

### Plaintiff Manuel

26.     Plaintiff Manuel is a current shareholder of NantHealth. Plaintiff Manuel has continuously held NantHealth common stock since early June 2016.  Manuel is a resident of Pennsylvania.

**Nominal Defendant NantHealth**

27.     NantHealth is a Delaware corporation with its principal executive offices at 9920 Jefferson Boulevard, Culver City, California, 90232. NantHealth's shares trade on the NASDAQ under the ticker symbol "NH."

**Defendant Soon-Shiong**

28.     Defendant Soon-Shiong is the Company's controlling shareholder and has served as the Company's CEO, and as Chairman of the Board since the founding of the Company in July 2010. According to the Company's Schedule 14A filed with the SEC on April 21, 2020 (the "2020 Proxy Statement"), as of April 13, 2020, Defendant Soon-Shiong beneficially owned 65,113,411 shares of the Company's common stock, representing 58.9% of all outstanding shares as of that date, and rendering Defendant Soon-Shiong a controlling shareholder.[4] Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $1.80, Defendant Soon-Shiong owned over $117.2 million worth of NantHealth stock.  Soon-Shiong is a citizen of California.

29.     In addition to his positions at the Company, Defendant Soon-Shiong is, and was at all relevant times, the CEO of the following non-profits: (1) the Chan Soon-Shiong NantHealth Foundation; (2) the Chan Soon-Shiong Family Foundation; and (3) the Chan Soon-Shiong Institute of Molecular Medicine. He is also the CEO and founder of NantOmics, a for profit entity.

---

[4]     Includes (i) 62,214,114 shares of NantHealth's common stock held by NantWorks, LLC ("NantWorks"); and (ii) 2,899,297 shares of NantHealth's common stock held by NantOmics, LLC ("NantOmics"). NantWorks is the largest member of NantOmics, holding approximately 84% of the outstanding equity and approximately 99% of the outstanding voting equity. Defendant Soon-Shiong, is the controlling member of NantWorks with voting and dispositive power over the shares of NantHealth's common stock that are owned by NantWorks. The address of NantWorks is 9920 Jefferson Boulevard, Culver City, California 90232. Defendant Soon-Shiong, indirectly owns all of the equity interests in NantWorks.

30.     The Company's 2020 Proxy Statement stated the following about Defendant Soon-Shiong:

> **Patrick Soon-Shiong, M.D., FRCS (C), FACS** has served as our Chief Executive Officer and as Chairman of our board of directors since the formation of our company in July 2010. In 2011, he founded NantWorks, an ecosystem of companies to create a transformative global health information and next generation pharmaceutical development network for the secure sharing of genetic and medical information. Dr. Patrick Soon-Shiong, a physician, surgeon and scientist, has pioneered novel therapies for both diabetes and cancer, published over 100 scientific papers, and has over 230 issued patents on groundbreaking advancements spanning a myriad of fields. Dr. Soon-Shiong performed the world's first encapsulated human islet transplant, the first engineered islet cell transplant and the first pig to man islet cell transplant in diabetic patients. He invented and developed Abraxane, the nation's first FDA-approved protein nanoparticle albumin-bound delivery technology for the treatment of cancer. Abraxane was approved by the FDA for metastatic breast cancer in 2005, lung cancer in 2012, and pancreatic cancer in 2013. Abraxane is now approved in many countries across the globe. From 1997 to 2010, Dr. Soon-Shiong served as founder, Chairman and CEO of two global pharmaceutical companies, American Pharmaceutical Partners (sold to Fresenius SE for $4.6 billion in 2008) and Abraxis BioScience (sold to Celgene Corporation for $3.8 billion in 2010). Dr. Patrick Soon-Shiong serves as Chairman and Chief Executive Officer of NantKwest, Inc. (NASDAQ:NK), a publicly-traded pioneering clinical-stage immunotherapy company and an affiliate of NantHealth. Although we expect Dr. Patrick Soon-Shiong will devote on average at least 20 hours per week to our company, he will also focus on NantKwest, where he is Chairman and Chief Executive Officer, and will devote time to other companies operating under NantWorks. In June 2018, Dr. Soon-Shiong became the owner and executive chairman of the Los Angeles Times, San Diego Union-Tribune, Los Angeles Times en Español and other publications under the California Times. Dr. Soon-Shiong also serves as Chairman of the Chan Soon-Shiong Family Foundation and Chairman and CEO of the Chan Soon-Shiong Institute of Molecular Medicine, a non-profit medical research organization. He was appointed by former House Speaker Paul Ryan to the Health Information Technology Advisory Committee, a committee established by the 21st Century Cures Act that advises the President and his administration on health IT policy and issues with healthcare interoperability and privacy and security, while working with key stakeholders to create standards in these areas. He previously co-chaired the CEO Council for Health and Innovation at the Bipartisan Policy Center and previously served as a member of the Global Advisory Board of Bank of America. He is an Adjunct Professor of Surgery at UCLA and a visiting Professor at the Imperial College of London. The Friends of the National Library of Medicine has honored him with their Distinguished Medical Science Award. Dr. Soon-Shiong holds a degree in medicine from the University of the Witwatersrand and a M.Sc. in science from the University of British Columbia.

We believe that Dr. Patrick Soon-Shiong is qualified to serve as a member of our board of directors due to his depth of expertise as chairman and chief executive officer of multiple multi-billion dollar companies in the life sciences industry, his broad experience in research and development of pioneering technologies and his educational background.

**Non-Party Director Blaszyk**

31.     Michael Blaszyk ("Blaszyk") has served as a Company director since July 2015 and is a member of the Audit Committee and the Compensation Committee.  He previously served as the Chair of the Company's Audit Committee. Blaszyk also serves as a director and committee member of other companies including Sound Physicians, Inc. and NantKwest, Inc. According to the 2020 Proxy Statement, as of April 13, 2020, Blaszyk beneficially owned 148,780 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $1.80, Blaszyk owned approximately $267,804 worth of NantHealth stock.

32.     For the fiscal year ended December 31, 2019, Blaszyk received $184,124 in compensation from the Company. This included $84,103 in fees paid or earned in cash and $100,021 in stock awards.

33.     The Company's 2020 Proxy Statement stated the following about Blaszyk:

***Michael Blaszyk*** has served as a member of our board of directors since July 2015. Mr. Blaszyk has served as the chief financial officer and chief corporate officer for Dignity Health (formerly known as Catholic Healthcare West), a not-for-profit public benefit corporation, since December 2000. Prior to joining Dignity Health, Mr. Blaszyk was the senior vice president and chief financial officer for University Hospitals Health System in Cleveland, Ohio, a healthcare system, from October 1997 to December 2000. Mr. Blaszyk also previously served as the managing partner of the Northeast region Health Care Provider Consulting Practice for Merger LLC (formerly known as William M. Mercer), a global consulting firm, and the executive vice president at Boston Medical Center, a non-profit academic medical center. Mr. Blaszyk currently serves as Senior Executive Advisor to Beecken Petty O'Keefe & Company. Mr. Blaszyk is a director/manager for Medicus, NantHealth, Lumere, Absolute Dental Management, Himagine and Health Management Associates. He received his bachelor's degree in life sciences

11

from Wayne State University and his master's degree in health services administration from the University of Colorado.

We believe that Mr. Blaszyk is qualified to serve as a member of our board of directors because of his extensive experience and knowledge in the healthcare industry and his significant financial and accounting background.

**Non-Party Director Burnett**

34.      Mark Burnett ("Burnett") served as a Company director from May 2016 until June 2018, when he requested that the Board not re-nominate him as a director.[5] According to the Company's Schedule 14A filed with the SEC on April 30, 2019 (the "2019 Proxy Statement), Burnett serves as a director of NantBioScience, Inc.

35.      For the fiscal year ended December 31, 2018, Burnett received $25,000 in compensation from the Company in fees earned or paid in cash. For the fiscal year ended December 31, 2017, Burnett received over $50,000 in compensation from the Company in fees earned or paid in cash. For the fiscal year ended December 31, 2016, Burnett received over $2.1 million in compensation from the Company. This included $29,167 in fees earned or paid in cash, and $2,079,758 in stock awards.

36.      The Company's 2018 Proxy Statement stated the following about Burnett:

***Mark Burnett*** has served as a member of our board of directors since May 2016. Mr. Burnett has been the President of the MGM Television and Digital Group since January 2016, and is an eight-time Emmy Award winner. Mr. Burnett has produced more than 3,200 hours of television programming, which regularly airs in more than 70 countries worldwide. The group Mr. Burnett leads currently has numerous TV shows airing or in production, including "The Voice" (NBC); "Survivor" (CBS); "Shark Tank" (ABC); "Fargo" (FX); "Vikings" (HISTORY); "Beyond the Tank" (ABC); "Celebrity Apprentice" (NBC); "Teen Wolf" (MTV); "500 Questions" (ABC); "The People's Choice Awards" (CBS); "Lucha Underground" (El Rey Network); and "America's Greatest Makers" (INTEL/Turner Awards (CBS)). Mr. Burnett is one of very few producers to have had a renewed series of

---

[5]      Pursuant to the Company's 2019 Proxy Statement, Defendant Soon-Shiong and Burnett agreed that Burnett "would be appointed as a director of, and receive equity in, other entities controlled by [Defendant Soon-Shiong] as mutually determined between them."

each of the four major networks and to have multiple series win their time slots on five nights of television in the same week. Prior to joining MGM, Mr. Burnett was a director and Chief Executive Officer of One Three Media from April 2011 until September 2014, and was a director and Chief Executive Officer of UAMG, LLC from September 2014 until January 2016. Mr. Burnett has also served as a director of Lightworkers Media OTT, LLC and its predecessor entities since December 2012. Mr. Burnett is also a director of our affiliate, NantBioScience, Inc.

We believe that Mr. Burnett is qualified to serve as a member of our board of directors because of his expertise in the areas of marketing and communications.

**Non-Party Director Calhoun**

37.     Kirk K. Calhoun ("Calhoun") has served as a Company director since May 2016, and currently serves as the Chair of the Audit Committee and a member of the Compensation Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Calhoun beneficially owned 148,780 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $1.80, Calhoun owned approximately $267,804 worth of NantHealth stock.

38.     For the fiscal year ended December 31, 2016, Calhoun received $29,167 in compensation from the Company in fees paid or earned in cash. For the fiscal year ended December 31, 2017, Calhoun received $222,443 in compensation from the Company. This included $50,000 in fees paid or earned in cash and $172,443 in stock awards. For the fiscal year ended December 31, 2018, Calhoun received $240,054 in compensation from the Company. This included $55,000 in fees paid or earned in cash and $185,054 in stock awards. For the fiscal year ended December 31, 2019, Calhoun received $177,235 in compensation from the Company. This included $77,214 in fees paid or earned in cash and $100,021 in stock awards.

39.     The Company's 2020 Proxy Statement stated the following about Defendant Calhoun:

***Kirk K. Calhoun*** has served as a member of our board of directors since May 2016. Mr. Calhoun joined Ernst & Young LLP, a public accounting firm, in 1965 and served as a partner of the firm from 1975 until his retirement in 2002. Mr. Calhoun is a Certified Public Accountant (non-practicing) with a background in auditing and accounting. He has previously served on the boards and audit committees of seven public companies in the pharmaceutical and medical diagnostic industries. Mr. Calhoun currently serves on the boards of Ryerson Holding Corporation (NYSE: RYI), a metals processor and distributor, and PLx Pharma, Inc. (NASDAQ: PLXP), a specialty pharmaceutical company focused on commercializing aspirin products, plus three private companies, including NeuroSigma, Inc., a developer of products treating major neurological and neuropsychiatric disorders. Mr. Calhoun received a BS in accounting from the University of Southern California.

We believe that Mr. Calhoun is qualified to serve as a member of our board of directors because of his extensive experience and knowledge in the healthcare industry and his significant financial and accounting background.

### **Non-Party Director Sitrick**

40.     Michael S. Sitrick ("Sitrick") has served as a Company director since May 2016. He is the Chair of the Company's Compensation Committee, and he sits on the Audit Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Sitrick beneficially owned 148,780 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $1.80, Sitrick owned approximately $267,804 worth of NantHealth stock.

41.     For the fiscal year ended December 31, 2016, Sitrick received $32,083 in compensation from the Company in fees paid or earned in cash. For the fiscal year ended December 31, 2017, Sitrick received $227,443 in compensation from the Company. This included $55,000 in fees paid or earned in cash and $172,443 in stock awards. For the fiscal year ended December 31, 2018, Sitrick received $246,304 in compensation from the Company. This included $61,250 in fees paid or earned in cash and $185,054 in stock awards. For the fiscal year ended

December 31, 2019, Sitrick received $176,882 in compensation from the Company. This included

$77,861 in fees paid or earned in cash and $100,021 in stock awards.

42.     The Company's 2020 Proxy Statement stated the following about Sitrick:

*Michael S. Sitrick* has served on our board of directors since May 2016. Since November 2009, Mr. Sitrick has served as the Chairman and Chief Executive Officer of Sitrick Group LLC, a subsidiary of Resources Connection, Inc (NASDAQ: RECN), and Sitrick And Company which he founded in 1989 and at which he was Chairman and Chief Executive Officer. Sitrick And Company, which was sold to Resources Connection, Inc. in 2009, is a public relations, strategic communications and crisis management company providing advice and counseling to some of the country's largest corporations, non-profits and governmental agencies, in many areas including investor relations, corporate governance, mergers and acquisitions, litigation support, corporate positioning and repositioning, reputation management, the development and implementation of strategies to deal with short sellers, executive transitions and government investigations. Prior to that, from 1981 to 1989 he was an executive and senior vice president – communications for Wickes Companies, Inc., head of communications and public affairs for National Can Corporation from 1974 to 1981 and group supervisor at Selz, Seabolt and Associates before that. Prior to that, Mr. Sitrick was assistant director of public information in the Richard J. Daley administration in Chicago and worked as a reporter. Mr. Sitrick is a published author, frequent lecturer, a former board member at three public companies (two of which were sold) and a current and former board member of several charitable organizations. He holds a BS in business administration with a major in journalism from the University of Maryland, College Park.

### **Non-Party Director and Officer Louks**

43.     Ron Louks ("Louks") served as a Company director from May 2018 to April 2020.

Louks has been a fulltime employee of the Company from 2017 through the present.

44.     The Company's 2020 Proxy Statement stated the following about Louks:

*Ron Louks* joined us as Senior Vice President, Mobile Platform Technology & Emerging Solutions in January 2017 and was appointed as Chief Operating Officer in May 2017. Prior to that, Mr. Louks was President, Devices and Emerging Solutions, at Blackberry Limited (NASDAQ: BBRY) from January 2014 to May 2016. Mr. Louks also served as Chief Executive Officer of The OpenNMS Group from August 2013 through January 2014, Chief Executive Officer of Plus 1, LLC from March 2012 to July 2013 and served as the Chief Strategy Officer of HTC Corporation from July 2010 through January 2012. In addition, Mr. Louks held many leadership positions in the technology industry prior to that, including Chief

15

Technology Officer at Sony Ericsson. Mr. Louks received his bachelor of applied science from McMaster University.

**Non-Party Director Wise**

45.      Deanna Wise ("Wise") has served as a Company director since March 2020.

46.      The Company's 2020 Proxy Statement stated the following about Wise:

*Deanna Wise* was appointed to our board of directors on March 11, 2020. Ms. Wise is currently the Senior Vice President and Chief Information Officer of Banner Health, a non-profit health system based in Phoenix, Arizona, having joined Banner Health in 2019. Between May 2011 and December 2018, Ms. Wise served as Executive Vice President and Chief Information Officer at Dignity Health, a California-based not-for-profit public benefit corporation. Before joining Dignity Health, between October 2006 and March 2011, Ms. Wise served as the Senior Vice President and Chief Information Officer for Vanguard Health Systems (NYSE: VHS). Prior to this role, between August 2004 and October 2006, Ms. Wise was the Chief Information Officer for Vanguard's Abrazo Health Care Phoenix market. Prior to joining Abrazo Health Care, between November 2002 and August 2004, Ms. Wise served as the Chief Information Officer for the Maricopa County Health District. Ms. Wise earned a computer science degree from Danville Area Community College and is a Project Management Professional (PMP) certified member of the Professional Management Institute (PMI). Ms. Wise was also inducted into the 2018 CIO Hall of Fame.

## SOON-SHIONG'S FIDUCIARY DUTIES

47.      By reason of his position as an officer, director, and controlling shareholder of NantHealth, and because of his ability to control the business and corporate affairs of NantHealth, Soon-Shiong owed NantHealth and its minority shareholders fiduciary obligations of trust, loyalty, good faith, candor, and due care, and was and is required to use his utmost ability to control and manage NantHealth in a fair, just, honest, and equitable manner. Soon-Shiong was and is required to act in furtherance of the best interests of NantHealth and its minority shareholders so as to benefit all shareholders equally.

48.      Soon-Shiong owes to NantHealth and its minority shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     Soon-Shiong, because of his positions of control and authority as a director, officer, and controlling shareholder of NantHealth, was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge his duties, Soon-Shiong was required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Soon-Shiong owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. Soon-Shiong's conduct complained of herein involves knowing and culpable violations of his obligations, the absence of good faith on his part, or a reckless disregard for his duties to the Company and its minority shareholders, that he was aware or should have been aware posed a risk of serious injury to the Company.

52.     As a senior executive officer and director of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, Soon-Shiong had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Consolidated Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

53.     Soon-Shiong owed to NantHealth and the minority shareholders the duty of loyalty requiring that he favor NantHealth's interest and that of its shareholders over his own while conducting the affairs of the Company and refrain from using his position, influence or knowledge of the affairs of the Company to gain personal advantage.

## SOON-SHIONG'S MISCONDUCT

### Background

54.     Based in Culver City, California, NantHealth is a healthcare technology company that purports to provide precision medicine, data, and software related to the diagnosis and treatment of critical diseases such as cancer.

55.     The Company was founded by Defendant Soon-Shiong as a Delaware limited liability company in July 2010 under the name "About Advanced Health, LLC." About Advanced Health LLC later changed its name to NantHealth LLC. NantHealth LLC became NantHealth, Inc. following the Company's IPO on June 1, 2016.

56.     Defendant Soon-Shiong is also the founder of numerous other non-profit and for-profit companies.  According to *Politico*, at least twenty-three entities controlled by Defendant Soon-Shiong are associated with a single address.  In particular, Soon-Shiong controlled three non-profit entities relevant to the allegations herein: the Chan Soon-Shiong Family Foundation; the Chan Soon-Shiong NantHealth Foundation; and the Chan Soon-Shiong Institute of Molecular Medicine.  Soon-Shiong is the chief executive of each of the three entities.

57.     NantOmics, another entity owned and controlled by Defendant Soon-Shiong, offers testing capabilities that provide medical profiles of the cancers of individual patients. NantOmics has several accredited and licensed laboratories located around the United States.

58.     In May 2016, shortly before the Company went public, NantHealth and NantOmics entered into a reseller agreement, pursuant to which NantHealth received the exclusive rights to access and sell GPS Cancer. NantHealth describes GPS Cancer as a platform designed to diagnose cancer "at the molecular level by measuring the whole genome and proteome of a patient and thereby potentially predicting the patient's response and resistance to particular therapies." This information about the phenotype and expression of a particular patient's cancer purportedly provides information that can impact treatment decisions by giving doctors insight into what drugs and therapies are most likely to address the patient's cancer.

59.     GPS Cancer is central to the Company's business model, as demonstrated by the Company's Offering Materials, which highlighted GPS Cancer extensively. For example, the Prospectus, in a section titled "Key Factors Affecting our Performance," lists "Commercialize and Expand the Adoption of Our GPS Cancer Solution" as the first key factor, stating, in relevant part:

> Our performance depends on our ability to drive adoption of GPS Cancer and reimbursement at levels that are profitable . . . . GPS Cancer is the only comprehensive and commercially available clinical cancer platform incorporating and integrating whole genome (comparing both a patient's normal and tumor tissue), RNA, proteomic and molecular pathways information into a clinical report that analyzes this data and identifies actionable targets and potential treatment decisions. We believe the potential market for GPS Cancer is significant. We are increasing recognition of GPS Cancer by engaging and educating oncologists, cancer patients, patient advocacy groups and other key oncology stakeholders and pursuing reimbursement.

60.     The importance of GPS Cancer to the success of NantHealth is further evidenced by the Company's press releases and periodic filings with the SEC, as well as analyst reports regarding NantHealth.

**_Defendant Soon-Shiong's and the Company's Undisclosed Arrangements with the University of Utah_**

61.     Between September 2014 and January 2015, the University of Utah entered into a series of *quid pro quo* agreements with entities controlled by Defendant Soon-Shiong. The effect of these agreements was that certain non-profits controlled by Defendant Soon-Shiong would provide the University with a $12 million "donation" that would enable the University of Utah to purchase $10 million worth of research services from third parties in connection with a project referred to as the "Heritage 1K Project."[6]

62.     The MOU was entered into between the University of Utah and Defendant Soon-Shiong in September 2014. Under the MOU, NantHealth had the right to perform all the research services for the Heritage 1K Project. The MOU stated that "Donor-affiliated Scientists shall have the right to analyze the sequence data for any or all of the Heritage 1K project," and that genetic analysis would be carried out "by a bioinformatics team associated with the Donor."

63.     After the execution of the MOU, and also in September 2014, the University of Utah and three non-profit entities controlled by Defendant Soon-Shiong[7] executed the Donation Agreement, pursuant to which the controlled entities donated $12 million to the University of Utah. The Donation Agreement did not reference the MOU and was executed by Defendant Soon-Shiong as CEO of the non-profits.

64.     Under the Donation Agreement, the donation was to be used for "whole genome, exome, RNA sequencing and analysis of approximately 1,000 individuals distributed among Utah families affected by a variety of rare and common diseases and other phenotypes relevant to health

---

[6]     Pursuant to the Donation Agreement, the remaining $2 million of the $12 million gift was designated "to provide scientific and administrative support for the [Heritage 1K] Project and its scientific staff at the University."
[7]     Specifically, the entities who contributed to the donation were the Chan Soon-Shiong Family Foundation, the Chan Soon-Shiong NantHealth Foundation, and the Chan Soon-Shiong Institute of Molecular Medicine.

such as chronic lymphocytic leukemia, prostate cancer, diabetes mellitus, amyotrophic lateral sclerosis (Lou Gehrig's disease), healthy aging/longevity, and other diseases."

65.     The Donation Agreement established that $10 million of the donation could be allocated to third-party services for analyzing the patient data. The criteria to qualify to perform the work as a third-party was highly specific. The Donation Agreement stated, in relevant part:

> In performing the research, ***University may contract with non-University entities (an "Omics Facility") for the performance of the Omics Analyses*** or other work in connection with the Project. Any such Omics Facility will comply with the highest quality, research-grade sequencing available at time of the Gift, and University will make all efforts to ensure that the ***highest standards*** are met, including germline WGS (60 x coverage) on all samples, cancer and somatic WGS (60 x coverage) and WES for all cancer-related samples, and whole exome sequencing or RNA-Seq (three replicates) for selected samples as technically necessary or desired . . . For Project samples, University will expect the Omics Facility or Facilities to perform the following functions: WGS, WES, RNA-seq (total and poly-a), and HIPAA-secured transport of sequence data to analysis machines for quality control, variant calling and variant annotation (e.g., determining if a given variant induces an amino acid change), and that these will be presented in a complete report including annotated VCF files to Heritage 1K Scientists at the University within a total of seven to ten (7-10) business days from the time of receipt of sample (it being understood and agreed that the 7- 10 business day time frame is in the course of performing Omics Analysis on 1,000 samples over a period of 12 months).

(Emphasis added.)

66.     As the University later acknowledged, the only facilities capable of meeting the specification in the Donation Agreement within the University of Utah's timeline were those owned by NantHealth.

67.     In January 2015, the University of Utah and NantHealth entered into the Heritage Service Agreement for NantHealth to provide research services to the University in connection with the Heritage 1K Project.

68.     The Heritage Service Agreement provided that NantHealth would perform the $10 million worth of research services that had been contemplated in the MOU and Donation Agreement.

69.     The Heritage Service Agreement did not reference the MOU, instead stating that the "University requires the services of a genomics sequencing facility to perform certain genomics sequencing and analyses using samples provided by the University."

70.     The scope of work described by the Heritage Service Agreement is substantially similar to that outlined in the Donation Agreement. The Heritage Service Agreement states, in relevant part:

> Facility agrees to perform comprehensive whole genome sequencing ("WGS"), whole exome sequencing (WES), RNA-Seq, and analyses (the "Omics Analyses" or "Services"), as requested from time to time by the University . . . the parties anticipate that the University will require Omics Analyses on approximately 1,000 individuals, and on some number of matched somatic samples, to be determined on an Initiative-by-Initiative basis in collaboration with the scientific staff of Facility . . . Turn-around-time for delivery of the [complete report] shall be approximately seven to ten (7-10) business days from Facility's receipt of sample, assuming a volume of not more than 100 samples per month.

71.     The Heritage Service Agreement states that NantHealth "has the facilities, equipment and qualified personnel necessary to perform the services required by the University."

72.     The University of Utah has paid millions to NantHealth for performing research services pursuant to the Heritage Service Agreement. These services do not include GPS Cancer tests.

73.     On April 4, 2016, the Company's independent accounting firm, Ernst & Young LLP ("Ernst & Young"), submitted its 2015 audit results to the Board. ███████████

████████████████████████████████████████████████████████████

74.





### The IPO

75.     Following the execution of the MOU, Donation Agreement, and Heritage Services Agreement, the Company filed the Registration Statement with the SEC on May 6, 2016. The Registration Statement was signed by Soon-Shiong.

76.     On June 1, 2016, the Company filed its final amendment to the Registration Statement with the SEC, and the Registration Statement was declared effective on that same date.

77.     In the IPO, NantHealth offered 6,500,000 shares of common stock were offered at a price of $14.00 per share, and the underwriters were granted an option to purchase an additional 975,000 shares. According to the Offering Materials, there would be 120,732,690 shares of NantHealth stock outstanding following the IPO.

78.     NantHealth ultimately sold 6,900,000 shares in the IPO, raising net proceeds of approximately $83.2 million.

### Soon-Shiong Repeatedly Attends Meetings to Discuss Business Related to GPS Cancer and Fail to Correct His Knowingly False & Misleading Statements

79.     Beginning at least as early as August 2016, Soon-Shiong repeatedly met with the Board to discuss and stay up-to-date on important Company operations such as marketing strategy, sales and revenue figures, accounting principles regarding revenue recognition, analyst forecasts, internal auditing, related party transactions, and other relevant financial information related to the Company's core product, GPS Cancer.

80.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

81.     ████████████████████████████████████████████████
████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████

82.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

83.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

84.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

85.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

86.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████

87.  █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████

88.  █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████

89.  █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

90. 

91.

*Notes Issuance*

92.     On or around December 15, 2016, NantHealth entered into agreements to issue $100 million in senior unsecured notes, set to mature on December 13, 2021 (the "Notes"). Of the Notes, $90 million were sold to unaffiliated entities.

**False and Misleading Statements**

*The Offering Materials*

93.     The Company filed the Registration Statement with the SEC on May 6, 2016. The Registration Statement was signed by Soon-Shiong, and was declared effective on June 1, 2016. On June 3, 2016, the Company filed the Prospectus with the SEC, which formed part of and was incorporated into the Registration Statement.

94.     The Offering Materials only made the following statements regarding the Soon-

Shiong/University Agreements:

> We expect to launch our commercial sequencing and molecular analysis solution,
> or GPS Cancer, in the second quarter of 2016. In January 2015, we entered into an
> agreement to provide certain research related sequencing services to a university
> which is engaged in researching the genetic causes of certain hereditary diseases.
> The agreement provides that the university pay us $10.0 million in exchange for
> our providing sequencing services through our reseller agreement with NantOmics.
> In 2015, we provided $6.2 million of services, which has been recorded as a deemed
> capital contribution instead of revenue. At the university's request, ***certain non-
> profit organizations provided partial funding for the sequencing and related
> bioinformatics costs associated with the project.*** Our Chairman and Chief
> Executive Officer serves as a member of the board of directors of, and may have
> significant influence or control over, these organizations. ***The university was not
> contractually or otherwise required to use our molecular profiling solution or
> any of our other products or services as part of the charitable gift.*** In 2016, we
> expect to complete another $3.8 million in services, which will also be recorded as
> deemed capital contributions.

> * * *

> In January 2015, the Company entered into an agreement to provide certain
> research related sequencing services to a university which is engaged in researching
> the genetic causes of certain hereditary diseases. The agreement provides that the
> university pay the Company $10[ million] in exchange for the Company providing
> sequencing services through its Reseller Agreement with NantOmics. The
> Company provided $6,190[,000] of services in 2015 at a cost of approximately
> $3,714[,000]. At the request of the university, ***certain public and private charitable
> 501(c)(3) non-profit organizations provided partial funding for the sequencing
> and related bioinformatics costs associated with the project***. The Company's
> Chairman and CEO serves as the CEO and a member of the board of directors of
> each of the organizations and by virtue of these positions he may have influence or
> control over these organizations. ***The university was not contractually or
> otherwise required to use the Company's molecular profiling solutions or any of
> the Company's other products or services*** as part of the charitable gift. The
> $6,190[,000] of services performed has been recorded as a deemed capital
> contribution within Series A members' equity and the costs have been expensed as
> incurred as other services cost of revenue. The remaining $3,810[,000] in
> sequencing services will be recorded as a deemed capital contribution within Series
> A members' equity as services are performed, and any future related costs will be
> expensed at the same time as the recognition of the capital contribution.

(Emphasis added.)

95.     In regard to GPS Cancer, the Offering Materials stated, in relevant part:

**Key Factors Affecting Our Performance**

We believe that our performance and future success are dependent upon a number of factors, including our ability to (i) commercialize and grow acceptance and adoption of our GPS Cancer solutions, (ii) continue to expand sales of CLINICS, NantOS and NantOS apps to both new and existing clients, (iii) acquire and integrate technologies and businesses that would enhance our offering, (iv) innovate and enhance our Systems Infrastructure and platforms, including in particular, integrating our capabilities in support of growth of GPS Cancer, and (v) successfully invest in our infrastructure. While each of these areas presents significant opportunities for us, they also pose significant risks and challenges that we must address. See the section titled "Risk Factors" for more information.

*Commercialize and Expand the Adoption of Our GPS Cancer Solution*

Our performance depends on our ability to drive adoption of GPS Cancer and reimbursement at levels that are profitable. We also receive revenue from our sale of NantOmics' whole genome sequencing and proteomic analysis based on certain amounts billed for the NantOmics services, as specified in our Reseller Agreement. GPS Cancer is the only comprehensive and commercially available clinical cancer platform incorporating and integrating whole genome (comparing both a patient's normal and tumor tissue), RNA, proteomic and molecular pathways information into a clinical report that analyzes this data and identifies actionable targets and potential clinical treatment decisions. We believe the potential market for GPS Cancer is significant. We are increasing recognition of GPS Cancer by engaging and educating oncologists, cancer patients, patient advocacy groups and other key oncology stakeholders and pursuing reimbursement. In January 2016, a large health plan announced that it would provide insurance coverage for GPS Cancer, representing the nation's first such insurance coverage for a comprehensive whole genome and proteome molecular diagnostic program in the United States.

96.     The Offering Materials also discussed the Company's "Market Opportunity" and

"Competitive Strengths," stating, in relevant part:

**Our Market Opportunity**

We have a unique opportunity to become the leading next-generation, evidence-based, personalized healthcare company by applying novel diagnostics tailored to the specific molecular profiles of patient tissues, integrated clinically to track patient outcomes. We believe the increasing focus on value-based reimbursement models and evidence-based, personalized medicine will drive validation and adoption of CLINICS, positioning us at the forefront of multiple significant growing market opportunities. Recent statistics show that 41% of Americans will be diagnosed with cancer at some point in their lives, resulting in a potential $173 billion of medical costs by 2020. Further, cancer patients receiving chemotherapy

average $111,000 in annual medical and pharmacy costs. We estimate the potential global market opportunity for CLINICS, including GPS Cancer, to be in excess of $50 billion annually, as our platforms and solutions enable more effective treatment decisions for critical illnesses.

We believe the potential addressable market for CLINICS will continue to grow in relation to the market-share gains of value-based models. Additionally, we see the precision medicine market growing substantially as comprehensive diagnostics and evidence-based medicine become increasingly important across multiple disease areas and likely assuming greater share of the combined biopharmaceutical and diagnostics markets. We expect several factors to drive adoption of our universal diagnostics solution GPS Cancer, which enables an increased understanding of molecular pathways and their targets, such as

- improved pharmacoeconomics, including the use of more cost-effective drugs approved for other indications (such as asthma and diabetes) in cancer treatment regimens;
- a clearer understanding of critical drug resistance information;
- increased adoption of bundled payments as providers and payors recognize the efficiency of optimized therapies; and
- increased awareness and published clinical results demonstrating the benefits of evidence-based molecular medicine.

**Our Competitive Strengths**

We have invested significant capital and healthcare and biotechnology expertise over nearly a decade to develop, acquire and integrate the necessary components to establish a comprehensive, adaptive learning system designed to address many of the challenges faced by stakeholders across the continuum of care.

We believe our unique capabilities will facilitate the shift from a siloed domain approach to a more patient-centered and patient-empowered approach, and from retrospective claims data mining to real-time, proactive biometric and phenotypic analysis. We believe molecular profile data will significantly enhance outcomes and allow a shift from cohort statistics driven pathways to individualized treatment pathways and accelerate the benefit of value-based models. We also believe the unique multidimensional approach of combining biometric and phenotypic data with targeted molecular pathway information will lead to network effects unavailable to parties looking at each segment individually.

We believe we are differentiated by CLINICS, which creates a novel, comprehensive ecosystem with powerful network effects. In our view, clients who adopt our platforms receive more coordinated, targeted patient therapy and care, which leads to improved outcomes at lower cost. Each data point contributes to the broader dataset, enhancing the continuous learning system and driving value to the

32

user and overall adoption of the system. We believe our success will be based on the following key strengths and advantages:

\* \* \*

- *A clinical comprehensive molecular analysis solution*. We have exclusive rights to NantOmics' proprietary clinical comprehensive molecular analysis solution, GPS Cancer, for the clinical market that examines the entire genome, both in tumor and normal tissue samples, in addition to RNA and protein expression in the tumor sample, including quantitative proteomics measured by mass spectrometry. The test provides quantitative analysis of targeted proteins at the attomolar level, while also comparing 6 billion DNA base pairs (tumor and normal) and sequencing 200,000 RNA transcripts and provides analysis for over 15,000 nodes within approximately 1,500 protein pathways. Using this solution, we create a full genomic and quantitative proteomic profile designed to identify alterations in cellular signaling behavior that are driving disease progression. Unique adaptive machine learning algorithms match the alterations to a library of known signaling pathways and drug and drug targets, irrespective of indication, to predict the effectiveness of personalized therapies and points of resistance. We are able to deliver to providers and payors integrated and comprehensive test results aimed to arrive at improved care decisions for patients. We deliver a concise, actionable GPS Cancer report that matches these alterations with approved on-label and investigative targeted therapies and clinical trials, and GPS Cancer is the only comprehensive and commercially available clinical cancer platform incorporating and integrating whole genome (comparing both a patient's normal and tumor tissue), RNA, proteomic and molecular pathways information into such a report. We have signed agreements or agreements in principle with several customers for GPS Cancer.

97.   The statements made in the Offering Materials referenced above were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, prospects, and legal compliance, which were known to Soon-Shiong. Specifically, Soon-Shiong willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant

33

Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) that the Company had failed to maintain effective disclosure controls and procedures; and (6) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *July 25, 2016 Press Release*

98.     On July 25, 2016, the Company issued a press release announcing a partnership with the University of Utah to analyze certain genomic profiles. The press release stated, in relevant part:

> NantHealth . . . has partnered with the University of Utah in analyzing the entire genomic profiles of at least 1,000 individuals who have a history of rare and life-threatening diseases and conditions in their respective families. The landmark project will focus on researching the genetic causes of 25 conditions, including, breast, colon, ovarian, and prostate cancers, amyotrophic lateral sclerosis (ALS), chronic lymphocytic leukemia, autism, preterm birth, epilepsy, and other hereditary conditions. Genomic sequencing will be conducted with unique, comprehensive molecular tests offered by NantHealth.

> NantHealth's genomic sequencing platform integrates whole genome (DNA) sequencing, and RNA sequencing. By carrying out this extensive testing, including analysis of germline and somatic samples, University of Utah and NantOmics researchers will be able to explore the underlying genetic causes of certain conditions and diseases at the cellular level.

99.     The press release quoted Defendant Soon-Shiong, who stated, "[u]nderstanding the molecular profile and underlying genetic basis of various conditions and diseases, including cancer, will be accelerated through our partnership with the University of Utah and its Utah Genome Project."

100.     The press release continued, stating, "[t]he Heritage 1K Project will expand and focus Utah Genome Project research discovery efforts to help patients prevent, diagnose, and successfully treat diseases that have afflicted their families."

101.     Finally, the press release quoted CEO of University of Utah Health Care Dr. Vivian S. Lee as stating:

> By partnering with NantHealth and leveraging the power of genome sequencing, our researchers are now transforming our understanding of common diseases and how they should be treated . . . We are pleased to be working with Dr. Soon- Shiong to further expand genetic discovery research under our Utah Genome Project.

102.     The statements in the July 25, 2016 press release were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had failed to maintain effective disclosure controls and procedures; and (6) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### August 9, 2016 Press Release and Conference Call

103.     On August 9, 2016 the Company issued a press release regarding its financial results for the quarter ended June 30, 2016. The Company filed a Form 8-K with the SEC on the

same day, to which the press release was attached as an exhibit. The press release stated, in relevant

part:

> CULVER CITY, Calif.--(BUSINESS WIRE)--Aug. 9, 2016-- NantHealth, Inc. (NASDAQ-GS: NH), a next-generation, evidence-based, personalized healthcare company, today reported financial results for its 2016 second quarter ended June 30, 2016. The company completed its initial public offering (IPO) in early June 2016, raising net proceeds of approximately $83.2 million.
>
> For the 2016 second quarter, total net revenues increased 167% to $31.5 million from $11.8 million in last year's second quarter. Gross profit grew 69% to $9.3 million, from $5.5 million, for the 2015 second quarter. Selling, general and administrative (SG&A) expenses were $47.2 million, including stock compensation expense related to the company's IPO, compared with $17.8 million for the prior year second quarter. Research and development (R&D) expenses, including stock compensation expense related to the company's IPO, increased to $24.3 million from $5.0 million in the comparable quarter of last year.
>
> With the inclusion of stock based compensation expense related to the IPO, equal to $0.42 per share, net loss was $54.1 million, or $0.52 per share, compared with $17.2 million, or $0.21 per share, for the 2015 second quarter. Financial results for the 2016 second quarter included approximately $43.7 million in stock based compensation, equal to $0.42 per share, related to the vesting of equity tied to the company's Initial public offering. On a non-GAAP basis, for the 2016 second quarter, adjusted net loss was $16.5 million, or $0.15 per share, compared with adjusted net loss of $14.3 million, or $0.15 per share, in the prior year second quarter.
>
> "We achieved stellar topline results across all of our revenue lines, reflecting how strongly customers have responded to NantHealth's innovative offerings," said Patrick Soon-Shiong, M.D., chief executive officer and chairman of NantHealth. "Our strong second-quarter financial performance included revenues recognized from several large implementations and service contracts for our technology offerings, which were completed and delivered earlier than anticipated. As a result, we recognized certain revenues in our second quarter that we previously projected to be recorded in the second half of 2016.
>
> "Looking ahead, we are focused on adding customers and executing on our opportunities across the spectrum of our offerings. In addition, the acquisitions we completed in the last year are paying dividends and our GPS Cancer product continues to gain traction and acceptance among insurers. Combined, these efforts and initiatives will drive our growth in the near term and beyond."

104. The press release additionally noted highlights for GPS Cancer, stating, in relevant

part:

**GPS Cancer – Highlights**

- **Number of covered cancer lives:** at June 30, the number of patients with cancer covered by a payer for GPS testing was approximately 180,000. Subsequent to the quarter through August 9, the company added approximately 20,000 covered cancer lives, bringing the total number of cancer patients covered by GPS Cancer to approximately 200,000.

- **Number of GPS Cancer payers:** at June 30, the number of payers covering GPS Cancer was three. Subsequent to the end of the quarter through August 9, the company added three new payers, bringing the total number of payers covering GPS Cancer to six, resulting in 200,000 covered cancer lives.

- **Number of international GPS Cancer payers:** During the second quarter, the company added an international reseller.

105.    Also on August 9, 2016 the Company held a conference call with analysts and investors. During the call, NantHealth's President and Chief Growth Officer, non-party Robert Watson ("Watson") stated that the Company's "second quarter included a small number of completed GPS Cancer tests" due to the "short window for ordering." He further explained that "GPS Cancer orders continue to ramp up into the third quarter."

106.    During the call, Defendant Soon-Shiong touted the Company's growth, stating, "Yesterday, frankly, I think we broke the record because we are actually processing 350 whole-genome simultaneously on our massive parallel computing gear." Defendant Soon-Shiong further indicated that NantHealth's "machines are running at full tilt."

107.    The statements in the August 9, 2016 press release and conference call were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant

37

Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) that GPS Cancer orders were not "ramping up," as asserted in the August 9, 2016 conference call; (6) the Company had exaggerated the use of, and demand for, GPS Cancer; (7) the Company had failed to maintain effective disclosure controls and procedures; and (8) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *Q2 2016 10-Q*

108.    The Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2016 with the SEC on August 15, 2016 (the "Q2 2016 10-Q").

109.    The Q2 2016 10-Q commented on an agreement the Company entered into "to provide certain research related sequencing services to a university," stating, in relevant part:

> In January 2015, the Company entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases ("the university"). The agreement provides that the university pay the Company $10[ million] in exchange for the Company providing sequencing services through the Original Reseller Agreement.
>
> At the request of the university, ***certain public and private charitable 501(c)(3) non-profit organizations provided partial funding for the sequencing and related bioinformatics costs associated with the project***. The Company's Chairman and CEO serves as the CEO and a member of the board of directors of each of the organizations and by virtue of these positions he may have influence or control over these organizations. ***The university was not contractually or otherwise required to use the Company's molecular profiling solutions or any of the Company's other products or services as part of the charitable gift***.

(Emphasis added.)

38

110.    Regarding the Company's disclosure controls, the Q2 2016 10-Q further provided

that:

> **Disclosure Controls and Procedures**
> Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. ***Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of such date.*** Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

(Emphasis added.)

111.    Attached to the Q2 2016 10-Q was a certification pursuant to Rule 13a-14(a) and

15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by

Defendant Soon-Shiong attesting to the accuracy of the Q2 2016 10-Q.

112.    The statements in the Q2 2016 10-Q were materially false and misleading, and they

failed to disclose material facts necessary to make the statements made not false and misleading.

Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU was executed prior to

the Donation Agreement, and it required that the University offer a business associated with

Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K

Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding

for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation

Agreement contained precise eligibility requirements and a short deadline for the services to be

performed; (4) the University of Utah had not independently selected NantHealth to perform the

research services based on its evaluation of NantHealth's capabilities; (5) the Company had

39

exaggerated the use of, and demand for, GPS Cancer; (6) the Company had failed to maintain effective disclosure controls and procedures; and (7) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *November 7, 2016 Press Release and Conference Call*

113.    After markets closed on November 7, 2016, the Company issued a press release attached to a current report on Form 8-K filed with the SEC. It reported that 524 GPS Cancer tests had been ordered during the fiscal quarter ended September 30, 2016, which the press release characterized as "Rapid Adoption of GPS Cancer."

114.    The press release stated, in relevant part:

CULVER CITY, Calif.--(BUSINESS WIRE)--Nov. 7, 2016-- NantHealth, Inc. (NASDAQ-GS: NH), a next-generation, evidence-based, personalized healthcare company, today reported financial results for its third quarter ended September 30, 2016.

For the 2016 third quarter, total net revenue increased 76% to $25.4 million from $14.4 million in last year's third quarter. Gross profit more than tripled to $8.1 million, from $2.3 million, for the 2015 third quarter. Selling, general and administrative (SG&A) expenses were $24.7 million compared with $18.1 million for the prior year third quarter. Research and development (R&D) expenses increased to $13.9 million from $7.0 million in the comparable quarter of last year.

Net loss for the 2016 third quarter was $36.9 million, or $0.30 per share, compared with $23.0 million, or $0.24 per share, for the 2015 third quarter. Financial results for the 2016 third quarter included approximately $5.5 million of intangible amortization and $5.2 million in non-cash, stock-based compensation expense, equal to $0.10 per share. On a non-GAAP basis, for the 2016 third quarter, adjusted net loss was $22.4 million, or $0.18 per share, compared with $18.2 million, or $0.17 per share, in the prior year third quarter.

"The significant increase of total net revenue was primarily driven by a 252% increase in SaaS revenue," said Patrick Soon-Shiong, M.D., chief executive officer and chairman of NantHealth. "We continue to make great strides in healthcare interoperability and connectivity. *With regard to our GPS Cancer Test, education in the oncology community is progressing rapidly. As the oncologists begin to understand that this test better informs them and their patients as to the biology*

*of the cancer and which drugs may or may not be effective based on the genomics and proteomics signature, adoption is progressing as evidenced by the over 100% increase in number of oncologists ordering the test.* We are gratified to experience this response since we believe the test is as important to guide the physician as to which drugs not to administer as well as which agents may show sensitivity. The opportunity to have this information on hand before treatment begins is having an impact on physicians' acceptance of the value that this test can bring to cancer care. The challenge and opportunity remains, [sic] our need to continue this educational process both with provider and payer. We have ramped up our efforts to educate oncologists in target markets, secured new payer coverage and streamlined IT implementations."

(Emphasis added.)

115.    The press release also provided quarterly highlights for GPS Cancer, stating, in

relevant part:

**GPS Cancer – Highlights**

- **Number of covered cancer lives:** at September 30, 2016 the number of patients with cancer covered by a payer for GPS testing was approximately 200,000. Subsequent to the end of the quarter, the company reported a coverage agreement with Horizon BCBS for a pilot study.

- **Number of GPS Cancer payers:** at September 30, 2016 the number of payers covering GPS Cancer was seven, representing 200,000 covered cancer lives. Discussions are in progress with 17 payers, increasing from 13 in Q2. GPS Cancer Coverage[.]

- **Number of international GPS Cancer payers:** Subsequent to the end of the third quarter, the company added an additional international reseller bringing the total of international resellers to two.

- **Number of GPS Cancer Tests:** 524 ordered in Q3.

116.    On the same day, the Company held a conference call with analysts and investors,

during which it was reported that 180 of the 524 GPS Cancer tests had been ordered by the

University of Utah.

117.    During the call, Defendant Soon-Shiong stated:

In the GPS Cancer profile segments of our business, you will see that we have now had rapid adoption of GPS Cancer with more than 100% increase in the number of

oncologists ordering the test from the second quarter to the third quarter. We have 524 GPS Cancer orders in the quarter and we've delivered completed reports on 334 of these to date as we're going through the processing.

* * *

Let me turn my attention to GPS cancer. We've clearly made significant progress during this quarter and have learned a lot with regard to a launch of this novel breakthrough product. Of the 524 of GPS Cancer orders in the quarter, 344 were commercial and 180 were ordered under a research agreement with University of Utah, which we announced earlier this year. We completed more than, as I said, 334 GPS Cancer reports.

118.    Defendant Soon-Shiong also cited purchases from a clinic in Florida as proof of market demand for GPS Cancer and the utility of the results provided by GPS Cancer. He did not disclose, however, that the doctor who ran the clinic, Steve Mamus, was also a paid consultant for NantHealth.

119.    Watson noted that GPS Cancer orders were increasing, stating, in relevant part:

GPS orders accelerated in the quarter. The number of reports delivered in the quarter was 334. However, revenue recognition was adversely impacted by three issues. First, the 180 profiles that were completed under the research agreement with the University of Utah were not recognized as revenue because it was considered a research project that was started in advance of the IPO.

120.    Contrary to these statements, the Heritage Service Agreement did not involve any GPS Cancer profiles, and no GPS Cancer profiles had been conducted under the Heritage Services Agreement.

121.    The statements in the November 7, 2016 press release and conference call were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant

42

Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had exaggerated the use of and demand for GPS Cancer; (6) 180 GPS Cancer tests allegedly provided to the University of Utah during the third fiscal quarter of 2016 were not, in fact, GPS Cancer tests, but rather, as Defendant Soon-Shiong later acknowledged, "the gene sequencing work for the university was done on the same machines that perform the [GPS] cancer test"; (7) at least one doctor who was ordering GPS Cancer tests was a paid consultant of NantHealth; (8) the Company had failed to maintain effective disclosure controls and procedures; and (9) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *Q3 2016 10-Q*

122.    On November 10, 2016, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2016 with the SEC (the "Q3 2016 10-Q"). Defendant Soon-Shiong signed the Q3 2016 10-Q.

123.    The Q3 2016 10-Q made substantially similar statements regarding NantHealth's relationship with the University of Utah as contained in the Q2 2016 10-Q. Specifically, the Q3 2016 10-Q stated as follows:

> In January 2015, the Company entered into an agreement to provide certain research related sequencing services to a university which is engaged in researching the genetic causes of certain hereditary diseases. The agreement provides that the university pay the Company $10,000 in exchange for the Company providing sequencing services.

At the request of the university, ***certain public and private charitable 501(c)(3) non-profit organizations provided partial funding for the sequencing and related bioinformatics costs associated with the project***. The Company's Chairman and CEO serves as the CEO and a member of the board of directors of each of the non-profit organizations and by virtue of these positions he may have influence or control over these organizations. ***The university was not contractually or otherwise required to use the Company's molecular profiling solutions or any of the Company's other products or services as part of the charitable gift, however, the university did not have a requirement to order or pay for the services unless it first received private donor funding for the project.*** As a result, the Company does not classify the fees related to this project as revenue but instead classifies the amounts as deemed capital contributions from the Company's Chairman and CEO.

(Emphasis added.)

124.    Regarding the Company's disclosure controls, the Q3 2016 10-Q further provided that:

**Disclosure Controls and Procedures**
Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

125.    Attached to the Q3 2016 10-Q was a SOX certification signed by Defendant Soon-Shiong attesting to its accuracy.

44

126.    The statements in the Q3 2016 10-Q were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had failed to maintain effective disclosure controls and procedures; and (6) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### The Truth Gradually Emerges as Defendant Soon-Shiong Continues to Mislead Shareholders

127.    During the Relevant Period, the truth regarding NantHealth, its relationship with the University of Utah, and demand for GPS Cancer slowly emerged through a series of partial disclosures in media and analyst reports during 2017.  The Company, however, continued to repeat the same false and misleading disclosures concealing the true nature of its arrangement with the University.

### *March 6, 2017 STAT Article*

128.    Early on Monday, March 6, 2017, *STAT* published an article titled "How the world's richest doctor gave away millions – then steered the cash back to his company." The article reported that of the $12 million donation made to the University of Utah, by non-profits controlled

by Defendant Soon-Shiong "$10 million . . . would be sent right back to one of his companies. And the contract for his gift was worded in a way that left the University of Utah with no other choice."

129.   The March 6, 2017 *STAT* article opined that the deal with the University of Utah:

> made it possible for [NantHealth] to inflate, by more than 50 percent, the number of test orders it reported to investors late last year while updating them on interest in . . . GPS Cancer. [Defendant] Soon-Shiong's team counted genetic sequencing ordered by the University of Utah in those order numbers — ***even though the work for the university did not have anything to do with diagnosing or recommending treatments for cancer patients***.

(Emphasis added.)

130.   With regard to the legality of the Soon-Shiong/University Agreements, the *STAT* article noted that:

> Four tax experts who reviewed the contracts at STAT's request all agreed that the Utah deal was suspicious. Two said it appeared to violate federal tax rules governing certain charitable donations, amounting to indirect self-dealing by [Defendant] Soon-Shiong and his foundations.

> "They're laundering the funds through the University of Utah," said Marc Owens, a tax lawyer with Loeb & Loeb . . . who said the contracts appeared to violate federal rules.

131.   Marc Owens, a tax lawyer, was further quoted as stating, "I think that this transaction was deliberately structured to attempt to disguise self-dealing."

132.   The article also reported that a University of Utah spokesman and the geneticist leading the Heritage 1K Project had stated that the services procured from the Company were not related to GPS Cancer, and were instead straightforward genetic testing. The leading geneticist on the Heritage 1K Project "said she could not understand why NantHealth would count the work as orders for GPS Cancer."

*March 7, 2017 Conference Call*

133.    The Company held a conference call with analysts and investors on March 7, 2017. During that call, a Company representative stated with regard to GPS Cancer orders in the quarter ended September 30, 2016: "So let's talk about GPS [Cancer] by the numbers. These are Q3 numbers. End of Q3, there's about 170 ordering physicians. There were 524 tests in the quarter."

134.    The statements in the March 7, 2017 conference call were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had overstated the number of GPS Cancer orders received in the quarter ended September 30, 2016, thereby exaggerating the demand for GPS Cancer in the marketplace; (6) the Company had failed to maintain effective disclosure controls and procedures; and (7) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

*March 7, 2017 Los Angeles Times Article and March 8, 2017 BioSpace Article*

135.    After markets closed on March 7, 2017, *Los Angeles Times* published an article discussing the March 6, 2017 *STAT* article and the allegations therein.[8] While the *Los Angeles Times* article quoted Defendant Soon-Shiong as describing the allegations in the *STAT* article as "maliciously false," he did not deny that the University of Utah had not ordered any GPS Cancer tests, instead defending the inclusion of those tests in the GPS Cancer orders on the basis "that the gene sequencing work for the university was done on the same machines that perform the cancer test."

136.    The *Los Angeles Times* article reported that "[t]he university said it had tried to look for another provider to perform the genomic sequencing but chose NantHealth because it was the only company that met the contract's detailed requirements."

137.    On March 8, 2017, *BioSpace* published an article reiterating Defendant Soon-Shiong's acknowledgment on the prior day that although the contract did not specifically require the University to select the Company for its services, it was the only company that met the contract's detailed requirements.

***2016 10-K***

138.    On March 31, 2017, the Company filed its 2016 10-K, which was signed by Soon-Shiong.

---

[8]     At the time, Defendant Soon-Shiong was the second largest shareholder and vice chairman of Tronc, Inc., which owned *Los Angeles Times*, as of February 28, 2017, according to Tronc, Inc.'s Schedule 14A filed with the SEC on March 9, 2017. In 2018, Tronc, Inc. was sold to Nant Capital, LLC, a private investment vehicle of Defendant Soon-Shiong, for approximately $500 million. Later that year, Tronc, Inc. changed its name to its forerunner, Tribune Publishing Company. In late 2019, Alden Global Capital acquired approximately a 32% stake in shares of Triune Publishing Company. According to Tribune Publishing Company's most recent Schedule 14A filed with the SEC on April 7, 2020, Defendant Soon-Shiong beneficially owns approximately 24% of the outstanding common stock of Tribune Publishing Company.

139.    Regarding the Company's relationship with the University of Utah, the 2016 10-K

stated:

### GPS in Rare Diseases and Chronic Illnesses

Although we are deploying GPS initially for cancer, we believe this solution has potential application in identifying molecular profiles and germline mutations in rare diseases and chronic illnesses. Our molecular profile solutions are being used by a large academic research institution to examine the genomic familial drivers of cardiac disease and to perform additional research in ALS, obesity, suicide and diabetes, among other diseases.

For example, in July 2016, NantHealth announced a partnership with the University of Utah to analyze the entire genomic profiles of at least 1,000 individuals who have a history of rare and life-threatening diseases and conditions in their respective families. The landmark project is focusing on researching the genetic causes of 25 conditions, including, breast, colon, ovarian, and prostate cancers, amyotrophic lateral sclerosis (ALS), chronic lymphocytic leukemia, autism, preterm birth, epilepsy, and other hereditary conditions.

140.    Regarding the Company's disclosure controls, the 2016 10-K further provided that:

### Evaluation of Disclosure Controls and Procedures
Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. ***Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of such date.*** Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives of ensuring that information we are required to disclose in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosures, and is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. There is no assurance that our disclosure controls and procedures will operate effectively under all circumstances.

(Emphasis added.)

141.    Attached to the 2016 10-K was a SOX certification signed by Defendant Soon-Shiong attesting to its accuracy.

142.    The statements in the 2016 10-K were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had not performed any GPS Cancer tests for the University of Utah, and there was not as much demand for GPS Cancer as represented; (6) the Company had failed to maintain effective disclosure controls and procedures; and (7) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### Early April 2017 Media Reports

143.    *Politico* published an investigative report on April 9, 2017, titled "How Washington's favorite cancer fighter helps himself." The *Politico* report revealed a pattern of self-dealing by Defendant Soon-Shiong disguised as philanthropic activity. According to the report, "[a] POLITICO investigation found that the majority of [the Chan Soon-Shiong NantHealth

50

foundation's] expenditures flow to businesses and not-for-profits controlled by [Defendant] Soon-Shiong himself, and the majority of its grants have gone to entities that have business deals with his for-profit firms."

144.    On April 13, 2017, *L.A. Weekly* published an article titled "Patrick Soon-Shiong Is No Longer the Richest Person in L.A., -- and That's Not the Worst of It." The article detailed the above-described allegations against the Company and Defendant Soon-Shiong. The *L.A. Weekly* article reported that "[a] spokesman for [Defendant] Soon-Shiong [told] *L.A. Weekly*: 'The Politico article has numerous inaccuracies and misleading statements.' When asked for an example, the spokesman said, 'We're not gonna go point by point on this.'"

145.    The following day, Good Friday, while the market was closed, *STAT* published an article titled "'It will help us with our product': Emails show how a billionaire's philanthropy boosted his business." The article averred that *STAT* had obtained "more than a dozen" NantHealth documents, including "emails and documents [that] make clear that executives at NantHealth and officials at the university viewed the deal through a transactional lens, intended, at least in part, to boost [Defendant] Soon-Shiong's commercial interests."

146.    Specifically, with regard to the MOU, the article stated that "[a] university memorandum from September 2014, days before the donation was made official, stipulates that the genetic analysis to be paid for by [Defendant] Soon-Shiong's gift would be done by [Defendant] Soon-Shiong's team."

147.    Before markets opened on April 24, 2017, *Bloomberg* published an article that revealed that the success of GPS Cancer was limited and suggested that the Company's financial metrics were not telling the full story.

148.    Regarding payment for GPS Cancer tests, the *Bloomberg* article stated, in relevant part:

> "They seem to distribute an extraordinary number of tests that aren't paid for," said Paul Knight, an analyst at Janney Montgomery Scott who covers the diagnostic industry. Giving away tests to doctors to get the word out and generate demand is common among genomics startups but NantHealth's numbers are "unusual" and show that the test is "a long way from being commercially viable."

149.    With regard to the Company's financial reporting, the *Bloomberg* article stated: "NantHealth reported $100.4 million in 2016 revenue but didn't break out how much came from the diagnostic tests. The company also sells various software services to payers and hospitals."

150.    Regarding NantHealth's customer base, *Bloomberg* reported that the while the Company had reported that it had signed eight employers and insurers to use the tests, those entities "aren't rushing to place orders." Further, of those eight entities, *Bloomberg* reported that two were "double counted"—employers and insurers who had signed a single contract were counted as two separate entities.

### *2017 Proxy Statement*

151.    On April 24, 2017, the Company filed the 2017 Proxy Statement with the SEC. Defendant Soon-Shiong, and non-parties Blaszyk, Burnett, Calhoun, and Sitrick solicited shareholder votes in advance of the Company's annual meeting to be held June 13, 2017. In the proxy statement, these six directors solicited shareholder votes in favor of two management proposals including a proposal to elect Soon-Shiong, Sitrick, Calhoun, Burnett, and Blaszyk to new terms as directors.

152.    Although Soon-Shiong owned 57.9% of the Company's outstanding stock, a signed statement by Soon-Shiong on the first page assured shareholders that "[y]our vote is important," and a statement signed by the "Board of Directors," stated: "It is important that your shares be

represented at the 2017 annual meeting, regardless of the number of shares that you hold. You are,

therefore, urged to vote as promptly as possible to ensure your vote is recorded."

153.    The Proxy Statement contained a section titled, "Certain Relationships And Related

Party Transactions," that purported to disclose:

> [A] summary of transactions since January 1, 2016 to which we have been a party in which
> the amount involved exceeded $120,000 and in which any of our executive officers,
> directors, promoters or beneficial holders of more than 5% of our capital stock had or will
> have a direct or indirect material interest, other than compensation arrangements which are
> described under the section of this proxy statement titled "Executive Compensation."

154.    The "Certain Relationships And Related Party Transactions," section stated:

> In connection with our IPO, we adopted a written Related Party Transactions Policy
> that sets forth our policies and procedures regarding the identification, review,
> consideration, approval and oversight of "related person transactions."

> For purposes of our policy only, a "related party transaction" is a past, present or
> future transaction, arrangement or relationship (or any series of similar transactions,
> arrangements or relationships) in which we and any "related person" are
> participants, the amount involved exceeds $120,000 and a related person has a
> direct or indirect material interest. Various transactions are not covered by this
> policy, including transactions involving compensation for services provided to us
> as an employee, director, consultant or similar capacity by a related person, equity
> and debt financing transactions with a related person that are approved by our audit
> committee, and other transactions not otherwise required to be disclosed under Item
> 404 of Regulation S-K. A "related person," as determined since the beginning of
> our last fiscal year, is any executive officer, director or nominee to become director,
> a holder of more than 5% of our common stock, including any immediate family
> members of such persons. Any related person transaction may only be
> consummated if approved by our audit committee in accordance with the policy
> guidelines set forth below.

> Under the policy, where a transaction has been identified as a related person
> transaction, management must present information regarding the proposed related
> party transaction to our audit committee for review and approval during its first
> regularly scheduled committee meeting. In considering related person transactions,
> our audit committee takes into account the relevant available facts and
> circumstances including, but not limited to whether the terms of such transaction
> are no less favorable than terms generally available to an unaffiliated third-party
> under the same or similar circumstances and the extent of the related person's
> interest in the transaction. In the event a director has an interest in the proposed

transaction, the director must recuse himself or herself from the deliberations and approval process.

155.   The "Certain Relationships And Related Party Transactions," section detailed numerous related party transactions with entities controlled by Soon-Shiong, including the Company's investment in NantOmics in 2015, the Amended Reseller Agreement with NantOmics originally entered in 2015, agreements with NantWorks and its affiliates dating back to 2012, an agreement with Allscripts Healthcare, LLC entered in 2015.  For each transaction, the Proxy Statement set forth details regarding it and why it was a related party transaction.

156.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

157.   Compounding this omission, elsewhere in the proxy statement, under the heading "Equity Contributions," Soon-Shiong caused the 2017 Proxy Statement to repeat the same misleading disclosures the Company had issued in its Registration Statement and Forms 10-Q:

> In January 2015, we entered into an agreement to provide certain research related sequencing services to a research institution. The agreement provides that the institution pay us $10.0 million in exchange for providing sequencing services. Certain public and private charitable 501(c)(3) non-profit organizations provided partial funding for the sequencing and related bioinformatics costs associated with the project. Our Chairman and CEO serves as the CEO and a member of the board of directors of each of the non-profit organizations, and by virtue of these positions, he may have influence or control over these organizations. The institution was not contractually or otherwise required to use our molecular profiling solutions or any of our other products or services as part of the charitable gift; however, the institution did not have a requirement to order or pay for the services unless it first received private donor funding for the project. As a result, we did not classify the fees related to this project as revenue but instead classified the amounts as deemed capital contributions from our Chairman and CEO.

158.    The 2017 Proxy Statement also failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had not performed any GPS Cancer tests for the University of Utah, and there was not as much demand for GPS Cancer as represented; (6) the Company had failed to maintain effective disclosure controls and procedures; and (7) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

159.    As a result of the material misstatements and omissions contained in the 2017 Proxy Statement, Company shareholders re-elected Defendant Soon-Shiong, and non-parties Blaszyk, Calhoun, Sitrick, and Burnett as directors. The misleading statements in the 2017 Proxy Statement were a fundamental link in Soon-Shiong's continued breaches of fiduciary duties, and caused NantHealth's shareholders to forego remedies available to them under Delaware law, such as suing to halt the vote, that they would have pursued had the truth been disclosed.

### Late April 2017 Disclosures

160.    According to a report by *The Salt Lake Tribune* published on April 26, 2017, the Speaker of the Utah State House of Representatives had stated the day prior that "lawmakers …

had reason to look into" the University due to its inappropriate purchase of services from NantHealth.

161. The *Deseret News* published an article on April 27, 2017 that quoted a spokesperson from the University of Utah who "confirmed that NantHealth was the only organization that met the 'specific requirements' stipulated in" the Donation Agreement. The Company's spokesperson admitted that "NantHealh facilities were the only facilities that could really meet the specifications … within the turnaround time that they required for the project."

162. On April 28, 2017, *The Cancer Letter* reported that the University of Utah had concluded "NantHealth was the only facility capable of meeting the state of the art standards and specification required under the gift agreement." It further reported that the University of Utah had stated "[n]o future collaborations with NantHealth are planned."

163. *The Cancer Letter* article quoted Hakon Hakonarson[9] as stating, with regard to the Donation Agreement and Heritage Service Agreement:

> It is noteworthy that the sequencing metrics [Defendant Soon-Shiong's] company (NantHealth) is providing are conveniently exactly the same as the stipulations for the required metrics from the facility chosen for the project; so while there is no direct stipulation [in the Donation Agreement] that NantHealth be the sole provider, ***the stipulation makes it essentially impossible for the University of Utah to do this through a different partner***.

(Emphasis added.)

164. *The Cancer Letter* article also quoted Paul Wolpe[10] as stating:

> A grant given to a university for a research project should not use its funds to subcontract with a private company which has a key owner or official affiliated

---

[9]     Hakonarson is director of the Center for Applied Genomics at the Children's Hospital of Pennsylvania and an associate professor of pediatrics at the University of Pennsylvania School of Medicine.

[10]    Paul Wolpe is the director of the Emory Center for Ethics, the Asa Griggs Candler Professor of Bioethics, and the Raymond F. Schinazi Distinguished Research Chair in Jewish Bioethics.

with the fund. ***It is clearly a conflict of interest*** . . . If the grant requires the use of that company, it is an even more egregious conflict of interest. It is simply inappropriate to have a funder also be a key owner or otherwise significantly affiliated with a private company paid by those funds. It is, in fact, a kind of "money laundering"—using a university as a conduit to funnel foundation money through a university to a company affiliated with the foundation, formally or through a common owner or a key investor or executive . . . For a company to profit from such a foundation should never be permitted.

(Emphasis added.)

165.    On Friday, April 28, 2017, after trading hours, *The Salt Lake Tribune* published an article titled "U. Health Care CEO Vivian Lee resigns after cancer institute controversy." The article reported that the CEO of the University of Utah Health Care System had resigned. It further noted that Jon Huntsman Sr., benefactor of the Huntsman Cancer Institute at the University of Utah, believed that the resignation was "related to her dealings with [Defendant] Soon-Shiong."

### *Q1 2017 10-Q*

166.    On May 12, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2017 with the SEC (the "Q1 2017 10-Q"). Defendant Soon-Shiong signed the Q1 2017 10-Q.

167.    The Q1 2017 10-Q made similar statements regarding NantHealth's relationship with the University of Utah as those in the Forms 10-Q excerpted above, which misrepresented that the funding provided by Soon-Shiong's charities was "partial" and that the University was not required to use the Company's services:

In January 2015, the Company entered into an agreement to provide certain research related sequencing services to a research institution. The agreement provides that the institution pay the Company $10,000 in exchange for the Company providing sequencing services. ***Certain public and private charitable 501(c)(3) non-profit organizations provided partial funding for the sequencing and related bioinformatics costs associated with the project***. The Company's Chairman and CEO serves as the CEO and a member of the board of directors of each of the non-profit organizations and by virtue of these positions he may have influence or control over these organizations. ***The institution was not contractually***

*or otherwise required to use the Company's molecular profiling solutions or any of the Company's other products or services as part of the charitable gift, however, the institution did not have a requirement to order or pay for the services unless it first received private donor funding for the project*. As a result, the Company does not classify the fees related to this project as revenue but instead classifies the amounts as deemed capital contributions from the Company's Chairman and CEO.

(Emphasis added.)

168. Attached to the Q1 2017 10-Q was a SOX certification signed by Defendants Soon-Shiong attesting to its accuracy.

169. The statements in the Q1 2017 10-Q were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had failed to maintain effective disclosure controls and procedures; and (6) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *Q2 2017 10-Q*

170.     On August 11, 2017, the Company filed its quarterly report on Form 10-Q for the

fiscal quarter ended June 30, 2017 with the SEC (the "Q2 2017 10-Q"). Defendant Soon-Shiong

signed the Q2 2017 10-Q.

171.     The Q2 2017 10-Q made similar statements regarding NantHealth's relationship

with the University of Utah as those in the Forms 10-Q excerpted above, which misrepresented

that the funding provided by Soon-Shiong's charities was "partial" and that the University was not

required to use the Company's services:

> In January 2015, the Company entered into an agreement to provide certain
> research related sequencing services to a research institution. The agreement
> provides that the institution pay the Company $10,000 in exchange for the
> Company providing sequencing services. ***Certain public and private charitable
> 501(c)(3) non-profit organizations provided partial funding for the sequencing
> and related bioinformatics costs associated with the project***. The Company's
> Chairman and CEO serves as the CEO and a member of the board of directors of
> each of the non-profit organizations and by virtue of these positions he may have
> influence or control over these organizations. ***The institution was not contractually
> or otherwise required to use the Company's molecular profiling solutions or any
> of the Company's other products or services as part of the charitable gift,
> however, the institution did not have a requirement to order or pay for the services
> unless it first received private donor funding for the project***. As a result, the
> Company does not classify the fees related to this project as revenue but instead
> classifies the amounts as deemed capital contributions from the Company's
> Chairman and CEO.

(Emphasis added.)

172.     Attached to the Q2 2017 10-Q was a SOX certification signed by Defendant Soon-

Shiong attesting to its accuracy.

173.     The statements in the Q2 2017 10-Q were materially false and misleading, and they

failed to disclose material facts necessary to make the statements made not false and misleading.

Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU required that the

University offer a business associated with Defendant Soon-Shiong the opportunity to perform all

of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant

Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs

associated with the project;" (3) the Donation Agreement contained precise eligibility

requirements and a short deadline for the services to be performed; (4) the University of Utah had

not independently selected NantHealth to perform the research services based on its evaluation of

NantHealth's capabilities; (5) the Company had failed to maintain effective disclosure controls

and procedures; and (6) as a result of the foregoing, statements about the Company's business,

operations and prospects were materially false and misleading and lacked a reasonable basis at all

relevant times.

### *Q3 2017 10-Q*

174.    On November 14, 2017, the Company filed its quarterly report on Form 10-Q for

the fiscal quarter ended September 30, 2017 with the SEC (the "Q3 2017 10-Q"). Defendant Soon-

Shiong signed the Q3 2017 10-Q.

175.    The Q3 2017 10-Q made the same statements regarding NantHealth's relationship

with the University of Utah as those in the Forms 10-Q excerpted above, which misrepresented

that the funding provided by Soon-Shiong's charities was "partial" and that the University was not

required to use the Company's services:

> In January 2015, the Company entered into an agreement to provide certain
> research related sequencing services to a research institution. The agreement
> provides that the institution pay the Company $10,000 in exchange for the
> Company providing sequencing services. ***Certain public and private charitable
> 501(c)(3) non-profit organizations provided partial funding for the sequencing
> and related bioinformatics costs associated with the project***. The Company's
> Chairman and CEO serves as the CEO and a member of the board of directors of
> each of the non-profit organizations and by virtue of these positions he may have
> influence or control over these organizations. ***The institution was not contractually
> or otherwise required to use the Company's molecular profiling solutions or any
> of the Company's other products or services as part of the charitable gift,
> however, the institution did not have a requirement to order or pay for the services***

*unless it first received private donor funding for the project*. As a result, the Company does not classify the fees related to this project as revenue but instead classifies the amounts as deemed capital contributions from the Company's Chairman and CEO.

(Emphasis added.)

176.   Attached to the Q3 2017 10-Q were SOX certifications signed by Defendants Soon-Shiong attesting to its accuracy.

177.   The statements in the Q3 2017 10-Q were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had failed to maintain effective disclosure controls and procedures; and (6) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### The Utah Legislative Auditor General's Report

178.   In November 2017, the Office of the Legislative Auditor General of the state of Utah issued a report concluding that the University of Utah improperly bypassed procurement rules in awarding NantHealth the contract for the Heritage 1K Project. The Audit Subcommittee of the Legislative Management Committee determined that the University severely overpaid for

NantHealth's services when compared to fair market value. Although the audit concluded that the use of NantHealth's services was not an express condition of the Company's donation, the audit revealed that the University itself believed that employing NantHealth's services was required under the Soon-Shiong/University Agreements.

### *2017 10-K*

179.    On March 16, 2018, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K").  Defendant Soon-Shiong signed the 2017 10-K.

180.    The 2017 10-K made the same statements regarding NantHealth's relationship with the University of Utah as those in the Forms 10-Q excerpted above, which misrepresented that the funding provided by Soon-Shiong's charities was "partial" and that the University was not required to use the Company's services:

> In January 2015, the Company entered into an agreement to provide certain research related sequencing services to a research institution. The agreement provides that the institution pay the Company $10,000 in exchange for the Company providing sequencing services. ***Certain public and private charitable 501(c)(3) non-profit organizations provided partial funding for the sequencing and related bioinformatics costs associated with the project***. The Company's Chairman and CEO serves as the CEO and a member of the board of directors of each of the non-profit organizations and by virtue of these positions he may have influence or control over these organizations. ***The institution was not contractually or otherwise required to use the Company's molecular profiling solutions or any of the Company's other products or services as part of the charitable gift, however, the institution did not have a requirement to order or pay for the services unless it first received private donor funding for the project***. As a result, the Company does not classify the fees related to this project as revenue but instead classifies the amounts as deemed capital contributions from the Company's Chairman and CEO.

(Emphasis added.)

181.    Attached to the 2017 10-K was a SOX certification signed by Defendant Soon-Shiong attesting to its accuracy.

182.    The statements in the 2017 10-K were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, Soon-Shiong improperly failed to disclose that: (1) the MOU required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had failed to maintain effective disclosure controls and procedures; and (6) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### 2018 Proxy Statement

183.    On April 30, 2018, Soon-Shiong continued to mislead investors by causing the Company to file its 2018 Proxy Statement with the SEC, which contained false and misleading statements and omissions related to NantHealth's transaction with the University. Specifically, although the 2018 Proxy Statement contained a section titled "Certain Relationships and Related Party Transactions," which purported to describe material related party transactions. Similarly to the 2017 Proxy Statement, the 2018 Proxy Statement failed to disclose or discuss the Soon-Shiong/University Agreements or, as a result of those agreements, the University as a related party.

184.    Although Soon-Shiong owned 64.6% of the Company's outstanding stock, a signed statement by Soon-Shiong on the first page assured shareholders that "[y]our vote is important,"

and a statement signed by the "Board of Directors," stated: "It is important that your shares be represented at the 2018 annual meeting, regardless of the number of shares that you hold. You are, therefore, urged to vote as promptly as possible to ensure your vote is recorded." The Proxy Statement elsewhere repeated that, "Your vote is very important."

185.    The Proxy Statement contained a section titled, "Certain Relationships And Related Party Transactions," that purported to disclose:

> [A] summary of transactions since January 1, 2017 to which we have been a party in which the amount involved exceeded $120,000 and in which any of our executive officers, directors, promoters or beneficial holders of more than 5% of our capital stock had or will have a direct or indirect material interest, other than compensation arrangements which are described under the section of this proxy statement titled "Executive Compensation."

186.    The "Certain Relationships And Related Party Transactions," section stated:

> In connection with our IPO, we adopted a written Related Party Transactions Policy that sets forth our policies and procedures regarding the identification, review, consideration, approval and oversight of "related person transactions."

> For purposes of our policy only, a "related party transaction" is a past, present or future transaction, arrangement or relationship (or any series of similar transactions, arrangements or relationships) in which we and any "related person" are participants, the amount involved exceeds $120,000 and a related person has a direct or indirect material interest. Various transactions are not covered by this policy, including transactions involving compensation for services provided to us as an employee, director, consultant or similar capacity by a related person, equity and debt financing transactions with a related person that are approved by our audit committee, and other transactions not otherwise required to be disclosed under Item 404 of Regulation S-K. A "related person," as determined since the beginning of our last fiscal year, is any executive officer, director or nominee to become director, a holder of more than 5% of our common stock, including any immediate family members of such persons. Any related person transaction may only be consummated if approved by our audit committee in accordance with the policy guidelines set forth below.

> Under the policy, where a transaction has been identified as a related person transaction, management must present information regarding the proposed related party transaction to our audit committee for review and approval during its first regularly scheduled committee meeting. In considering related person transactions, our audit committee takes into account the relevant available facts and circumstances including, but not limited to whether the terms of such transaction

are no less favorable than terms generally available to an unaffiliated third-party under the same or similar circumstances and the extent of the related person's interest in the transaction. In the event a director has an interest in the proposed transaction, the director must recuse himself or herself from the deliberations and approval process.

187.    The "Certain Relationships And Related Party Transactions," section detailed numerous related party transactions with entities controlled by Soon-Shiong, including the Company's investment in NantOmics in 2015, the Amended Reseller Agreement with NantOmics originally entered in 2015, agreements with NantWorks and its affiliates dating back to 2012, an agreement with Allscripts Healthcare, LLC entered in 2015.  For each transaction, the Proxy Statement set forth details regarding it and why it was a related party transaction.

188.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

189.    Compounding this omission, elsewhere in the proxy statement, under the heading "Equity Contributions," Soon-Shiong caused the Proxy Statement to repeat the same misleading disclosures the Company had issued in its Registration Statement and Forms 10-Q:

> In January 2015, we entered into an agreement to provide certain research related sequencing services to a research institution. The agreement provides that the institution pay us $10.0 million in exchange for providing sequencing services. Certain public and private charitable 501(c)(3) non-profit organizations provided partial funding for the sequencing and related bioinformatics costs associated with the project. Our Chairman and CEO serves as the CEO and a member of the board of directors of each of the non-profit organizations, and by virtue of these positions, he may have influence or control over these organizations. The institution was not contractually or otherwise required to use our molecular profiling solutions or any of our other products or services as part of the charitable gift; however, the institution did not have a requirement to order or pay for the services unless it first received private donor funding for the project. As a result, we did not classify the fees related to this project as revenue but instead classified the amounts as deemed capital contributions from our Chairman and CEO.

190.     The 2018 Proxy Statement solicited shareholder approval of the Amendment Proposal, and, if approved, the total number of shares reserved for issuance would be 12.8 million shares, which represented approximately 11.8% of the Company's common stock outstanding as of April 13, 2018.

191.     The 2018 Proxy Statement also failed to disclose that: (1) the MOU was executed prior to the Donation Agreement, and it required that the University offer a business associated with Defendant Soon-Shiong the opportunity to perform all of the research services for the Heritage 1K Project; (2) non-profit entities owned by Defendant Soon-Shiong had provided all of the funding for the "sequencing and related bioinformatics costs associated with the project;" (3) the Donation Agreement contained precise eligibility requirements and a short deadline for the services to be performed; (4) the University of Utah had not independently selected NantHealth to perform the research services based on its evaluation of NantHealth's capabilities; (5) the Company had not performed any GPS Cancer tests for the University of Utah, and there was not as much demand for GPS Cancer as represented; (6) the Company had failed to maintain effective disclosure controls and procedures; and (7) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

192.     As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders re-elected Defendant Soon-Shiong, and non-parties Blaszyk, Calhoun, and Sitrick as directors and approved the Amendment Proposal. The misleading statements in the 2018 Proxy Statement were a fundamental link in Soon-Shiong's continued breaches of fiduciary duties, and caused NantHealth's shareholders to forego remedies available

to them under Delaware law, such as suing to halt the vote, that they would have pursued had the truth been disclosed.

### *Q1 2018 10-Q*

193.    On May 10, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 with the SEC (the "Q1 2018 10-Q"). Defendant Soon-Shiong signed the Q1 2018 10-Q. The Q1 2018 10-Q did not affirmatively correct the repeated misrepresentations of "partial" funding by Soon-Shiong's charities and that the University was not required to use NantHealth to perform services under the agreement.  Nonetheless, for the first time since the Company's IPO, the Form 10-Q omitted the assertion of partial funding:

> In December 2016, the Company entered into an agreement to provide genomic and proteomic sequencing and related bioinformatics services to an institution related to cancer research. The agreement provides that the institution pay the Company a fixed per-test fee in exchange for the services to be provided by the Company. A private charitable 501(c)(3) non-profit organization controlled by the Company's Chairman and CEO also made a charitable gift to the institution in December 2016. The gift does not contractually or otherwise require the institution to use the Company's molecular profiling solutions or any of the Company's other products or services… During July 2017, the agreement with the institution was canceled.

194.    In early April 2019, Defendant Soon-Shiong was again embroiled in an alleged scandal involving repayment to one of the companies he owns and controls. On April 3, 2019, Sorrento Therapeutics Inc. ("Sorrento") filed two lawsuits seeking a total of nearly $1.1 billion against, among others, Defendant Soon-Shiong. The lawsuit alleged, among other things, that Defendant Soon-Shiong redirected over $90 million of funds from a joint venture, "Immunotherapy Nantibody," Sorrento had with NantCell, Inc., a company owned and controlled by Defendant Soon-Shiong, to NantPharma LLC, another company owned and controlled by Defendant Soon-Shiong.

## THE FEDERAL SECURITIES CLASS ACTION

195.   On March 27, 2018, Judge Hatter denied defendants motion to dismiss securities

fraud claims against defendant Soon-Shiong, holding, among other things:

> To satisfy Rule 9(b)'s heightened pleading requirement for a securities fraud claim, Plaintiffs must identify the who, what, when, where, and how of the misconduct alleged, as well as what was false or misleading about the allegedly fraudulent statement, and why it was false. *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013). Here, *the foundation of Plaintiffs' § 10(b) and Rule 10b-5 claim is built upon misrepresentations and omissions made by NantHealth and Soon-Shiong in various press releases, quarterly reports, and investor calls, namely, that Soon-Shiong's nonprofits provided only partial funding to the University, the University was not contractually or otherwise obligated to use NantHealth*, and there were 524 GPS Cancer tests ordered in the third quarter. *The parties do not dispute that the content of these statements was material information*. Further, *Plaintiffs alleged that NantHealth and Soon-Shiong omitted material information regarding the nature of NantHealth's relationship with the University*. Once NantHealth chose to tout positive information regarding its relationship to the University, it was bound to do so in a manner that would not mislead investors; it had an obligation to disclose adverse information that cut against the positive information. *See Schueneman*, 840 F.3d at 706. Plaintiffs sufficiently alleged that NanthHealth failed to disclose that adverse information.

> \* \* \*

> Here, Soon-Shiong was, allegedly, intimately involved with the nonprofits, the MOU, the Agreements, and was the catalyst of the relationship between NantHealth and the University. Due to Soon-Shiong's role in forming the relationship between the University and NantHealth, he knew, or had reason to know, of the potential constraints and incentives placed on the University to select NantHealth as its research provider. However, Soon-Shiong, allegedly, made statements contrary to the true nature of the relationship between the University and NantHealth, or at the very least, omitted material information regarding the true nature of the relationship. Additionally, Soon-Shiong, allegedly, knew that the University's test orders were not GPS Cancer test orders, yet he still represented that the University's orders were GPS Cancer tests so as to artificially inflate NantHealth's quarterly numbers.

> Accordingly, assessing the allegations holistically, Plaintiffs have alleged sufficient facts to raise a strong inference that Soon-Shiong intentionally, knowingly, or with deliberate recklessness, misrepresented, or omitted material facts, regarding the relationship between the University and NantHealth, and NantHealth's total orders of GPS Cancer. See Tellabs, 551 U.S. at 321. Thus, Plaintiffs § 10(b) and Rule 10b-5 claim satisfies the PSLRA. See Scheuneman, 840 F.3d at 704.

*Deora v. NantHealth, Inc.,* 2018 WL 4743494, at *3 (C.D. Cal. Mar. 27, 2018) (emphasis added).

196.    Following denial of the motion to dismiss, on July 30, 2019, Judge Hatter granted the Federal Securities Class Action plaintiffs' motion for class certification.  Federal Securities Class Action, ECF No. 100.

197.    On October 23, 2019, the parties filed notice of a settlement that would pay $16.5 million to the members of the class, or approximately $0.97 per damaged share.  Judge Hatter issued an order finally approving the settlement on September 10, 2020.  Federal Securities Class Action, ECF Nos. 107, 132.

## THE CHANCERY COURT ACTION

198.    On January 14, 2020, Chancellor Bouchard issued an order denying defendants' the motion to dismiss as to a claim of breaches of fiduciary duty against Soon-Shiong and holding that demand was futile as to claims against Soon-Shiong.  The order held as follows:

> The challenged disclosures fall into three categories, *i.e.*, (i) misrepresentations that the Nonprofits' $12 million gift to the University of Utah did not obligate the University to obtain services from NantHealth when, in actuality, it did; (ii) misrepresentations that the Nonprofits provided only partial funding for the Heritage 1K project when, in actuality, they provided the entire funding; and (iii) statements portraying the commercial demand for GPS Cancer to be greater than it was.

> \* \* \*

> Defendants concede for purposes of this motion, as they credibly must, that Soon-Shiong is interested. The gravamen of the Amended Complaint is that Soon-Shiong caused the Nonprofits he controlled to make a donation to the University of Utah with the understanding—which was not disclosed—that the University would be required to turn around and pay those funds (less some "scientific and administrative support" costs) to NantHealth to use its GPS technology. As NantHealth's controlling stockholder, Soon-Shiong stood to benefit from this scheme to make it appear as if a prestigious institution independently had endorsed

NantHealth's technology and that there was greater commercial demand for GPS Cancer than there actually was.

\* \* \*

As to Burnett, the Complaint alleges that he entered into an agreement with Soon-Shiong in November 2016 when joining the boards of two Soon-Shiong controlled entities—NantHealth and NantBioScience, Inc.—whereby Burnett was provided options to acquire common stock valued at $10 million on the date of grant, which would vest in 25% tranches over four years. When this action was filed, three tranches had not vested. Thus, a vote in favor of suing Soon-Shiong would put at risk Burnett's remaining $7.5 million worth of stock options in addition to the equity he would receive if NantBioScience were to go public. The Complaint further alleges that in February 2015, Soon-Shiong provided cancer treatment to Burnett's son free-of-charge, that Burnett was not listed as an independent director of the Company in a May 2016 public filing and that NantHealth's board determined that Burnett was not independent in March 2017—about one year before this action was filed.

As to Sitrick, who also was not listed as an independent director of the Company in a May 2016 public filing, the Complaint alleges he has known Soon-Shiong for approximately twenty years and served on the boards of several of his entities. Sitrick is the founder, CEO and Chairman of Sitrick and Company, which has provided public relations services to at least one Soon-Shiong-controlled entity and to Soon-Shiong personally since 2002. Sitrick also serves as director of one of the Nonprofits and has served as a trustee of the St. John's Health Center Foundation with Soon-Shiong, which is the recipient of at least $100 million from that same Nonprofit affiliated with Soon-Shiong.54 In a book he published in January 2018, just a few months before this action was filed, Sitrick wrote about Soon-Shiong in exceptionally glowing terms that, combined with his lengthy personal and professional relationship with Soon-Shiong, cast further substantial doubt on his ability to be impartial in deciding whether or not to initiate litigation against him:

> [Soon-Shiong] is also one of the most compassionate men I have ever met, the personification of the caring doctor you used to see in TV dramas .... [Soon-Shiong] is someone I am honored to call my friend and client, and it has been a privilege to work alongside him, both as a strategic public relations counsel and as a member of his various boards of directors, including those of APP, Abraxis BioScience, and one of his two new public companies, NantHealth .... The value of his work is incalculable. At the risk of using what has become an overused term, it is priceless.

Having determined that demand is excused as to Count I against Soon-Shiong, the next question is whether Count I states a claim for relief against him. It clearly does. As discussed above, Count I alleges that Soon-Shiong orchestrated a scheme for

his personal benefit by secretly directing a contribution from the Nonprofits he controls to NantHealth through a respected educational institution in order to burnish the Company's image and artificially inflate the perceived demand for GPS Cancer. Significantly, the district court in the Securities Action determined there were sufficient facts regarding the same post-IPO conduct alleged here to infer scienter on behalf of Soon-Shiong under the heightened pleading standard of the Private Securities Litigation Reform Act of 1995.56 Based on these facts, it is reasonably conceivable that Soon-Shiong could be found to have violated his duty of loyalty to the Company. Accordingly, for the reasons explained above, the motion to dismiss Count I is DENIED as to defendant Soon-Shiong.

*In re Nanthealth, Inc.*, 2020 WL 211065, at **4-5, 7-9.

199.    The Chancery Court Action is currently in discovery.

## DAMAGES TO NANTHEALTH

200.    As a direct and proximate result of Soon-Shiong's conduct, NantHealth will lose and expend many millions of dollars, and has already done so.

201.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, CFO, the majority of the members of its Board, and two former members of its Board, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

202.    Such expenditures include, but are not limited to, the approximately $16.5 million the Company paid to resolve the Federal Securities Class Action.

203.    These expenditures also include any costs incurred in connection with potential government or regulatory investigations into the Company's relationship with the University of Utah and the Soon-Shiong/University Agreements.

204.    As a direct and proximate result of Soon-Shiong's conduct, NantHealth has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Soon-Shiong's breaches of fiduciary duties and other wrongs.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

205.     Plaintiffs bring this action derivatively and for the benefit of NantHealth to redress injuries suffered, and to be suffered, as a result of Soon-Shiong's breaches of his fiduciary duties as a director and officer of NantHealth, and violations of Sections 10(b) and 14(a) of the Exchange Act.

206.     NantHealth is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

207.     Plaintiffs are, and have been at all relevant times, shareholders of NantHealth. Plaintiffs will adequately and fairly represent the interests of NantHealth in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

208.     When Plaintiff Shen filed his action, NantHealth's Board consisted of Defendant Soon-Shiong, and non-parties Sitrick, Calhoun, Blaszyk, and Burnett (the "*Shen* Board"). When Plaintiff Manuel filed his action, NantHealth's Board consisted of Defendant Soon-Shiong, and non-parties Sitrick, Calhoun, Blaszyk, and non-party Louks (the "*Manuel* Board"). NantHealth's current Board consists of Defendant Soon-Shiong, and non-parties Strick, Calhoun, Blaszyk, and Wise.

209.     Plaintiffs allege that the appropriate Board for demand futility purposes as to all counts is the *Shen* Board or the *Manuel* Board. As set forth below, demand is futile as to both the *Shen* Board or the *Manuel* Board because the only difference between the two is that Louks replaced Burnett, and Louks was employed fulltime as an executive of the Company and was not independent of Soon-Shiong. While Plaintiffs do not believe the current Board is relevant for demand futility purposes as to any Count, in the alternative, demand is excused as to the current

Board for the same reasons that it was excused to as to the *Shen* and *Manuel* Boards: Soon-Shiong dominates the Board and has complete control over its composition, and has chosen to fill the majority of Board seats with directors that are beholden to him and have a long history of non-NantHealth business with him.

210.    Plaintiffs did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act because, as set forth below, a majority of the Board was interested in a demand take legal action against Soon-Shiong in connection with his wrongs.   At all relevant times, NantHealth's proxy statements disclosed that Soon-Shiong controlled NantHealth, and that the Company did not have a nominating and governance committee.

### Demand is Excused as to Count I

#### Soon-Shiong was Not Disinterested

211.    At all relevant times, Soon-Shiong was the Company's CEO, Chairman of the Board, and controlling shareholder. Defendant Soon-Shiong is not disinterested because he is primarily employed as the CEO and Chairman of NantHealth.   As a result, he is an employee of the Company and is not an independent director under the listing standards of the Nasdaq Exchange or as defined by the Company.   Soon-Shiong owns more than 60% of the voting power of NantHealth stock and his reputation is inextricably linked to his founding of the Company and employment as its CEO.   As a result, demand is excused as to Soon-Shiong.

212.    Soon-Shiong signed the Donation Agreement, MOU, and Heritage Service Agreement with the University, so he had actual knowledge of the Soon-Shiong/University Agreements.   Moreover, as the CEO, Chairman, and controlling shareholder and with knowledge of the Soon-Shiong/University Agreements , Soon-Shiong knew that the University was not

ordering GPS Cancer tests.   Soon-Shiong's own statements misleadingly concealed Soon-Shiong/University Agreements that artificially increased demand for GPS Cancer, and he was well aware that the Company's public statements did so as well.   As explained by Vice Chancellor Bouchard:

> Soon-Shiong caused the nonprofits he controlled to make a donation to the University of Utah with the understanding—which was not disclosed—that the University would be required to turn around and pay those funds (less some "scientific and administrative support" costs) to NantHealth to use its GPS technology.   As NantHealth's controlling stockholder, Soon-Shiong stood to benefit from this scheme to make it appear as if a prestigious institution independently had endorsed NantHealth's technology and that there was greater commercial demand for GPS Cancer than there actually was.

*In re Nanthealth, Inc.*, 2020 WL 211065, at *5.

213.    Due to his statements regarding Soon-Shiong/University Agreements, Soon-Shiong was a defendant in the Federal Securities Class Action and his motion to dismiss the securities fraud claims against him was denied.   Additionally, in the Chancery Court Action, defendants conceded that Soon-Shiong lacks disinterest for the purposes of a demand arising from the wrongdoing alleged herein.   *In re Nanthealth, Inc.*, 2020 WL 211065, at *5 ("defendants concede for the purposes of this motion, as they credibly must, that Soon-Shiong is interested.").

214.    As a result, Soon-Shiong could not disinterestedly consider a demand for action against himself and demand is excused as to him.

*Sitrick was Not Independent of Soon-Shiong*

215.    Sitrick is not independent of Soon-Shiong, as Vice Chancellor Bouchard held in the Chancery Court Action.   *See In re Nanthealth, Inc.*, 2020 WL 211065, at *7.

216.    At the time of NantHealth's amendment to its Registration Statement filed with the SEC on May 24, 2016, Sitrick was not an independent director.

217.    Sitrick has known Soon-Shiong for approximately twenty years and served on the boards of several of his entities.  For example, Soon-Shiong formed American Pharmaceutical Partners, Inc. ("Old APP") in 2001.  Old APP developed, manufactured, and marketed injectable pharmaceutical products.  In April 2006, Old APP merged with American BioScience, Inc. and changed its name to Abraxis BioScience, Inc. ("Old Abraxis").  In November 2007, Old Abraxis separated into two independent publicly-traded companies: the hospital-based business, APP Pharmaceuticals, Inc. ("New APP") and its proprietary business Abraxis BioScience, Inc. ("New Abraxis"). In September 2008, New APP was acquired by and became a wholly-owned subsidiary of Fresenius Kabi Pharmaceuticals Holding, Inc. ("Fresenius").  In October 2010, New Abraxis was acquired by and became a wholly-owned subsidiary of Celgene Corporation ("Celgene"). Soon-Shiong made billions of dollars in these transactions, and he conferred substantial benefits on Sitrick, who was also a director of Old Abraxis at the time it split.  After the split, defendant Sitrick became a director of New Abraxis and New APP.  When Celgene acquired New Abraxis, Sitrick received $350,600 and 10,000 contingent value rights ("CVRs").  When Fresenius acquired New APP, Sitrick received $253,245.23 and 24,649 CVRs.

218.    Unsurprisingly, Sitrick is also a long-time friend of Soon-Shiong and the two share other beneficial business relationships.  Sitrick is the founder, CEO, and Chairman of Sitrick and Company, a public relations firm that provides services for NantWorks, and receives fees for that work.  In addition, Soon-Shiong is personally a client of Sitrick and Company, and appeared on that company's website in its list of current and former clients.  In 2018, when the singer Cher sued Soon-Shiong for stock fraud and breach of fiduciary duty for convincing her to sell her stock for too low of a price, Sitrick responded to the allegations personally as "spokesman for Soon-Shiong."  A quote from Soon-Shiong praising defendant Sitrick appears on the back cover of

Sitrick's book published on January 8, 2018: "When your reputation or your company's is on the line, its not about public relations, its about the truth. There is no one better than Mike Sitrick."  In the book, Sitrick discusses some of his work for Soon-Shiong, including when Soon-Shiong hired him in 2002 to address short sellers attacking Old APP and Soon-Shiong's related party transactions. In the book, Sitrick also discusses in detail killing a story that *The Wall Street Journal* planned to write about Soon-Shiong and brags that in 2003, Rudy Giuliani was "consulting" for Soon-Shiong and agreed to have lunch with an editor of *Forbes* magazine (along with defendant Sitrick) in order to help pitch a positive article about Soon-Shiong

219.    In the book, Sitrick wrote about Soon-Shiong in terms that Vice Chancellor Bouchard described as "exceptionally glowing," for example:

> [Soon-Shiong] is also one of the most compassionate men I have ever met, the personification of the caring doctor you used to see in TV dramas .... [Soon-Shiong] is someone I am honored to call my friend and client, and it has been a privilege to work alongside him, both as a strategic public relations counsel and as a member of his various boards of directors, including those of APP, Abraxis BioScience, and one of his two new public companies, NantHealth .... The value of his work is incalculable. At the risk of using what has become an overused term, it is priceless.

220.    Between 2012 and 2013, defendant Soon-Shiong acquired nearly 25% of the stock of JAKKS Pacific, Inc. ("Jakks"). In 2014, defendant Sitrick was nominated to a seat on the board of directors of Jakks.  Though the nomination did not explicitly state that it was related to or a result of defendant Soon-Shiong's massive position, plaintiffs infer that defendant Soon-Shiong at a minimum suggested or pushed for defendant Sitrick's inclusion on the board of directors of Jakks.  When this action was filed, Sitrick had received total compensation from that position of nearly $900,000.

221.    Sitrick serves on the board of the Chan Soon-Shiong NantHealth Foundation. Sitrick has allowed the Chan Soon-Shiong NantHealth Foundation to operate to mainly benefit

Soon-Shiong's for-profit business ventures.  Sitrick also served as a trustee of the St. John's Health Center Foundation with defendant Soon-Shiong, a nonprofit designed to advance the goals of St. John's Health Center in Santa Monica, California.  Notably, the Chan Soon-Shiong NantHealth Foundation has donated at least $100 million to St. John's. The Chan Soon-Shiong NantHealth Foundation lists St. John's as its primary affiliation, a designation that is needed in order for the Chan Soon-Shiong NantHealth Foundation to retain its title as a medical research organization. This designation is important in order for the Chan Soon-Shiong NantHealth Foundation to be legally allowed to engage in dealings with related entities.

222.    Accordingly, Sitrick is not independent of Soon-Shiong and therefore would be interested in a demand regarding Soon-Shiong's breaches of fiduciary duties, and demand is excused as to him on this basis.

#### Burnett was Not Independent of Soon-Shiong

223.    Burnett is not independent of Soon-Shiong, as Vice Chancellor Bouchard held in the Chancery Court Action.  *See In re Nanthealth, Inc.*, 2020 WL 211065, at *7.

224.    At the time of NantHealth's amendment to its Registration Statement filed with the SEC on May 24, 2016, Burnett not an independent director.  The Company's public filings also reflect that in March 2017, Burnett was not designated as an independent director under Nasdaq listing rules.

225.    In November 2016, Burnett entered into an agreement with Soon-Shiong pursuant to which, Soon-Shiong appointed Burnett to the boards of NantHealth and NantBioScience, Inc. ("NantBioScience").  In the agreement, Soon-Shiong agreed to provide Burnett with options in NantHealth and NantBioScience to acquire common stock with a valuation of $10 million on the date of the grant.  The options vested in 25% intervals over four years beginning on the one-year

anniversary of the effective date of the grant of the options.  When this action was filed in April 2018, only one tranche of the options had vested.  Defendant Soon-Shiong has spoken about combining NantBioScience with certain of his other "Nant" companies and taking them public under the name, NantBio.  A vote in favor of suing Soon-Shiong would have risked defendant Burnett's remaining approximately $7.5 million worth of stock options, in addition to the value of the equity he would receive if NantBio goes public.

226.   Further, in February 2015, Soon-Shiong provided cancer treatment to Burnett's son free-of-charge.  *See In re Nanthealth, Inc.*, 2020 WL 211065, at *7.

227.   Finally, Burnett was the beneficiary of an unusual indemnification agreement with Soon-Shiong that was extended to no other director on the Board.  As explained in the 2018 Proxy Statement:

> An entity controlled by Dr. Patrick Soon-Shiong has agreed to indemnify Mr. Burnett for any losses or liabilities incurred by Mr. Burnett in connection with his service on our board of directors, but only to the extent such losses or liabilities are not covered by our directors' and officers' insurance policies or our indemnification agreement with Mr. Burnett and only to the extent a court of competent jurisdiction has determined pursuant to a final order not subject to further appeal or stay that Mr. Burnett has breached his duty of loyalty to our company by reason of his service as a board member on other entities controlled by Dr. Patrick Soon-Shiong. The indemnification obligation will not apply to fraud, illegal acts or intentional misconduct of Mr. Burnett to the extent determined by a final order of a court of competent jurisdiction not subject to further appeal or a stay. Mr. Burnett has an understanding with Dr. Patrick Soon-Shiong that Mr. Burnett will be appointed as a director of, and receive equity in, other entities controlled by Dr. Patrick Soon-Shiong as mutually determined between them. Mr. Burnett currently serves as a director of NantBioScience, Inc. As noted above, Mr. Burnett is not standing for reelection at the Annual Meeting.

228.   For the foregoing reasons, Burnett could not disinterestedly and independently consider a demand to sue Soon-Shiong in connection with his fiduciary breaches, and as a result, demand is futile as to Burnett.

*Louks was Not Independent of Soon-Shiong*

229.    Non-party Louks lacks independence from defendant Soon-Shiong. When Plaintiff Manuel filed his action the principal professional occupation of Louks was, as it is today, his employment with NantHealth as Chief Operating Officer.  The Company's 2018 Proxy Statement conceded that Louks was not an independent director under Nasdaq listing standards or the Company's own guidelines.  As Chief Operating Officer, because the Company has no nominating and governance committee and is controlled by Soon-Shiong, Louks effectively serves at the pleasure of Soon-Shiong.

230.    During 2017 and 2018, Louks received over $4 million in total compensation for his role as Chief Operating Officer, which sums were material to him.  Because Soon-Shiong is the controlling shareholder of NantHealth, the Company's Chief Executive Officer, and its Chairman, Louks effectively served at the pleasure of Soon-Shiong.  Louks' career prospects and opportunity for success in his role as Chief Operating Officer are contingent on his maintaining a collaborative working relationship with Soon-Shiong, which he could not do if he were to vote to sue Soon-Shiong for his wrongdoing.[11]

231.    Accordingly, NantHealth's Board conceded that Louks was not independent and his ability to continue in his lucrative executive role, were contingent on the goodwill of Soon-Shiong alone.  Indeed, as NantHealth's 2018 Proxy Statement concedes, because Soon-Shiong owns a majority of voting stock and the Company qualifies as controlled, the Board does not even maintain an ostensibly independent nominating and governance committee.  If Louks were to investigate and decide to sue Soon-Shiong who was his boss, he would risk his continued access to millions in compensation.

---

[11]    Further demonstrating that Louks was, in 2018 when Manuel filed this action, reliant on the goodwill of Soon-Shiong for his continued access to lucrative compensation, in 2019 Louks received $929,329 in total compensation from his position as Chief Operating Officer.

232.     As a result, demand as to Louks was futile.

**Demand is Excused as to Count II**

<u>Soon-Shiong was Not Disinterested</u>

233.     For the reasons set forth herein, and *supra* at ¶¶ 211-14, Soon-Shiong personally knew the details of Soon-Shiong/University Agreements.  He knew that the disclosures outlined above in the Company's Registration Statement, Forms-10-Q, press releases, and investor conferences calls misrepresented the nature of the arrangement.  Evaluating the same substantive allegations, Judge Hatter held they "raise a strong inference that Soon-Shiong intentionally, knowingly, or with deliberate recklessness, misrepresented, or omitted material facts, regarding the relationship between the University and NantHealth." *Deora*, 2018 WL 4743494, at *3.  Vice Chancellor Bouchard reached the same conclusion: these facts allege "that Soon-Shiong orchestrated a scheme for his personal benefit by secretly directing a contribution from the Nonprofits he controls to NantHealth through a respected educational institution in order to burnish the Company's image and artificially inflate the perceived demand for GPS Cancer." *In re Nanthealth, Inc.*, 2020 WL 211065, at *8.

234.     ████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████ As Chairman, CEO, and the Company's controlling shareholder, he controlled the information disclosed in the Company's proxy statements.  However, in furtherance of his scheme, he concealed that the agreement was a related

party transaction, and he concealed the details of it by failing to disclose it in both proxy statements.

235.     As a result, Soon-Shiong would be interested in a demand to take action against him for his issuance of misleading proxy statements and demand is futile as to him in connection with Count II.

*Sitrick, Burnett, and Louks were Not Independent of Soon-Shiong*

236.     Plaintiffs incorporate and reallege the allegations set forth *supra* at ¶¶ 215-31.  For these reasons, Sitrick, Burnett, and Louks were not independent of Soon-Shiong and could not disinterestedly and independently evaluate a claim to sue Soon-Shiong in connection with his misleading statements, and they were equally unable to disinterestedly consider a demand to take action against Soon-Shiong in connection with his issuance of misleading proxy statements.  As a result, demand is excused as to Sitrick, Burnett, and Louks, and therefore to a majority of the *Shen* Board or the *Manuel* Board in connection with Count II.

**Demand is Excused as to Count III**

*Soon-Shiong is Not Disinterested*

237.     Soon-Shiong personally issued the misleading statements and concealed the material information at issue in the Federal Securities Class Action.  He controls the Board and the Company, and he personally was able to, and did, decide not to cause the Company to seek contribution from him for amounts necessary to settle the securities class action.  For the reasons set forth *supra* at ¶¶ 211-14, 233-35 , he could not disinterestedly and independently consider a demand to seek contribution against himself.  As a result demand is excused as to Soon-Shiong.

*Sitrick, Burnett, and Louks were Not Independent of Soon-Shiong*

238.     Plaintiffs incorporate and reallege the allegations set forth *supra* at ¶¶ 215-31.  For these reasons, Sitrick, Burnett, and Louks were not independent of Soon-Shiong and for the same reasons that they could not disinterestedly and independently evaluate a claim to sue Soon-Shiong for his breaches of fiduciary duties, they could not disinterestedly and independently evaluate a claim to sue Soon-Shiong for contribution due to the harm to the Company in the Securities Class Action.  As a result, demand is excused as to Sitrick, Burnett, and Louks, and therefore to a majority of the *Shen* Board or the *Manuel* Board in connection with Count III.

### Calhoun is Not Independent of Soon-Shiong

239.     Calhoun is a current director of NantHealth.  Calhoun has a longstanding business relationship with Soon-Shiong that has compensated him handsomely and which Calhoun will not jeopardize by suing Soon-Shiong.  For example, Calhoun was a director of Old Abraxis at the time of the split in November 2007.  Calhoun became a director of New Abraxis. When Celgene acquired New Abraxis, Calhoun received $919,296.63 and 30,925 CVRs.  These amounts were material to Calhoun.  Soon-Shiong controls whether Calhoun will continue to serve on NantHealth's Board due to Soon-Shiong's status as NantHealth's largest shareholder, CEO, and Chairman.  Due to his longstanding business relationship with Soon-Shiong, Calhoun could not disinterestedly consider a demand to sue Soon-Shiong.

### Blaszyk is Not Independent of Soon-Shiong

240.     Blaszyk is a current director of NantHealth.  Blaszyk, like Calhoun, Sitrick, and Soon-Shiong, was a director of Old Abraxis at the time of the split in November 2007.  Blaszyk became a director of New APP.  When Fresenius acquired New APP, Blaszyk received $253,245.23 and 24,649 CVRs. Further, defendant Blaszyk became a director of Fresenius, with Soon-Shiong, after the acquisition until February 2011.

241.    Blaszyk is also a director of NantKwest, Inc. ("NantKwest"), another Soon-Shiong controlled entity.   NantKwest paid Blaszyk as a director $393,500 in compensation in 2016, $168,365 in 2017, $179,966 in 2018, and $185,598 in 2019.   Indeed, Blaszyk and Soon-Shiong were together named as defendants in a securities fraud class action arising from NantKwest's IPO.   *Sudunagunta v. NantKwest, Inc. et al*., C.A. No. 2:16-cv-01947 (C.D. Cal) (the "NantKwest Litigation").   On September 20, 2017, the Court denied defendants' motions to dismiss claims against Soon-Shiong and Blaszyk, among others.   NantKwest Litigation, ECF No. 121.   The NantKwest Litigation subsequently settled for $12 million.

242.    Blaszyk has a longstanding professional relationship with Soon-Shiong outside of NantHealth whereby Soon-Shiong is Blaszyk's patron, placing him on boards controlled by Soon-Shiong to Blaszyk's great financial benefit.   To take action against Soon-Shiong would cause Blaszyk to risk losing this lucrative arrangement, and, as a result he cannot disinterestedly and independently consider a demand to take action against Soon-Shiong.   Demand is futile as to Blaszyk.

## COUNT I

### Against Soon-Shiong for Breach of Fiduciary Duty

243.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

244.    Soon-Shiong owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of NantHealth's business and affairs, particularly with respect to issues as fundamental as public disclosures.

245.    Soon-Shiong's conduct set forth herein was due to his intentional or reckless breach of the fiduciary duties owed to the Company.  Soon-Shiong intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of NantHealth.

246.    In breach of his fiduciary duties owed to NantHealth, Soon-Shiong willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering him personally liable to the Company for breaching his fiduciary duties.

247.    In particular, Soon-Shiong knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misrepresent the nature of the related party agreement that he engineered between his charities and the University so as to misleadingly represent the demand for its core product, GPS Cancer.

248.    As a direct and proximate result of Soon-Shiong's breaches of his fiduciary obligations, NantHealth has sustained and continues to sustain significant damages, including direct monetary damages, liability in the securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, Soon-Shiong is liable to the Company.

## COUNT II

### Against Soon-Shiong for Violations of
### Section 14 of the Securities Exchange Act of 1934

249.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

250.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  The Company's proxy statement filed on April

24, 2017 violated §14(a) and Rule 14a-9 because it concealed the related party agreement with the University, and the nature of that agreement, in furtherance of the scheme to misrepresent NantHealth's results and demand for its core product detailed herein.  The Company's proxy statement filed on April 30, 2018 similarly violated §14(a) and Rule 14a-9 because it concealed the related party agreement with the University, and the nature of that agreement, in furtherance of the scheme to misrepresent NantHealth's results and demand for its core product detailed herein.

251.    Soon-Shiong did in fact know that the statements contained in the proxy statement were materially false and misleading.

252.    The misrepresentations and omissions in the proxy statement were material to Company shareholders evaluating the proxy statements.  The 2017 Proxy Statement solicited and obtained shareholder votes for director nominees and the 2018 Proxy Statement solicited and obtained shareholder votes for: (i) director nominees; (ii) approval of an amendment to the Company's 2016 Equity Incentive Plan; and (iii) ratification of the appointment of the Company's independent auditor.  The proxy statement was an essential link in the accomplishment of the Soon-Shiong's scheme to misrepresent the nature of the Soon-Shiong/University Agreements because had he not misrepresented the agreements in the Proxy Statements the truth would have been revealed.

253.    The misleading statements in the 2017 Proxy Statement and the 2018 Proxy Statement caused direct harm to NantHealth and to its shareholders.  Had the truth been revealed in the proxy statements, NantHealth's minority shareholders would have known that all of Soon-Shiong's misleading statements detailed herein were untrue, and they would have pursue state law remedies to halt the 2017 and 2018 shareholder votes and annual meetings, such as suing for an injunction.  Because the proxy statements misled them as to the Soon-Shiong/University

Agreements, they forewent their state law remedies and did not take action to halt the meetings, and Soon-Shiong's continued ability to control the Board and confer equity compensation on the directors he dominates at the expense of the Company went unchallenged.

254.    The Company was damaged as a result of the Soon-Shiong's material misrepresentations and omissions in the proxy statement.

### COUNT III

**Against Soon-Shiong for Contribution**
**for Violations of Sections 10(b) and 21D of the Exchange Act**

255.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

256.    Defendant Soon-Shiong was named as a defendant in the related securities class action.  His conduct, as alleged herein, exposed the Company to significant liability under various federal and state securities laws by his disloyal acts and ultimately resulted the payment of $16.5 million to settle claims arising from that wrongdoing.

257.    NantHealth was named as a defendant in related securities class actions that alleged and assert claims arising under § 10(b) of the Exchange Act.  The Company was alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. When NantHealth was forced to settle the claims for violating the federal securities laws, the Company's liability arose in whole or in part from the intentional and knowing acts or omissions of Soon-Shiong as alleged herein, who has caused the Company to suffer substantial harm through his disloyal acts. The Company is entitled to contribution and indemnification from Soon-Shiong in connection with all claims that have been, are, or may be asserted against the Company by virtue of his wrongdoing.

258.     As an officer, director and controlling shareholder, Soon-Shiong had the power or ability to, and did, control or influence, either directly or indirectly, NantHealth's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

259.     Soon-Shiong is liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

260.     Soon-Shiong has damaged the Company and is liable to the Company for contribution.

261.     No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against Soon-Shiong as follows:

(a)     Declaring that Plaintiffs may maintain this action on behalf of NantHealth, and that Plaintiffs are adequate representatives of the Company;

(b)     Declaring that Soon-Shiong has breached his fiduciary duties to NantHealth;

(c)     Determining and awarding to NantHealth the damages sustained by it as a result of the violations set forth above from Soon-Shiong, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing NantHealth and Soon-Shiong to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect NantHealth and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions

for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

        1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

        2.  a provision to permit the shareholders of NantHealth to nominate at least three candidates for election to the Board; and

        3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)     Awarding NantHealth restitution from Soon-Shiong, and each of them;

      (f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)     Granting such other and further relief as the Court may deem just and proper.

Dated: October 5, 2020              Respectfully submitted,

                                      **FARNAN LLP**

                                      /s/ Brian E. Farnan
                                      Brian E. Farnan (Bar No. 4089)
                                      Michael J. Farnan (Bar No. 5165)
                                      919 N. Market St., 12th Floor
                                      Wilmington, DE 19801
                                      Telephone: (302) 777-0300
                                      Facsimile: (302) 777-0301
                                      Email: bfarnan@farnanlaw.com
                                              mfarnan@farnanlaw.com

                                    *Liaison Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, NY 10019
Telephone: (212) 935-7400
Email: bsachsmichaels@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 210-9160
Email: rprongay@glancylaw.com

*Co-Lead Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204

*Additional Counsel for Plaintiffs*

## <u>NANTHEALTH, INC. VERIFICATION</u>

I, Louis Manuel, hereby verify that I am familiar with the allegations in the Verified Amended Stockholder Derivative Complaint (the "Amended Complaint"), and that I have authorized the filing of the Amended Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: __10/1/2020_____

DocuSigned by:

_Louis Manuel_____
40EBDE2B1A754F9

Louis Manuel

## VERIFICATION

I, Tony Shen am a plaintiff in the within action. I have reviewed the allegations made in this verified consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _9/23/2020_, 2020.

Tony Shen